_____

Honorable August B. Landis
United States Bankruptcy Judge

Entered on Docket
May 25, 2021

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

* * * * * *

|  |  |  |
|---|---|---|
| In re: | ) | Case No.: 19-12664-abl |
|  | ) |  |
| DIVINA AQUINO, | ) | Chapter 13 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) | Hearing Date: April 29, 2020 |
|  | ) | Hearing Time: 9:30 a.m. |
|  | ) |  |
|  | ) |  |

## MEMORANDUM AND ORDER DENYING TRUSTEE'S MOTION TO DISMISS AND DENYING CONFIRMATION OF AMENDED CHAPTER 13 PLAN #2

On April 29, 2020, two pending matters came before the Court for hearing. The first matter was confirmation of Chapter 13 Plan #2[1] filed by debtor Divina Aquino ("Ms. Aquino"). The second matter was a Motion to Dismiss[2] filed by Kathleen A. Leavitt, the standing chapter 13 trustee assigned to administer Ms. Aquino's case ("Trustee").

At the April 29, 2020 hearing, attorney Jennifer Isso, Esq. appeared telephonically for Ms. Aquino. Attorney Danielle N. Gueck-Townsend appeared telephonically for Trustee.

_____

[1]ECF No. 50.  In this Memorandum and Order, all references to "ECF No." are to the numbers assigned to the documents filed in the above-captioned bankruptcy case as they appear on the docket maintained by the Clerk of the Court.
[2]ECF No. 60.

## ISSUES

1.      Whether Trustee proved by a preponderance of the evidence that cause exists to dismiss Ms. Aquino's bankruptcy case under Section 1307(c).

2.      Whether Trustee proved by a preponderance of the evidence that Section 1325(b)(1)(B) bars confirmation of Plan #2 because that plan fails to provide that all projected disposable income to be received during the applicable commitment period will be applied to make payments to unsecured creditors; and if so, whether Ms. Aquino then proved by a preponderance of the evidence that Trustee's objection to confirmation of Plan #2 based upon Section 1325(b)(1)(B) lacks merit.

3.      Whether Ms. Aquino proved by a preponderance of the evidence that Plan #2 was filed in good faith as required by Section 1325(a)(3).

## FINDINGS OF FACT

**A.      Procedural History**

**1.      Ms. Aquino Files a Voluntary Chapter 7 Bankruptcy Petition, And the United States Trustee Moves to Dismiss Her Case As a Presumed Abuse of the Bankruptcy Code**

This case commenced on April 30, 2019, when Ms. Aquino filed a voluntary petition[3] under chapter 7 -- not chapter 13 -- of the Bankruptcy Code.[4]  Despite subsequent amendments to her chapter 7 schedules[5] and chapter 7 means test forms,[6] the United States Trustee ("UST") identified Ms. Aquino's case as an abuse of chapter 7 of the Code.  Resultantly, on August 1, 2019, the UST filed the written notice required by 11 U.S.C. § 704(b)(1)(A) in Ms. Aquino's case.[7]  The 10 Day Statement reads:

---

[3] ECF No. 1.

[4] 11 U.S.C. §§ 101 – 1532, inclusive.  Unless otherwise noted, in this Memorandum and Order, "Code" refers to the Bankruptcy Code, and "Section(s)" refers to the corresponding section(s) of the Code. References to "Rule(s)" are to the Federal Rules of Bankruptcy Procedure.

[5] ECF No. 14 and 20 (collectively "Amended Chapter 7 Schedules").

[6] ECF No. 21.

[7] ECF No. 22 ("10 Day Statement").

As required by 11 U.S.C. Section 704(b)(1)(A), the United States Trustee has reviewed the materials filed by the debtor(s).  Having considered these materials in reference to the criteria set forth in 11 U.S.C. Section 707(b)(2)(A), and, pursuant to 11 U.S.C. Section 704(b)(2), the United States Trustee has determined that:  (1) the debtor's(s') case should be presumed to be an abuse under section 707(b); and (2) the product of the debtor's current monthly income, multiplied by 12, is not less than the requirements specified in section 704(b)(2)(A) or (B).  As required by 11 U.S.C. Section 704(b)(2) the United States Trustee shall, not later than 30 days after the date of this Statement's filing, either file a motion to dismiss or convert under section 707(b) or file a statement setting forth the reasons the United States Trustee does not consider such a motion to be appropriate.  Debtor(s) may rebut the presumption of abuse only if special circumstances can be demonstrated as set forth in 11 U.S.C. Section 707(b)(2)(B).[8]

The UST then filed a Motion to Dismiss Case Pursuant to 11 U.S.C. §§ 707(b)(1), 707(b)(2), and 707(b)(3).[9]  The UST Dismissal Motion was supported by the sworn declaration of Paralegal Specialist Anabel Abad Santos.[10]  The UST Declaration contains a detailed summary of financial data the UST had obtained from Ms. Aquino, with various source documents attached.  The UST Dismissal Motion was set for hearing on September 11, 2019.[11]

## 2. Facing Dismissal of Her Chapter 7 Bankruptcy As An Abusive Filing, Ms. Aquino Converts Her Case to Chapter 13, And Trustee Is Appointed

On September 10, 2019, the day prior to the scheduled hearing on the UST Dismissal Motion, Ms. Aquino filed a Motion to Convert Case.[12]  The Conversion Motion sought to convert Ms. Aquino's case from chapter 7 to chapter 13 of the Bankruptcy Code, and was granted by order dated September 17, 2019.[13]  Trustee was appointed to administer Ms. Aquino's

---

[8] Id.
[9] ECF No. 25 ("UST Dismissal Motion").
[10] ECF No. 26 ("UST Declaration").
[11] ECF No. 27.
[12] ECF No. 30 ("Conversion Motion").
[13] ECF No. 31 ("Conversion Order").

case that same day.[14]

### 3. Ms. Aquino Files Amended Schedules And Various Proposed Plans; Trustee Opposes Confirmation And Seeks Dismissal

After her case was converted from chapter 7 to chapter 13, on October 20, 2019, counsel for Ms. Aquino filed amendments to her bankruptcy schedules and statement of financial affairs.[15]  On that same date, she filed a Chapter 13 Statement of Your Current Monthly Income and Calculation of Commitment Period,[16] a Chapter 13 Calculation of Your Disposable Income,[17] and her first proposed chapter 13 plan.[18]  The absence of Ms. Aquino's signatures on the Chapter 13 Schedules, Chapter 13 CMI Form, and Chapter 13 Disposable Income Form, as well as the use of an outdated CMI form, caused the Clerk of Court to issue Notice of Docketing Error forms related to those filings the following day, October 21, 2019.[19] In response to the NODEs, on October 27, 2019,  Ms. Aquino filed another set of schedules,[20] another Chapter 13 CMI Form,[21] and another Chapter 13 Disposable Income Form.[22]

Trustee's Opposition to Confirmation of Plan #1 Combined with Trustee's

---

[14]ECF No. 32.

[15]ECF No. 36 (collectively "Chapter 13 Schedules").  The Chapter 13 Schedules were unsigned when filed.  See ECF No. 36.  An Amendment Cover Sheet filed that same date, however, contains Ms. Aquino's declaration that the information in the Chapter 13 Schedules was true and correct to the best of her information and belief.  The Amendment Cover Sheet signed by Ms. Aquino is dated October 13, 2019, a week before the Chapter 13 Schedules were filed.  See ECF No. 40, p. 2 of 2.

[16]ECF No. 38 ("Chapter 13 CMI Form").  The Chapter 13 CMI Form was unsigned when filed on October 20, 2019.

[17]ECF No. 39 ("Chapter 13 Disposable Income Form").  The Chapter 13 Disposable Income Form was also unsigned when filed on October 20, 2019.

[18]ECF No. 37 ("Plan #1").

[19]ECF Nos. 41, 42, and 43 ("NODEs").

[20]ECF No. 46 ("Amended Chapter 13 Schedules").  The Amended Chapter 13 Schedules were still not signed by Ms. Aquino when filed.

[21]ECF No. 45 ("Amended Chapter 13 CMI Form").  The Amended Chapter 13 CMI Form bears Ms. Aquino's signature, dated two weeks earlier on October 12, 2019.  ECF No. 45, p. 3 of 3.

[22]ECF No. 44 ("Amended Chapter 13 Disposable Income Form").  The Amended Chapter 13 Disposable Income Form bears Ms. Aquino's signature dated two weeks earlier on October 12, 2019.  ECF No. 44, p. 8 of 8.

Recommendation for Dismissal was filed on November 1, 2019.[23]  In TSOP #1, Trustee cited a myriad of reasons for dismissal of Ms. Aquino's chapter 13 bankruptcy case under Section 1307(c).  A non-inclusive list of those reasons is as follows:

- Debtor(s) failed to commence Plan payments.  11 U.S.C. §§ 1326(a)(1), 1307(c)(4).

- Debtor(s) is/are delinquent in plan payments.  11 U.S.C. § 1307(c)(1).

- Debtor(s) failed to comply with notice/renotice requirements.  Failure to set a confirmation hearing according to 11 U.S.C. § 1324(b); Bankruptcy Rule 2002(a) and (b), and 11 U.S.C. § 1307(c)(1).

- Plan is not feasible as required by 11 U.S.C. § 1322 based on: Toyota Motor Credit Corporation.[24]

---

[23]ECF No. 48 ("TSOP #1").

[24]The reason for Trustee's concern regarding Ms. Aquino's debt to Toyota Motor Credit Corporation becomes apparent upon review of the bankruptcy schedules she filed with the Court at various points in time.  At Schedule D:  Creditors Who Have Claims Secured by Property, the Chapter 7 Schedules reflect a single $19,500.00 **secured** debt owed to "Toyota Financial," collateralized by a 2019 Toyota CHR valued at $15,500.00.  ECF No. 1, p. 21 of 55.  At Schedule A/B: Property, the Chapter 7 Schedules show the 2019 Toyota CHR as Ms. Aquino's only vehicle.  ECF No. 1, p. 14 of 55.  Curiously though, at Schedule E/F:  Creditors Who Have Unsecured Claims, the Chapter 7 Schedules show three supposedly **unsecured** debts owed to Toyota Motor Credit in the form of an auto loan and two leases.  ECF No. 1, pp. 30-31 of 55.  The purportedly unsecured auto loan obligation to Toyota Motor Credit was scheduled at $25,407.00, the first lease obligation to Toyota Motor Credit at $13,412.00, and the second lease obligation to Toyota Motor Credit at $0.00.  ECF No. 1, pp. 30-31 of 55.  But at Schedule G: Executory Contracts and Unexpired Leases, the Chapter 7 Schedules show no unexpired leases at all.  ECF No. 1, p. 33 of 55.  And the Chapter 7 Schedules do not identify any of the vehicles related to the three ostensibly unsecured debts to Toyota Motor Credit by make or model.

When Ms. Aquino filed the Chapter 13 Schedules and Amended Chapter 13 Schedules, she simply didn't include Schedule D – Creditors Who Have Claims Secured by Property.  The Chapter 13 Schedules and Amended Chapter 13 Schedules still show the 2019 Toyota CHR as her only automobile.  ECF No. 36, p. 1; ECF No. 46, p. 1. The Chapter 13 Schedules and Amended Chapter 13 Schedules still show that she owed **unsecured** debts to Toyota Motor Credit on a total of three accounts, an auto loan and two leases, in the same amounts reflected in the Chapter 7 Schedules, again without identifying the relevant vehicles by make or model.  ECF No. 36, p. 17 of 33, Items 4.2.5, 4.2.6, and 4.2.7; ECF No. 46, p. 17 of 25, Items 4.2.5, 4.2.6, and 4.2.7.  And while her Chapter 13 Schedules and Amended Chapter 13 Schedules were modified to show an unexpired residential real property lease with O'Harmony Homes, they do not reveal

5

- The Plan fails to provide for all of the Debtor(s)' disposable income pursuant to 11 U.S.C. § 1325(a)(3) and (b) based on: Trustee objects to $1,509.50 retirement contribution while paying 0% to general unsecured creditors.[25]

TSOP #1 was electronically served on Ms. Aquino's counsel, and mailed to both Ms. Aquino and her counsel, when it was filed on November 1, 2019.[26]  TSOP #1 was not supported by a declaration or any other admissible evidence.

Three days later, on November 4, 2019, counsel for Ms. Aquino filed a Summary of Your Assets and Liabilities and Certain Statistical Information.[27] Although Ms. Aquino's Chapter 13 Schedules and Amended Chapter 13 Schedules did not include Schedule D: Creditors Who Have Claims Secured by Property, the Statistical Summary listed secured debt in the amount of $19,500.00.[28]

On November 4, 2019, counsel for Ms. Aquino also filed modified Chapter 13 Plan #2.[29] Between November 4, 2019 and January 30, 2020, various unsuccessful attempts were made by Ms. Aquino's counsel to provide proper notice of a confirmation hearing on Plan #2.[30]

On January 30, 2020, Trustee filed a Motion to Dismiss Ms. Aquino's bankruptcy case.[31] In the Dismissal Motion, Trustee identified a variety of reasons why dismissal was warranted under Section 1307(c) including, without limitation, the following:

- Debtor(s) is/are delinquent in plan payments. 11 U.S.C. § 1307(c)(1).

---

any unexpired automobile leases involving Toyota Motor Credit.  ECF No. 36, p. 20 of 33; ECF No. 46, p. 20 of 25.

Finally, Plan #1 provides only for payment of the secured claim owed to Toyota Financial (not Toyota Motor Credit) related to the 2019 Toyota CHR.  According to Plan #1, that secured claim was in the principal amount of $15,500.00 with interest at 2% per annum, yielding a total debt estimated at $16,275.00.  ECF No. 37, pp. 2-3 of 6, Section 4.  In its treatment of executory contracts, Plan #1 did not identify any lease obligations owed to either Toyota Motor Credit or Toyota Financial.  ECF No. 37, p. 4 of 6, Section 6.

[25] See ECF No. 48, pp. 1-2 of 4.
[26] ECF No. 48, p. 4 of 4.
[27] ECF No. 49 ("Statistical Summary").
[28] Id., p. 1 of 3.
[29] ECF No. 50 ("Plan #2").
[30] ECF Nos. 51, 52, 53, 55, 56, 57, 58 and 59.
[31] ECF No. 60 ("Dismissal Motion").

- Debtor(s) failed to comply with notice/renotice requirements: Failure to set a confirmation hearing according to 11 U.S.C. § 1324(b), Bankruptcy Rule 2002(a) and (b), and 11 U.S.C. § 1307(c)(1).

- The Plan fails to provide for all of the Debtor(s)' Disposable Income pursuant to 11 U.S.C. § 1325(a)(3) and (b) based on: Debtor contributes $1,509.50 per month to her 401(k) while paying 0% to unsecured creditors. 11 U.S.C. § 1325(a)(3).

- Trustee objects to the voluntary retirement contribution as this expense is not permitted during the pendency of the bankruptcy case. <u>Parks v. Drummond</u>, 475 B.R. 703 (9th Cir. BAP 2012).[32]

The Dismissal Motion was electronically served on Ms. Aquino's counsel when it was filed on January 30, 2020.[33]  The Dismissal Motion was not supported by a declaration or any other admissible evidence.

     The hearing on the Dismissal Motion was originally set on the Court's chapter 13 duty judge calendar for March 12, 2020.[34]  Ms. Aquino's counsel was electronically served with notice of the March 12, 2020 hearing on the Dismissal Motion, and notice was also mailed to Ms. Aquino and her counsel on January 30, 2020.[35]

     On February 2, 2020, counsel for Ms. Aquino succeeded in scheduling and noticing a confirmation hearing on Plan #2.  The confirmation hearing on Plan #2 was set for March 12, 2020, the same date as the scheduled hearing on Trustee's Dismissal Motion.[36]  On February 10, 2020, Trustee filed an Opposition to Confirmation of Plan #2 Combined with Trustee's Recommendation for Dismissal.[37]  In TSOP #2, Trustee stated:

     Trustee objects to confirmation of the Chapter 13 Plan and recommends that this case be dismissed pursuant to 11 U.S.C. § 1307(c) for one or more of the

---

[32]<u>See</u> ECF No. 60, pp. 1-2 of 2.
[33]ECF No. 60.
[34]ECF No. 61.
[35]<u>Id.</u> at pp. 3-4 of 4.
[36]ECF No. 63 and 64.
[37]ECF No. 65 ("TSOP #2").

following reasons:

  • Debtor(s) are delinquent in plan payments. 11 U.S.C. § 1307(c)(1).

    . . . . .

The Plan fails to provide for all of the Debtor(s)' disposable income pursuant to 11

U.S.C. § 1325(a)(3) and (b) based on:

  • Debtor contributes $1,509[38] per month to her 401(k) while paying 0% to

    general unsecured creditors. 11 U.S.C. § 1325(a)(3). Trustee objects to the

    voluntary retirement contribution as this expense is not permitted during the

    pendency of the bankruptcy case.  Parks v. Drummond, 475 B.R. 703 (9th Cir.

    B.A.P. 2012).

TSOP #2 was electronically served on Ms. Aquino's counsel when it was filed on February 10,

2020.  It was also mailed to Ms. Aquino and her counsel on that date.[39]  TSOP #2 was not

supported by a declaration or any other admissible evidence.  Counsel for Ms. Aquino did not

file any papers responsive to TSOP #2 but did file an opposition to the Dismissal Motion on

February 27, 2020.[40]

### 4.    The April 29, 2020 Hearing On Trustee's Dismissal Motion And Confirmation of Plan #2

Trustee's Dismissal Motion and confirmation of Plan #2 came before the Court for

hearing as scheduled on March 12, 2020.  At the request of the parties, the Court continued both

matters from March 12, 2020 to March 25, 2020.[41]

While awaiting the continued hearing, counsel for the parties conferred and on March 23,

2020, executed a Stipulation to Continue Trustee's Motion to Dismiss and Debtor's

---

[38]The Amended Chapter 13 Schedules list the precise amount of Ms. Aquino's voluntary
monthly 401(k) retirement plan contributions as $1,509.50.  ECF No. 46, p. 23 of 25, line 5c.
Various papers on the Court's docket round off, up, or down when referring to the amount of Ms.
Aquino's voluntary monthly 401(k) retirement plan contributions.  For clarity, consistency, and
avoidance of doubt, the Court will use the $1,509.50 figure throughout this Memorandum and
Order when referring to Ms. Aquino's voluntary monthly 401(k) retirement plan contributions.
[39]Id. at p. 3 of 3.
[40]ECF No. 66.
[41]ECF Nos. 67-69.

Confirmation Hearing Set for March 25, 2020 at 9:30 a.m.[42]  The Court entered its order approving that stipulation the same day, rescheduling the hearing on both matters for April 29, 2020.[43]

At the April 29, 2020 hearing, counsel for Trustee and Ms. Aquino presented argument regarding the Dismissal Motion and confirmation of Plan #2.  Counsel for Trustee posited that Ms. Aquino's payment delinquency stood at $4,200.00.[44]  Trustee's counsel noted that while Ms. Aquino had consistently claimed a $500.00 monthly expense for childcare and child education, the only dependent identified in her schedules was her 22-year-old adult son.  Trustee's counsel also pointed out that Ms. Aquino's bankruptcy filings showed that she was making $1,509.50 voluntary monthly 401(k) retirement plan contributions, and argued that such contributions were impermissible under chapter 13 of the Code.  Counsel for Trustee observed that, absent the claimed $500.00 monthly expense for childcare and education and the $1,509.50 voluntary monthly 401(k) retirement plan contributions, Ms. Aquino could pay 100% of the creditor claims filed in her case.  For those reasons, Trustee's counsel asserted that sufficient cause existed to dismiss Ms. Aquino's chapter 13 case under Section 1307(c)(1), and that confirmation of Plan #2 should be denied under Section 1325.

Counsel for Ms. Aquino countered that Trustee's argument was the "first she was hearing" about Ms. Aquino having a payment delinquency.[45]  She contended that the scheduled $500.00 monthly expense for childcare and education was not involved in Ms. Aquino's disposable income calculation and was therefore "not material" to the issues before the Court. She asserted that Ms. Aquino's $1,509.50 voluntary monthly 401(k) retirement plan contributions were not part of the bankruptcy estate under Section 541(b)(7), and therefore should not be considered in calculating her disposable income under Section 1325(b).  In

---

[42]ECF No. 71.

[43]ECF No. 72.

[44]Since no plan has been confirmed in Ms. Aquino's case, the delinquency cited by Trustee apparently relates to the payments required under Section 1326(a)(1)(A).

[45]It is noteworthy that Trustee's TSOP #1, TSOP #2, and Dismissal Motion all specifically allege that "Debtor(s) is/are delinquent in plan payments."  ECF No. 48, p. 1 of 4; ECF No. 60, p. 1 of 2; ECF No. 65, p. 1 of 3.

summary, counsel for Ms. Aquino argued that there was simply no cause for dismissal under Section 1307(c)(1), that the calculations in Plan #2 were accurate, that Plan #2 had been proposed in good faith and was feasible, and that Plan #2 satisfied all applicable standards for confirmation under Section 1325.

Counsel for Trustee replied that the combination of Ms. Aquino's $4,200.00 payment delinquency, failure to substantiate the $500.00 monthly expense for child care and education for her 22-year-old adult son, and the proposed $1,509.50 voluntary monthly 401(k) retirement plan contributions when unsecured creditors would receive nothing,[46] was sufficient to establish cause for dismissal of the case under Section 1307(c)(1) and to deny confirmation of Plan #2 under Section 1325.  No exhibits or testimony were offered or admitted into evidence by counsel for Trustee, or by counsel for Ms. Aquino, at the April 29, 2020 hearing.

At the conclusion of the April 29, 2020 hearing, the Court closed the record and took the Dismissal Motion and confirmation of Plan #2 under submission.  The Court also expressly advised counsel that the pending issues, and in particular the propriety of Ms. Aquino's proposed $1,509.50 voluntary monthly 401(k) retirement plan contributions, warranted a written decision. The Court continued the hearing until May 27, 2020.[47]

### 5.    The May 27, 2020 Hearing, the June 3, 2020 Order Denying Confirmation of Plan #2, And the Court's Subsequent Order Vacating It

While the Dismissal Motion and confirmation of Plan #2 were under submission pending a written ruling as the Court had expressly stated at the conclusion of the April 29, 2020 hearing, this case came back before the Court as scheduled on May 27, 2020.  Since the only matters pending before the Court were already under submission and the related record was closed, the Court probably should not have conducted the May 27, 2020 hearing - - but it did.  After the May 27, 2020 hearing, counsel for Trustee submitted an order which denied confirmation of Plan

---

[46]Under Plan #1, general unsecured creditors were to receive nothing.  ECF No. 37, p. 4 of 6, Section 5.4.  Under Plan #2, though, general unsecured creditors were actually to receive payments totaling $9,878.67 over the five year plan term.  ECF No. 50, p. 4 of 6, Section 5.4.
[47]ECF No. 77.

#2 but did not provide for dismissal of Ms. Aquino's case.  The Court entered the order submitted by Trustee's counsel denying confirmation of Plan #2 on June 3, 2020.[48]

Two weeks later, on June 17, 2020, counsel for Ms. Aquino filed a Motion Under Rules 7052 and 9024.[49]  In the Motion to Reconsider, Ms. Aquino sought to have the Court "vacate the order entered on June 3, 2020, and replace it with an order prepared by the Court which clearly identifies the findings of fact and conclusions of law that form the basis for denying confirmation of the Debtor's Amended Chapter 13 Plan #2."[50]  As stated at the conclusion of the April 29, 2020 hearing, that was always the Court's intention.

Although counsel for Ms. Aquino filed the Motion to Reconsider on June 17, 2020, it was not noticed for hearing until September 3, 2020.[51]  Trustee filed an opposition to the Motion to Reconsider on September 16, 2020.[52]

Following a hearing on September 30, 2020, the Court granted the Motion to Reconsider, and by order dated October 1, 2020, vacated its June 3, 2020 order denying confirmation of Plan #2.[53]  As the Court stated it would at the conclusion of the April 29, 2020 hearing, as requested by Ms. Aquino, and having vacated its June 3, 2020 order denying confirmation of Plan #2, the Court now enters this Memorandum and Order to plainly state the findings of fact and conclusions of law which underpin the Court's decision as to the Dismissal Motion and confirmation of Plan #2.

**B.      Substantive Facts Regarding the Dismissal Motion And Confirmation of Plan #2**

    **1.      Facts Derived From the Chapter 7 Schedules And Chapter 7 Current Monthly Income Form**

        **a.      The Size of Ms. Aquino's Family**

The schedules and statement of financial affairs Ms. Aquino filed in support of her

---

[48]ECF No. 78.
[49]ECF No. 80 ("Motion to Reconsider").
[50]Id.
[51]ECF No. 82.
[52]ECF No. 84.
[53]ECF No. 86.

chapter 7 bankruptcy petition[54] show that she was married on the petition date,[55] and that her spouse was not seeking bankruptcy relief.[56]  The Chapter 7 Schedules also listed two dependents, a 22-year-old son, and a 20-year-old daughter, both of whom lived with her.[57]

### b.    Assets

The Chapter 7 Schedules, filed under oath months before the issues now pending before the Court had arisen, reflect the following assets[58]:

| | |
|---|---|
| Total real estate: | $        0.00 |
| Total vehicles: | $  15,500.00 |
| Total personal and household items: | $    2,600.00 |
| Total financial assets: | $  88,500.00 |
| **Total personal property:** | **$106,600.00** |

The $15,500.00 vehicle asset total shown in the Chapter 7 Schedules related to a 2019 Toyota CHR with 12,000 miles on it.  That is the only automobile Ms. Aquino claimed to own or lease in the Chapter 7 Schedules.[59]  The $88,500.00 in total financial assets listed in the Chapter 7 Schedules is comprised of a $1,500.00 balance in a Wells Fargo checking account,[60] a Fresenius 401(k) retirement account with an $84,000.00 balance,[61] and a $3,000.00 federal tax refund owed to Ms. Aquino.[62]

### c.    Liabilities

The sworn Chapter 7 Schedules reflect the following liabilities[63]:

---

[54]ECF No. 1 (collectively "Chapter 7 Schedules").
[55]ECF No. 1, p. 41 of 55, Part 1, Item 1.
[56]ECF No. 1, pp. 36-37 of 55.  More particularly, Schedule I:  Your Income reflects that Ms. Aquino's non-filing spouse had been a worker at the Venetian Hotel Casino for five years and was earning gross monthly wages of $4,150.00.  ECF No. 1, p. 36 of 55, Part 2, Items 2-4.
[57]ECF No. 1, p. 38 of 55, Part 1, Item 2.
[58]ECF No. 1, p. 12 of 55; ECF No. 1, pp. 14-18 of 55.
[59]ECF No. 1, p. 14 of 55, Part 2, Item 3.1; see also note 24, supra.
[60]ECF No. 1, p. 16 of 55, Part 4, Item 17.1.
[61]ECF No. 1, p. 16 of 55, Part 4, Item 21.
[62]ECF No. 1, p. 17 of 55, Part 4, Item 28.
[63]ECF No. 1, p. 32 of 55; ECF No. 1, pp. 22-32 of 55.

| | | |
|---|---|---|
| Secured claims: | $ 19,500.00[64] | |
| Domestic support obligations: | $ 2,964.00[65] | |
| Unsecured nonpriority claims: | $404,355.00[66] | |

The Chapter 7 Schedules list a single secured debt, owed to "Toyota Financial" in the amount of $19,500.00, repayment of which was secured by Ms. Aquino's 2019 Toyota CHR valued at $15,500.00, leaving an unsecured portion of $4,000.00.[67] The Chapter 7 Schedules show that a $2,964.00 priority unsecured claim, characterized as a domestic support obligation, had arisen in 2016 and was owed to the Internal Revenue Service.[68] A $310,000.00 debt owed to Specialized Loan Servicing due to a 2017 mortgage foreclosure, for which no proof of claim was timely filed, comprises over 76% of the $404,355.00 in total scheduled general unsecured claims listed in the Chapter 7 Schedules.[69] Net of that foreclosure deficiency sum, the unsecured debts listed in the Chapter 7 Schedules total $94,355.00.

### d.    Monthly Income

The Chapter 7 Schedules show that Ms. Aquino had been employed as a registered nurse at Fresenius Medical Care for 1 year and 3 months.[70] Her monthly gross wages, salary, and commissions (before all payroll deductions) were listed at $5,180.00.[71]

### e.    Retirement Plan Contributions

The Chapter 7 Schedules reflect ***mandatory*** monthly contributions to retirement plans of $612.90.[72] The Chapter 7 Schedules show ***voluntary*** monthly contributions to retirement plans of "$0.00."[73] So, whether properly characterized as mandatory or voluntary, the Chapter 7

---

[64]ECF No. 1, p. 21 of 55, Part 1, Item 2.1.

[65]ECF No. 1, p. 22 of 55, Part 1, Item 2.1; ECF No. 1, p. 32 of 55, Part 4, Item 6a.

[66]ECF No. 1, pp. 22-32 of 55, Part 2, Items 4.1 – 4.28; ECF No. 1, p. 32 of 55, Item 6j.

[67]ECF No. 1, p. 21 of 55, Part 1, Item 2.1.

[68]ECF No. 1, p. 22 of 55, Part 1, Item 2.1.

[69]ECF No. 1, p. 28 of 55, Part 2, Item 4.18.

[70]ECF No. 1, p. 36 of 55, Part 1.

[71]ECF No. 1, p. 36 of 55, Part 2, lines 2 and 4. The gross wages for her non-filing spouse were listed at $4,150.00. Id.

[72]ECF No. 1, p. 37 of 55, Item 5b. Mandatory contributions to retirement plans for her non-filing spouse were scheduled at $170.00.

[73]ECF No. 1, p. 37 of 55, Item 5c.

Schedules confirm that $612.90 was the total amount of monthly contributions being made to Ms. Aquino's 401(k) retirement plan via employer withholding when her bankruptcy petition was filed.

### f.    Monthly Expenses

The Chapter 7 Schedules list total monthly expenses (as distinguished from employer withholdings) of $6,170.00.[74]  Under the heading "Other payments you make to support others who do not live with you" the Chapter 7 schedules show a $550.00 expense for "Child's Education."[75]

### g.    Monthly Net Income

The Chapter 7 Schedules listed Ms. Aquino's monthly income as $3,742.93, the monthly income of her non-filing spouse as $3,179.00, and their combined monthly income as $6,921.93.[76]  In response to the question of whether she expected an increase or decrease in combined monthly income within the year after the Chapter 7 Schedules were filed, Ms. Aquino checked the box indicating "No."[77]

As noted previously, the Chapter 7 Schedules reflect monthly expenses totaling $6,170.00.[78]  Subtracting that sum from the $6,921.93 in combined monthly income earned by Ms. Aquino and her non-filing spouse yields a positive monthly net income figure of $751.93.[79] In response to the question of whether she expected an increase or decrease in monthly expenses within the year after the Chapter 7 Schedules were filed, Ms. Aquino checked the box indicating "No."[80]

### h.    Current Monthly Income, Household Size, And the Presumption of Abuse According to the Chapter 7 CMI Form

As originally filed, Ms. Aquino's Chapter 7 Statement of Your Current Monthly

---

[74]ECF No. 1, pp. 38-39 of 55, Schedule J:  Your Expenses.
[75]ECF No. 1, p. 39 of 55, Part 2, Item 19.
[76]ECF No. 1, p. 37 of 55, Part 2, Items 10 and 12.
[77]ECF No. 1, p. 37 of 55, Part 2, Item 13.
[78]ECF No. 1, p. 39 of 55, Part 2, Item 22c.
[79]ECF No. 1, p. 39 of 55, Part 2, Item 23c.
[80]ECF No. 1, p. 39 of 55, Part 2, Item 24.

14

Income[81] showed that she was living separately from her non-filing spouse.[82] The Chapter 7 CMI Form reflects gross wages, salary, tips, bonuses, overtime, and commissions received during the six month period prepetition totaling $6,810.00,[83] which annualizes to a total of $81,720.00.[84]

Despite having expressly acknowledged that she lived separately from her non-filing spouse,[85] and despite the fact that the Chapter 7 Schedules confirmed she had only two children,[86] the Chapter 7 CMI Form represented that there were **four** persons in her household, not three.[87]  Using the $84,997.00 median income level for a Nevada family of four, instead of three, the Chapter 7 CMI Form reflected that the presumption of abuse under Section 707(b)(2) did not arise.[88] Ms. Aquino signed the Chapter 7 CMI Form under penalty of perjury[89] and her counsel filed it with the Court on April 30, 2019.

### 2.    The June 7, 2019 Meeting of Creditors, And Facts Derived From the June 14, 2019 Amended Chapter 7 Schedules

Chapter 7 trustee Brian Shapiro commenced the meeting of creditors required by Section 341(a) as scheduled on June 7, 2019.[90]  Ms. Aquino appeared at the June 7, 2019 creditors' meeting, which was continued by trustee Shapiro to June 17, 2019 to allow Ms. Aquino to provide additional documents.[91]

On June 14, 2019, three days before the continued date for her creditors' meeting, Ms. Aquino filed amendments to some, but not all, of the Chapter 7 Schedules.  More particularly, Ms. Aquino filed amendments to Schedule A/B: Property and Schedule C:  The Property You

---

[81]ECF No. 4 ("Chapter 7 CMI Form").
[82]ECF No. 4, p. 1 of 3, Part 1, Item 1.
[83]ECF No. 4, pp.1-2 of 3, Part 1, Items 2 and 11; ECF No. 4, p. 3 of 3.
[84]ECF No. 4, p. 2 of 3, Part 2, Item 12b.
[85]ECF No. 4, p. 1 of 3, Part 1, Item 1.
[86]ECF No. 1, p. 38 of 55, Part 1, Item 2.
[87]ECF No. 4, p. 2 of 3, Part 2, Item 13.
[88]ECF No. 4, p. 2 of 3, Part 2, Item 14.
[89]ECF No. 4, p. 2 of 3, Part 3.
[90]ECF Nos. 7 and 12.
[91]ECF No. 12.

Claim as Exempt.[92]

The Amended Chapter 7 Schedules didn't modify Ms. Aquino's scheduled asset holdings in any way, as can be seen from the chart below[93]:

| Item | Chapter 7 Schedules - Schedule A/B Values | Amended Chapter 7 Schedules - Schedule A/B Values | Differential |
|---|---|---|---|
| Total Real Estate | $0 | $0 | $0 |
| Total Vehicles | $15,500.00 | $15,500.00 | $0 |
| Total Personal and Household Items | $2,600.00 | $2,600.00 | $0 |
| Total Financial Assets | $88,500.00 | $88,500.00 | $0 |
| Total Personal Property | $106,600.00 | $106,600.00 | $0 |

Ms. Aquino failed to appear at the continued meeting of creditors on June 17, 2019. As a result, the meeting of creditors was continued to July 15, 2019.[94]

### 3. The July 15, 2019 Meeting of Creditors, and Facts Derived From the July 24, 2019 Amendments to Ms. Aquino's Income And Expense Schedules And Chapter 7 CMI Form

Ms. Aquino failed to appear at the continued meeting of creditors on July 15, 2019. As a result, the meeting of creditors was continued again, this time to August 5, 2019, to allow Ms. Aquino to provide additional documents to Trustee.[95]

On July 24, 2019, Ms. Aquino filed amendments to the Chapter 7 Schedules, including amendments to Schedule I: Your Income[96] and Schedule J: Your Expenses.[97] She also filed an amended Chapter 7 CMI Form,[98] this time also completing an Official Form 122A-2 Chapter 7 Means Test Calculation form.[99]

---

[92]ECF No. 14 ("Amended Chapter 7 Schedules"). Ms. Aquino's exemption claims have not been contested.
[93]Comparing ECF No. 1, pp. 14-18 of 55 with ECF No. 14, pp. 1-5 of 7.
[94]ECF No. 15.
[95]ECF No. 18.
[96]ECF No. 20, pp. 1-2 of 4 ("Amended Chapter 7 Schedule I").
[97]ECF No. 20, pp. 3-4 of 4 ("Amended Chapter 7 Schedule J").
[98]ECF No. 21, pp. 1-2 of 12 ("Amended Chapter 7 CMI Form").
[99]ECF No. 21, pp. 3-12 of 12 ("Chapter 7 Means Test").

#### a.        Amended Chapter 7 Schedule I:  Monthly Income

The Chapter 7 Schedules and Amended Chapter 7 Schedule I both show that Ms. Aquino had been employed as a registered nurse at Fresenius Medical Care for 15 months[100] and had a non-filing spouse who was employed.[101]  Amended Chapter 7 Schedule I completely eliminated any reference to the income earned by Ms. Aquino's non-filing spouse, originally reported at a gross figure of $4,150.00 and at a net amount of $3,179.00.  Other substantive information contained in Amended Chapter 7 Schedule I differs significantly from Schedule I as filed within the Chapter 7 Schedules.

The table below[102] shows the marked differences between the monthly income information shown in the Chapter 7 Schedules and the monthly income information shown in Amended Chapter 7 Schedule I:

|  | Ms. Aquino - Original Chapter 7 Schedule I | Ms. Aquino - Amended Chapter 7 Schedule I | Non-Filing Spouse – Original Chapter 7 Schedule I | Non-Filing Spouse – Amended Chapter 7 Schedule I |
|---|---|---|---|---|
| Monthly gross wages, salary and commissions | $5,180.00 | $6,180.00 | $4,150.00 | $0.00 |
| Gross Income | $5,180.00 | $6,180.00 | $4,150.00 | $0.00 |
| Payroll Deductions: |  |  |  |  |
| Tax, Medicare, and Social Security | $688.17 | $688.17 | $623.00 | $0.00 |
| Mandatory contributions for retirement Plans | $612.90 | $612.90 | $170.00 | $0.00 |
| Voluntary contributions for retirement Plans | $0.00 | $0.00 | $178.00 | $0.00 |
| Insurance | $136.00 | $350.00 | $0.00 | $0.00 |
| Total payroll deductions | $1,437.07 | $1,651.07 | $971.00 | $0.00 |
| Total monthly take-home pay | $3,742.93 | $4,528.93 | $3,179.00 | $0.00 |
| Calculation of monthly income | $3,742.93 | $4,528.93 | $3,179.00 | $0.00 |

Although the Chapter 7 Schedules were filed just 85 days earlier, Amended Chapter 7 Schedule I shows a $1,000.00 increase in Ms. Aquino's gross monthly income; a $214.00 increase in the payroll deduction for insurance; and an overall increase in her monthly take-home pay of $786.00.  Those facts were obscured by the omission of monthly income information for

---

[100]If Ms. Aquino had been employed at Fresenius Medical Care for 15 months when her petition and original Schedule I were filed with the Court on April 30, 2019, she had actually been employed in that capacity for nearly 18 months when Amended Chapter 7 Schedule I was filed on July 24, 2019.

[101]Compare ECF No. 1, p. 36 of 55, Part 1 with ECF No. 20, p. 1 of 4, Part 1.

[102]Comparing ECF No. 1, pp. 36-37 of 55 with ECF No. 20, pp. 1-2 of 4.

17

Ms. Aquino's non-filing spouse from Amended Chapter 7 Schedule I, which reduced combined monthly income from $6,921.93 to $4,528.93.[103]

**b.**   **Amended Chapter 7 Schedule I:  Retirement Plan Contributions**

Amended Chapter 7 Schedule I did not alter the amount of Ms. Aquino's claimed monthly retirement plan contributions.  Compared with the Chapter 7 Schedules, Amended Chapter 7 Schedule I shows the same $612.90 mandatory monthly 401(k) retirement plan contribution, and reiterates that voluntary monthly retirement plan contributions were $0.00.[104] Stated another way, Amended Chapter 7 Schedule I confirms that Ms. Aquino was making total monthly retirement plan contributions of $612.90 both when the Chapter 7 Schedules were filed with her petition on April 30, 2019, and when Amended Chapter 7 Schedule I was filed 85 days later on July 24, 2019.[105]

Amended Chapter 7 Schedule I did, however, make a change to the amount of monthly retirement plan contributions made by Ms. Aquino's employed but non-filing spouse.  The Chapter 7 Schedules showed that her employed but non-filing spouse made $170.00 in mandatory retirement plan contributions and $178.00 in voluntary retirement plan contributions each month, for a total of $348.00.[106]  Amended Chapter 7 Schedule I showed that Ms. Aquino's employed but non-filing spouse made no retirement plan contributions at all.[107]

**c.**   **Amended Chapter 7 Schedule J:  Monthly Expenses**

The information contained in Amended Chapter 7 Schedule J also differed significantly from the information contained in Schedule J included within the Chapter 7 Schedules. Amended Chapter 7 Schedule J confirmed that Ms. Aquino had a son and daughter living in her

---

[103]Compare ECF No. 1, p. 37 of 55, Part 2, Item 12 with ECF No. 20, p. 2 of 4, Part 2, Item 12.

[104]Compare ECF No. 1, p. 37 of 55, Part 2, Items 5b and 5c with ECF No. 20, p. 2 of 4, Part 2, Items 5b and 5c.

[105]Id.

[106]ECF No. 1, p. 37 of 55, Part 2, Items 5b and 5c.

[107]ECF No. 20, p. 2 of 4, Part 2, Items 5b and 5c.

18

household, changing the daughter's age from 20 years old to 12 years old.[108]  The following table[109] shows the substantial differences between the monthly expense information shown in the Chapter 7 Schedules and the monthly expense information shown in Amended Chapter 7 Schedule J:

| Item | Chapter 7 Schedules - Schedule J | Amended Chapter 7 Schedule J | Differential |
|---|---|---|---|
| Rental or home ownership expense | $1,535.00 | $1,535.00 | $0 |
| Property, homeowner's or renter's insurance | $40.00 | $40.00 | $0 |
| Home maintenance, repair, and upkeep expenses | $50.00 | $50.00 | $0 |
| Utilities | | | |
|    Electricity, heat, natural gas | $370.00 | $270.00 | <-$100.00> |
|    Water, sewer, garbage collection | $175.00 | $175.00 | $0 |
|    Telephone, cell phone, internet, satellite, and cable services | $278.00 | $278.00 | $0 |
|    Other:    Gas | $50.00 | $0 | <-50.00> |
| Food and housekeeping supplies | $700.00 | $700.00 | $0 |
| Childcare and children's education costs | $500.00 | $0 | <-$500.00> |
| Clothing, laundry, and dry cleaning | $150.00 | $150.00 | $0 |
| Personal care products and services | $150.00 | $150.00 | $0 |
| Medical and dental expenses | $50.00 | $50.00 | $0 |
| Transportation, including gas, maintenance, bus or train fare. | $500.00 | $200.00 | <-$300.00> |
| Insurance | | | |
|    Life insurance | $35.00 | $35.00 | $0 |
|    Health insurance | $350.00 | $0 | <-$350.00> |
|    Vehicle insurance | $262.00 | $262.00 | $0 |
| Installment or lease payments | | | |
|    Car payments for Vehicle 1 | $425.00 | $425.00 | $0 |
| Other payments you make to support others who do not live with you. Specify:  Child's education | $550.00 | $550.00 | $0 |
| Calculate your monthly expenses | $6,170.00 | $4,870.00 | <-$1,300.00> |

To summarize, Amended Chapter 7 Schedule J filed on July 24, 2019, indicated Ms.

---

[108]Compare ECF No. 1, p. 38 of 55, Part 1, Item 2 with ECF No. 20, p. 3 of 4, Part 1, Item 2.

[109]Comparing ECF No. 1, pp. 38-39 of 55 with ECF No. 20, pp. 3-4 of 4.

Aquino had overstated her expenses by $1,300.00 when the Chapter 7 Schedules were filed 85 days earlier on April 30, 2019.  Amended Chapter 7 Schedule J also suggests that Ms. Aquino was no longer paying for health insurance.[110]

> d.    **Amended Chapter 7 Schedules I And J:  Monthly Net Income**

To summarize, by filing Amended Chapter 7 Schedule I and Amended Chapter 7 Schedule J, Ms. Aquino acknowledged that she was earning $1,000.00 per month more than reported in the Chapter 7 Schedules, omitted any reference to the monthly income earned by her employed but non-filing spouse, and revealed that she had overstated her monthly expenses by $1,300.00 when the Chapter 7 Schedules were filed with her petition.  Unsurprisingly, those changes had a significant impact on scheduled monthly net income.  That impact can be seen by reference to the table below[111]:

| Item | Chapter 7 Schedules – Schedules I and J | Amended Chapter 7 Schedules I and J | Differential |
|---|---|---|---|
| Combined monthly income | $6,921.93 | $4,528.93 | <-$2,393.00> |
| Monthly expenses | $6,170.00 | $4,870.00 | <-$1,300.00> |
| Monthly net income | $751.93 | <-$341.07> | <-$1,093.00> |

Taken as true,[112] Amended Chapter 7 Schedule I and Amended Chapter 7 Schedule J indicate that Ms. Aquino suffered a $1,093.00 decrease in monthly net income between the filing of the Chapter 7 Schedules on April 30, 2019, and the filing of Amended Chapter 7 Schedules I and J on July 24, 2019, just 85 days later.

> e.    **Current Monthly Income, Household Size, And the Presumption of Abuse According to the Amended Chapter 7 CMI Form**

---

[110]Compare ECF No. 1, p. 39 of 55, Part 2, Item 15b with ECF No. 20, p. 4 of 4, Part 2, Item 15b.

[111]Comparing ECF No. 1, p. 39 of 55, Part 2, Item 23 with ECF No. 20, p. 4 of 4, Part 2, Item 23.

[112]Amended Schedule I and Amended Schedule J were filed with the Court by Ms. Aquino's counsel without Ms. Aquino's signature.  See ECF No. 20.

On July 24, 2019, counsel for Ms. Aquino filed the Amended Chapter 7 CMI Form.[113] The information in the Amended Chapter 7 CMI Form is materially different from the Chapter 7 CMI Form filed contemporaneously with her bankruptcy petition on April 30, 2019. The differences are highlighted in the following table[114]:

| Item | Original Chapter 7 CMI Form | Amended Chapter 7 CMI Form | Change |
|---|---|---|---|
| Marital Status | Married; non-filing spouse; living separately | Married; non-filing spouse; living separately | None. |
| Gross wages, salary, tips, bonuses, overtime and commissions | $6,810.00 | $6,810.00 | None. |
| Total current monthly income | $6,810.00 | $6,810.00 | None. |
| Annualized current monthly income | $81,720.00 | $81,720.00 | None. |
| Household size | 4 | 3 | 1 fewer household member |
| Nevada median family income level | $84,997.00 | $69,239.00 | Decrease of $15,758.00 |
| Presumption of abuse | There is no presumption of abuse. | There is a presumption of abuse as determined by Form 122A | Reversal to report that the case is presumptively abusive |

In the original Chapter 7 CMI Form, Ms. Aquino: (a) claimed a four-person household size instead of her true three-person household size; (b) from there, claimed that her $81,720.00 annualized income was below Nevada's four-person median family income level of $84,997.00; and therefore (c) did not complete Official Form 122A-2, the full chapter 7 means test calculation.[115]

In the Amended Chapter 7 CMI Form, Ms. Aquino: (a) correctly claimed a three-person household size;[116] (b) from there, correctly disclosed that her $81,720.00 annualized income level exceeded Nevada's three-person median family income level of $69,239.00 by

---

[113]ECF No. 21, pp. 1-2 of 12.
[114]Comparing ECF No. 4 with ECF No. 21, pp. 1-2 of 12.
[115]See generally ECF No. 4.
[116]ECF No. 21, p. 2 of 12, Part 2, Item 13.

21

$12,481.00;[117] (c) was required to, and did, complete the full chapter 7 means test calculation on Official Form 122A-2;[118] and (d) upon completion of the Chapter 7 Means Test Form, acknowledged under oath that "[t]here is a presumption of abuse" in connection with her chapter 7 bankruptcy filing.[119]

It is also noteworthy at Part 2, Question 17, the Chapter 7 Means Test Form asks for the following information related to mandatory retirement plan contributions:

> **17.**    **Involuntary deductions:**  The total monthly payroll deductions that your job requires, such as retirement contributions, union dues, and uniform costs.
>
> Do not include amounts that are not required by your job, such as voluntary 401(k) contributions or payroll savings.

The amount of involuntary deductions claimed by Ms. Aquino in response to that question was "$0.00," an answer demonstrably at odds with the $612.90 in mandatory contributions for retirement plans reflected on Amended Chapter 7 Schedule I.[120]  That is the case even though Amended Chapter 7 Schedule I and the Amended Chapter 7 CMI Form were filed with the Court *on the same day*, July 24, 2019.[121]

### 4.    The August 5, 2019 Conclusion of the Meeting of Creditors, And Facts Derived From the UST Dismissal Motion And Supporting Documents

Unsurprisingly, after the Amended Chapter 7 CMI Form and the Chapter 7 Means Test were filed on July 24, 2019, confirming that Ms. Aquino's chapter 7 filing constituted a presumptive abuse of the Bankruptcy Code,[122] the UST took responsive action.  On August 1, 2019, the UST filed the 10 Day Statement disclosing the UST's intent to either file a motion to dismiss or convert Ms. Aquino's case, or file a further statement as to why such a motion would

---

[117]ECF No. 21, p. 2 of 12, Part 2, Items 12 – 14, inclusive.
[118]ECF No. 21, pp. 3-12 of 12 ("Chapter 7 Means Test Form").
[119]ECF No. 21 p. 10 of 12, Part 3, Items 39 and 40, <u>and</u> ECF No. 21, p. 3 of 12.
[120]<u>Compare</u> ECF No. 21, p. 7 of 12, Part 2, Item 17 <u>with</u> ECF 20, p. 2 of 4, Part 2, Item 5b.
[121]<u>Compare</u> ECF No. 20 p. 1 of 4 <u>with</u> ECF No. 21, p. 1 of 12.
[122]ECF No. 21 p. 10 of 12, Part 3, Items 39 and 40, <u>and</u> ECF No. 21, p. 3 of 12.

not be appropriate.[123]  Following the conclusion of the creditors' meeting on August 5, 2019, Trustee Shapiro filed a report of no distribution indicating he had determined there were no non-exempt assets available for liquidation and distribution to the creditors.[124]

The UST Dismissal Motion was filed on August 6, 2019.[125]  The supporting UST Declaration prepared by Paralegal Specialist Anabel Abad Santos[126] identified and addressed a series of recommended corrections to the Amended Chapter 7 CMI Form,[127] to various expense deductions itemized in the Chapter 7 Means Test,[128] to the retirement contribution and monthly net income amounts reported in Amended Chapter 7 Schedule I,[129] and to the expense information reported in Amended Chapter 7 Schedule J.[130]

### a.    UST Corrections:  Amended Chapter 7 CMI Form

The UST Declaration indicated that the financial information in the Amended Chapter 7 CMI Form was inaccurate and required correction.[131]  The impact of the proposed corrections to the Amended Chapter 7 CMI Form detailed in the UST Declaration is summarized in the following table[132]:

| Item | Amended Chapter 7 CMI Form Data | UST Corrected Chapter 7 CMI Form Data | Differential |
|---|---|---|---|
| **Income** | | | |
| Current Monthly Income | $6,810.00 | $8,836.41 | Understated:  $2,026.41 |
| Annualized Current Monthly Income | $81,720.00 | $106,036.92 | Understated:  $24,316.92 |

The UST Declaration shows that, after the recommended corrections were made, Ms. Aquino's current monthly income was $8,836.41, a $2,026.41 increase over the $6,810.00

---

[123]ECF No. 22.
[124]ECF No. 24.
[125]ECF No. 25.
[126]ECF No. 26.
[127]ECF No. 26, p. 2 of 32, para. 4.
[128]ECF No. 26, pp. 2-3 of 32, para. 5-6.
[129]ECF No. 26, p. 3 of 32, para. 7-8.
[130]ECF No. 26, pp. 3-4 of 32, para. 9-11.
[131]ECF No. 26, p. 2 of 32, para. 4; ECF No. 26, p. 20 of 32.
[132]Comparing ECF No. 21, pp. 1-2 of 2 with ECF No. 26, p. 20 of 32.

current monthly income figure reported in the Amended Chapter 7 CMI Form.[133]

**b.    UST Corrections: Chapter 7 Means Test Expense Deductions**

The UST Declaration also recommended corrections to various expense deductions listed in the Chapter 7 Means Test.[134]  The UST's recommended changes actually inured to Ms. Aquino's benefit, because she had failed to take full advantage of available expense deductions in completing the Chapter 7 Means Test.  The UST's recommended changes to the expense figures listed in the Chapter 7 Means Test Form are summarized in the chart below[135]:

| Item | Chapter 7 Means Test Form Data | UST Corrected Chapter 7 Means Test Form Data | Differential |
|---|---|---|---|
| **Expenses** | | | |
| Line 13 - Vehicle Ownership or Lease Expense | $171.17 | $172.00 | Understated: $0.83 |
| Line 16 – Taxes | $683.00 | $1,617.56 | Understated: $934.56 |
| Line 18 – Life Insurance | $0.00 | $33.15 | Understated: $33.15 |
| Line 25 – Health and Disability Insurance | $0.00 | $225.87 | Understated: $225.87 |
| Line 36 – Chapter 13 Administrative Expenses | $0.00 | $252.48 | Understated: $252.48 |

The UST Declaration further shows that after all recommended corrections were made, Ms. Aquino's allowable expense deductions totaled $6,567.06.[136] That is an increase of $1,446.06 over the $5,121.00 in expense deductions claimed in the Chapter 7 Means Test.[137] The UST Declaration also revealed when Ms. Aquino's corrected current monthly income of $8,836.41 was reduced by her corrected allowable expense deductions of $6,567.06, her corrected disposable monthly income was $2,269.35, yielding a $136,161.00 dividend to creditors over the course of a 60-month chapter 13 plan, and triggering the presumption of abuse in Ms. Aquino's case.[138]

---

[133]ECF No. 26, p. 20 of 32, Line 11.
[134]ECF No. 26, pp. 2-3 of 32, para. 5 and 6.
[135]Comparing ECF No. 26, p. 21 of 32 with ECF No. 21, pp. 3-11 of 12.
[136]ECF No. 26, p. 21 of 32, Line 38.
[137]ECF No. 26, p. 21 of 32, Line 38; see ECF No. 21, p. 10 of 12, Line 38.
[138]ECF No. 26, p. 21 of 32, Lines 38-40.

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

        **c.**        **UST Corrections:  Retirement Contribution And Monthly Net Income Amounts In Amended Chapter 7 Schedule I**

The UST Declaration noted that Amended Chapter 7 Schedule I showed monthly net income of $4,528.93.[139]  The UST Declaration then explained in detail how financial documents provided to the UST by Ms. Aquino revealed that her monthly net income was properly calculated at $6,215.00.[140]

Of particular relevance here, in calculating the corrected $6,215.00 monthly net income figure, the UST Declaration specifically identified two necessary adjustments to the retirement plan contribution amounts listed in Amended Chapter 7 Schedule I.  First, the UST disallowed the $612.90 monthly ***mandatory*** retirement plan contribution reflected in Amended Chapter 7 Schedule I, reducing that amount to $0.00.[141]  Second, the UST increased the ***voluntary*** retirement plan contribution from the $0.00 figure shown on Amended Chapter 7 Schedule I to $511.00, representing 6 percent of Ms. Aquino's monthly gross income.[142]  The UST Declaration explained that those corrections were necessary because Ms. Aquino had "improperly listed her voluntary retirement contributions as mandatory retirement contributions" in Amended [Chapter 7] Schedule I.[143]

        **d.**        **UST Corrections: Monthly Expense Information In Amended Chapter 7 Schedule J**

The UST Declaration noted while Ms. Aquino had listed monthly expenses of $4,870.00 in Amended Chapter 7 Schedule J, that sum included a $550.00 monthly college tuition payment for her 22-year-old son.  Elimination of that claimed monthly expense resulted in corrected total monthly expenses of $4,320.00.[144]

---

[139]ECF No. 26, p. 3 of 32, para. 7; see ECF No. 20, p. 2 of 4.

[140]ECF No. 26, p. 3 of 32, para. 7 and 8; ECF No. 26, p. 28 of 32, line 12.

[141]ECF No. 26, p. 3 of 32, para. 8; ECF No. 26, p. 28 of 32, Item 5b; see ECF No. 20, p. 2 of 4, Item 5b.

[142]ECF No. 26, p. 3 of 32, para. 8; ECF No. 26, p. 28 of 32, Item 5c; see ECF No. 20, p. 2 of 4, Item 5c.

[143]ECF No. 26, p. 3 of 32, para. 8, note 1; see ECF 20, p. 2 of 4, Item 5b.

[144]ECF No. 26, p. 3-4 of 32, para. 9-11; ECF No. 26, p. 29 of 32, Lines 19 and 22.

### e.    UST Corrections:  Monthly Net Income

The UST Declaration ultimately revealed that reducing Ms. Aquino's corrected monthly income of $6,215.00 by the corrected monthly expense total of $4,320.00 resulted in corrected monthly net income of $1,895.00.[145]  The UST Declaration further reflected that over a 60-month chapter 13 plan period, Ms. Aquino's corrected $1,895.00 net monthly income figure would result in a dividend to creditors totaling $113,700.00.[146]

### 5.    Conversion to Chapter 13 On the Eve of the UST Dismissal Motion Hearing

The UST Dismissal Motion was set for hearing on September 11, 2019 at 9:30 a.m.[147] Counsel for Ms. Aquino did not file an opposition to the UST Dismissal Motion.  Instead, at 8:53 p.m. on September 10, 2019, after regular business hours, and just over 12 hours before the scheduled hearing on the UST Dismissal Motion, Ms. Aquino's attorney filed the *ex parte* Conversion Motion.[148]

The next morning, September 11, 2019, counsel for Ms. Aquino failed to appear at the scheduled hearing on the unopposed UST Dismissal Motion.  Counsel for the UST did appear. Counsel for the UST advised the Court that the Conversion Motion had been filed, expressed no opposition to it, and after the hearing dutifully prepared and submitted an order converting this case to chapter 13.  The Conversion Order was docketed on September 17, 2019,[149] Trustee was assigned to administer the case,[150] and a meeting of creditors was set for October 29, 2019.[151]

### 6.    Facts Derived From the Chapter 13 Schedules, the Chapter 13 CMI Form, the Chapter 13 Disposable Income Form, And Plan #1

On October 20, 2019, just over a week before the date set for Ms. Aquino's initial chapter 13 meeting of creditors, her attorney filed the Chapter 13 Schedules.[152]  In addition, counsel filed

---

[145]ECF No. 26, pp. 3-4 of 32, para. 11; ECF No. 26, p. 29 of 32, Lines 22-23.
[146]Id.
[147]ECF No. 27.
[148]ECF No. 30.
[149]ECF No. 31.
[150]ECF No. 32.
[151]Id.
[152]ECF No. 36.

the Chapter 13 CMI Form,[153] the Chapter 13 Disposable Income Form,[154] and Plan #1.[155]

### a.    Chapter 13 Schedules:  Assets

The Chapter 13 Schedules changed the asset holdings reflected in the Chapter 7 Schedules and Amended Chapter 7 Schedules by a total of $70 as can be seen from the chart below[156]:

| Item | Chapter 7 Schedules - Schedule A/B Values | Amended Ch. 7 Schedule A/B Values | Chapter 13 Schedules - Schedule A/B Values | Differential |
|---|---|---|---|---|
| Total Real Estate | $0 | $0 | $0 | $0 |
| Total Vehicles | $15,500.00 | $15,500.00 | $15,500.00 | $0 |
| Total Personal and Household Items | $2,600.00 | $2,600.00 | $2,600.00 | $0 |
| Total Financial Assets | $88,500.00 | $88,500.00 | $88,570.00 | $0 |
| Total Personal Property | $106,600.00 | $106,600.00 | $106,670.00 | $70.00 |

The reason for the $70.00 differential appears to be twofold.  First, Ms. Aquino listed a $3,000.00 federal tax refund due as a financial asset when the Chapter 7 Schedules and the Amended Chapter 7 Schedules were filed.[157]  That federal tax refund was no longer listed as a financial asset in the Chapter 13 Schedules.[158]  Second, Ms. Aquino did not list a security deposit as a financial asset in the Chapter 7 Schedules or the Amended Chapter 7 Schedules.[159] However, a $3,070.00 security deposit in favor of O'Harmony Realty was listed as a financial asset in the Chapter 13 Schedules.[160] The apparent use of the $3,000.00 federal tax refund to

---

[153]ECF No. 38.

[154]ECF No. 39.

[155]ECF No. 37.

[156]Comparing ECF No. 1, pp. 14-18 of 55 with ECF No. 14, pp. 1-5 of 7, and ECF No. 36, pp. 1-5 of 33.

[157]ECF No. 1, p. 17 of 55, Schedule A/B:  Property, Part 4, Item 28; ECF No. 14, p. 4 of 7, Schedule A/B, Part 4, Item 28.

[158]ECF No. 36, p. 4 of 33, Part 4, Item 28.

[159]ECF No. 1, p. 16 of 55, Schedule A/B:  Property, Part 4, Item 22; ECF No. 14, p. 3 of 7, Schedule A/B, Part 4, Item 22.

[160]ECF No. 36, Schedule A/B:  Property, p. 3 of 33, Part 4, Item 22.

fund the bulk of that $3,070.00 security deposit is borne out by a Notice of Change of Address of Debtor filed on October 20, 2019.[161]

### b.    Chapter 13 Schedules:  Liabilities

The Chapter 7 Schedules include Schedule D:  Creditors Who Have Claims Secured by Property, describing the $19,500.00 debt to Toyota Financial secured by Ms. Aquino's 2019 Toyota CHR.  The Chapter 13 schedules do not.[162]

The unsecured debts listed in the Chapter 13 Schedules are exactly the same as the unsecured debts listed in the Chapter 7 Schedules.  A comparison is set forth in the following summary table[163]:

| Item | Chapter 7 Schedules - Schedule E/F Debts | Chapter 13 Schedules - Schedule E/F Debts | Differential |
|---|---|---|---|
| Domestic Support Obligation | $2,964.00 | $2,964.00 | $0 |
| Non-Priority Unsecured Claims | $404,355.00 | $404,355.00 | $0 |
| **Total Scheduled Debt** | $407,319.00 | $407,319.00 | $0 |

### c.    Chapter 13 Schedules:  Monthly Income

When the monthly income information reflected in Amended Chapter 7 Schedule I is compared to the monthly income information shown in the Chapter 13 Schedules filed just 88 days later, the contrast is remarkable.  A comparison is set forth in the following table[164]:

| | Ms. Aquino - Amended Chapter 7 Schedule I | Ms. Aquino- Chapter 13 Schedules – Schedule I | Non-Filing Spouse – Amended Chapter 7 Schedule I | Non-Filing Spouse – Chapter 3 Schedules – Schedule I |
|---|---|---|---|---|
| Monthly gross wages, salary and commissions | $6,180.00 | $7,134.42 | $0.00 | N/A |
| Estimated monthly overtime pay | $0.00 | $1,705.71 | $0.00 | N/A |
| Gross Monthly Income | $6,180.00 | $8,840.13 | $0.00 | N/A |
| Payroll Deductions: | | | | |
| Tax, Medicare, and Social Security | $688.17 | $1,691.78 | $0.00 | N/A |
| Mandatory contributions for retirement Plans | $612.90 | $0.00 | $0.00 | N/A |
| Voluntary contributions for retirement | | | | |

---

[161]ECF No. 34.

[162]See note 24, supra.

[163]Comparing ECF No. 1, pp. 22-32 of 55 with ECF No. 36, pp. 8-19 of 33.

[164]Comparing ECF No. 20, pp. 1-2 of 4 with ECF No. 36, pp. 22-23 of 33.

| Plans | $0.00 | $1,509.50 | $0.00 | N/A |
|---|---|---|---|---|
| Insurance | $350.00 | $259.17 | $0.00 | N/A |
| Total payroll deductions | $1,651.07 | $3,460.45 | $0.00 | N/A |
| Total monthly take-home pay | $4,528.93 | $5,379.68 | $0.00 | N/A |
| Calculation of monthly income | $4,528.93 | $5,379.68 | $0.00 | N/A |

The following differences between the monthly income information listed in Amended Chapter 7 Schedule I and the monthly income information shown in the Chapter 13 Schedules are particularly noteworthy:

- A $954.42 (15.44%) increase in Ms. Aquino's reported monthly gross wages, salary, and commissions;

- Disclosure of $1,705.71 in estimated monthly overtime earnings, none of which had ever been disclosed by Ms. Aquino in her prior bankruptcy schedules filed with the Court.[165]  Her chapter 7 case having been identified as abusive and converted to chapter 13 where creditors would be repaid from her future earnings, Ms. Aquino made it clear that she "***will no longer accept overtime assignments as readily as she has in the past.***"[166]  With a level of irony not wasted on this Court, that comment also made it plain that Ms. Aquino had readily accepted overtime assignments in the past, but completely failed to disclose the resultant income in her previously filed bankruptcy schedules.

- A $2,660.13 (43%) increase in reported total gross monthly income;

- A $90.83 (25.95%) decrease in reported monthly insurance deductions; and

- A $850.75 (18.78%) increase in reported monthly take home pay.

### d.    Chapter 13 Schedules:  Retirement Plan Contributions

The monthly retirement plan contributions listed in the Chapter 13 Schedules were also vastly different from those reflected in Amended Chapter 7 Schedule I.  Those differences are summarized below:[167]

---

[165]See ECF No. 1, p. 36 of 55, Part 2, Item 3 (estimated overtime pay scheduled at $0.00); ECF No. 20, p. 1 of 4, Part 2, Item 3 (same); ECF 36, p. 22 of 33, Part 2, Item 3 (estimated overtime pay scheduled at $1,705.71).

[166]ECF No. 36, p. 23 of 33, Part 2, Item 13 (emphasis added).

[167]Comparing ECF No. 20, p. 2 of 4, Part 2, Items 5b and 5c with ECF No. 36, p. 23 of 33, Part 2, Items 5b and 5c.

- A $612.90 (**100%**) *reduction* in reported *mandatory* monthly contributions to retirement plans;

- A $1,509.50 (**100%**) *increase* in reported *voluntary* monthly contributions to retirement plans;

- A net $896.60 (**146%**) *increase in total reported monthly retirement plan contributions*.

Simply stated, prior to the filing of the Chapter 13 Schedules, Ms. Aquino had never disclosed that her monthly retirement plan contributions were actually voluntary, not mandatory. It was also the first time that she claimed to be making total monthly retirement plan contributions that exceeded $612.90.  That information was disclosed only after the UST Dismissal Motion had been filed, and only after Ms. Aquino had voluntarily converted her case to chapter 13 to avoid dismissal as an abusive filing, meaning that she would have to make payments to her creditors over time.

### e.    Chapter 13 Schedules:  Monthly Expenses

The monthly expense information in the Chapter 13 Schedules diverged significantly from the monthly expense information shown in Amended Chapter 7 Schedule J, too, including the omission of Ms. Aquino's 12-year-old daughter as a claimed dependent.[168]  The differences be seen by reference to the table below:[169]

| Item | Amended Chapter 7 Schedule J Expenses | Chapter 13 Schedules – Schedule J Expenses | Differential |
|---|---|---|---|
| Rental or home ownership expense | $1,535.00 | $1,535.00 | $0 |
| Property, homeowner's or renter's insurance | $40.00 | $40.00 | $0 |
| Home maintenance, repair, and upkeep expenses | $50.00 | $50.00 | $0 |
| Utilities | | | |
|    Electricity, heat, natural gas | $270.00 | $175.00 | <-$95.00> |

[168]Compare ECF No. 36, p. 24 of 33, Part 1, Item 2 with ECF No. 20, p. 3 of 4, Part 1, Item 2.

[169]Comparing ECF No. 36, pp. 24-25 of 33 with ECF No. 20, pp. 3-4 of 4.

| | | | |
|---|---|---|---|
| Water, sewer, garbage collection | $175.00 | $0.00 | <-$175.00> |
| Telephone, cell phone, internet, satellite, and cable services | $278.00 | $375.00 | $97.00 |
| Food and housekeeping supplies | $700.00 | $700.00 | $0 |
| Childcare and children's education costs | $0 | $500.00 | $500.00 |
| Clothing, laundry, and dry cleaning | $150.00 | $150.00 | $0 |
| Personal care products and services | $150.00 | $150.00 | $0 |
| Medical and dental expenses | $50.00 | $250.00 | $200.00 |
| Transportation, including gas, maintenance, bus or train fare. | $200.00 | $300.00 | $100.00 |
| Charitable Contributions and religious donations | $0.00 | $200.00 | $200.00 |
| Insurance | | | |
| Life insurance | $35.00 | $0.00 | <-$35.00> |
| Health insurance | $0 | $0 | $0 |
| Vehicle insurance | $262.00 | $460.00 | $198.00 |
| Installment or lease payments | | | |
| Car payments for Vehicle 1 | $425.00 | $380.00 | <-$40.00> |
| Other payments you make to support others who do not live with you. Specify: Child's education | $550.00 | $0.00 | <-$550.00> |
| Calculate your monthly expenses | $4,870.00 | $5,265.00 | $395.00 |

To summarize, the Chapter 13 Schedules filed on October 20, 2019, showed $395.00 more in monthly expenses than those shown in Amended Chapter 7 Schedule J. The Chapter 13 Schedules were filed just 88 days after Amended Chapter 7 Schedule J.

### f.    Chapter 13 Schedules: Monthly Net Income

The monthly net income reported in the Chapter 13 Schedules deviated significantly from the monthly net income figure disclosed in Amended Chapter 7 Schedule I and Amended Chapter 7 Schedule J. The differential is summarized in the table below:[170]

| Item | Amended Chapter 7 Schedules I and J | Chapter 13 Schedules – Schedules I and J | Differential |
|---|---|---|---|
| Combined monthly income | $4,528.93 | $5,379.68 | $850.75 |
| Monthly expenses | $4,870.00 | $5,265.00 | $395.00 |
| Monthly net income | <-$341.07> | $114.68 | $455.75 |

---

[170]Comparing ECF No. 20 with ECF No. 36, pp. 22-25 of 33.

g.      **The Chapter 13 CMI Form:  Household Size, Applicable Commitment Period, Claimed Retirement Plan Contributions, And Monthly Disposable Income**

After the Conversion Motion was granted, the Conversion Order was entered, and Ms. Aquino's case became a chapter 13 proceeding, the focus of the means test process in her case changed.  In general terms, during the chapter 7 phase of Ms. Aquino's case, the focus of the means test was on whether her case was an abuse of chapter 7 of the Code (presumptively or otherwise), and therefore subject to dismissal under Section 707(b).  In the chapter 13 phase of her case, the focus of the means test was on her ability to fund a repayment plan for the benefit of her creditors, and whether any proposed plan(s) dedicated all of her projected disposable income to creditor repayment in keeping with Section 1325(b)(1)(B).  Much of the financial information needed to carry out the means test process, whether under chapter 7 or chapter 13, is the same.

Comparing the financial information in the Amended Chapter 7 CMI Form and Chapter 7 Means Test with the financial information reported in the Chapter 13 CMI Form is informative.  A comparison of that information is summarized in the table below:[171]

| Item | Amended Chapter 7 CMI Form[172] / Chapter 7 Means Test[173] | Chapter 13 CMI Form[174] | Differential |
|---|---|---|---|
| Marital Status | Married; non-filing spouse; living separately | Married; non-filing spouse; living separately | None |
| Gross wages, salary, tips, bonuses, overtime and commissions | $6,810.00 | $8,840.00 | $2,030.00 |
| Total current monthly income | $6,810.00 | $8,840.00 | $2,030.00 |
| Annualized current monthly income | $81,720.00 | $106,080.00 | $24,360.00 |
| Household size | 3 | 3 | None |
| Nevada median family income level | $69,239.00 | $69,239.00 | None |

[171]Comparing ECF No. 21 with ECF Nos. 38 and 39.
[172]ECF No. 21, pp. 1-2 of 12.
[173]ECF No. 21, pp. 3-12 of 12.
[174]ECF No. 38.

| Presumption of abuse [Ch. 7] / Applicable commitment period [Ch. 13] | There is a presumption of abuse as determined by Form 122A | The commitment period is 5 years. | N/A |
|---|---|---|---|

It is noteworthy that the $6,810.00 total current monthly income figure reported in the Amended Chapter 7 CMI Form and Chapter 7 Means Test is $2,030.00 less than the $8,840.00 current monthly income amount reported in the Chapter 13 CMI Form filed just 88 days later. Accepting the information in the more recent Chapter 13 CMI Form as true, total current monthly income in the chapter 7 phase of this case was understated by over 29%.

> ### h.    The Chapter 13 Disposable Income Form:  The Crux of the Contested Matters Before the Court

Because Ms. Aquino had reported that she was an above-median chapter 13 debtor, which required her chapter 13 debt repayment plan to cover a 5-year commitment period, her disposable income was subject to determination under Sections 1325(b)(2) and (b)(3) using information she was required to provide on Official Form 122C-2.[175]  Resultantly, Ms. Aquino completed and filed the Chapter 13 Disposable Income Form on October 20, 2019.[176]  The information contained in the Chapter 13 Disposable Income Form[177] is at the heart of the issues pending before the Court.

Much of the information contained in the Chapter 13 Disposable Income Form is not disputed by Trustee.  In fact, Trustee does not dispute Ms. Aquino's total claimed IRS expense allowances ($6,165.00),[178] her total claimed additional expense deductions ($426.00),[179] her total

---

[175]ECF No. 38, pp. 1 and 3 of 3.

[176]ECF No. 39.

[177]ECF No. 39.  As discussed previously, because the Chapter 13 Disposable Income Form was filed by Ms. Aquino's attorney without Ms. Aquino's signature (see ECF No. 39, p. 8 of 8), an Amended Chapter 13 Disposable Income Form was subsequently filed, this time with Ms. Aquino's signature (see ECF No. 44, p. 8 of 8).  Careful comparison shows that, with the exception of Ms. Aquino's signature and initials on each page of the Amended Chapter 13 Disposable Income Form, all information contained in the Chapter 13 Disposable Income Form and the Amended Chapter 13 Disposable Income Form is identical.

[178]ECF No. 39, p. 6 of 8, line 38.

[179]Id.

claimed deductions for debt payment ($487.00),[180] or her overall total deductions from income ($7,078.00).[181]

The issues raised by Trustee relate specifically to the determination of disposable income under Sections 1325(b)(2) and (b)(3) as shown in the Chapter 13 Disposable Income Form.[182] Line 41 of the Chapter 13 Disposable Income Form requires an above-median chapter 13 debtor like Ms. Aquino to respond to the following request for information:

> **41. Fill in all qualified retirement deductions.** The monthly total of all amounts that your employer withheld from wages as contributions for qualified retirement plans, as specified in 11 U.S.C. § 541(b)(7) plus all required repayments of loans from retirement plans, as specified in 11 U.S.C. § 362(b)(19).[183]     $_____

On Line 41 of the Chapter 13 Disposable Income Form, Ms. Aquino disclosed that the total of her monthly contributions to qualified retirement plans, combined with monthly payments on loans taken from such plans, was $1,509.50.[184] That figure exceeds the $612.90 in total monthly contributions to qualified retirement plans she had disclosed in the chapter 7 phase of her case by $896.60. That pencils out to an increase of 146.29%. The $1,509.50 figure is almost exactly $1,000.00 more than the $511.00 sum representing 6 percent of her monthly gross income as calculated by the UST and detailed in the UST Declaration.[185]

Unsurprisingly, Ms. Aquino's claimed $1,509.50[186] in post-conversion monthly retirement plan contributions had a significant impact on the disposable income calculation under Sections 1325(b)(2) and (b)(3) as shown in the Chapter 13 Disposable Income Form. Having reported current monthly income of $8,840.00, by claiming allowable deductions under Section 707(b)(2)(A) of $7,078.00 and an additional $1,509.50[187] in voluntary retirement plan

---

[180] Id.
[181] Id.
[182] ECF No. 39, p. 7 of 8, Part 2, lines 39 through 45, inclusive.
[183] ECF No. 39, p. 7 of 8, Part 2, line 41.
[184] ECF No. 39, p. 7 of 8, Part 2, line 41; see note 38, supra.
[185] ECF No. 26, p. 3 of 32, para. 8; ECF No. 26, p. 28 of 32, Line 5c.
[186] See note 38, supra.
[187] Id.

contributions, Ms. Aquino's monthly disposable income under Sections 1325(b)(2) and (b)(3) as shown on the Chapter 13 Disposable Income Form was only $252.50.[188]  Over the applicable 60 month commitment period, that $252.50 monthly disposable income figure would yield a total dividend to her creditors of $15,150.00.

Eliminating Ms. Aquino's voluntary retirement contributions entirely from the disposable income analysis under Sections 1325(b)(2) and (b)(3) as calculated using the Chapter 13 Disposable Income Form increases her monthly disposable income figure from $252.50 to $1,762.00.  Over the applicable 60-month commitment period, a $1,762.00 monthly disposable income figure yields a total dividend to creditors of $105,720.00.  That is an increase of $90,570.00 (597%) over the $15,150.00 dividend calculated using the $252.50 monthly disposable income figure shown on Ms. Aquino's Chapter 13 Disposable Income Form.

If the $511.00 figure the UST calculated as equating to 6 percent of Ms. Aquino's monthly gross income[189] is used as the amount of her total post-conversion monthly retirement plan contributions, disposable income under Sections 1325(b)(2) and (b)(3) as calculated using the Chapter 13 Disposable Income Form increases from $252.50 to $1,251.00.  Over the applicable 60-month commitment period, a $1,251.00 monthly disposable income figure yields a total dividend to creditors of $75,060.00.  That is an increase of $59,910.00 (395%) over the $15,150.00 dividend calculated using the $252.50 monthly disposable income figure shown on Ms. Aquino's Chapter 13 Disposable Income Form.

If the $612.90 figure shown in Ms. Aquino's Amended Chapter 7 Schedule I[190] is used as the amount of her post-conversion monthly retirement plan contributions, disposable income under Section 1325(b)(2) as calculated using the Chapter 13 Disposable Income Form increases to $1,149.10.  Over the applicable 60-month commitment period, a $1,149.10 monthly disposable income figure yields a total dividend to creditors of $68,946.00.  That is an increase of $53,796.00 (355%) over the $15,150.00 dividend calculated using the $252.50 monthly disposable income figure shown on Ms. Aquino's Chapter 13 Disposable Income Form.

---

[188]ECF No. 39, p. 7 of 8, Part 2, lines 39 – 45, inclusive; see note 38, supra.
[189]ECF No. 26, p. 3 of 32, para. 11; ECF No. 26, p. 28 of 32, Line 5c.
[190]ECF No. 20, p. 2 of 4, Part 2, Lines 5b and 5c.

i.    **Plan #1 Proposes to Pay Nothing to General Unsecured Creditors**

Plan #1 proposed to make $400.00 monthly payments to Trustee over the applicable 60-month commitment period.[191]  Since the Chapter 13 Disposable Income Form reported current monthly income of $8,840.00, claimed allowable deductions under Section 707(b)(2)(A) of $7,078.00, and took an additional $1,509.50[192] deduction for voluntary retirement plan contributions, Ms. Aquino's reported monthly disposable income under Section 1325(b)(2) was just $252.50.  That sum is $147.50 less than the contemplated $400.00 monthly plan payments.[193]

Anticipated payments to Trustee under Ms. Aquino's initial chapter 13 plan totaled $24,000.00.[194]  From the $24,000.00 in total plan payments:

- $2,400.00 would be paid to Trustee;[195]
- $4,000.00 would be paid to Ms. Aquino's attorney;[196]
- $16,275.00 would be paid to Toyota Financial on its claim secured by Ms. Aquino's 2019 Toyota CHR;[197] and
- While subtracting those payments from the $24,000.00 in total plan payments would leave a remainder of $1,325.00, unsecured creditors would receive no payments at all.[198]

During the 60-month term of Plan #1, while making a total of $90,600.00 in voluntary contributions to her retirement plan and paying administrative expenses and the debt secured by her 2019 Toyota CHR in full, Ms. Aquino proposed to pay her unsecured creditors nothing at all.

---

[191]ECF No. 37, p. 1 of 6, Section 2, para. 2.5.
[192]See note 38, supra.
[193]ECF No. 39, p. 7 of 8, Part 2, lines 39 – 45, inclusive; see note 38, supra.
[194]ECF No. 37, p. 2 of 6, Section 2, para. 2.7.
[195]ECF No. 37, p. 2 of 6, Section 2, para. 2.9.
[196]ECF No. 37, p. 2 of 6, Section 2, para. 2.10.
[197]ECF No. 37, p. 3 of 6, Section 4, para. 4.4.
[198]ECF No. 37, pp. 3-4 of 6, Section 5, para. 5.1 -5.4, inclusive.

36

7.    **The Amended Chapter 13 CMI Form And the Amended Chapter 13 Disposable Income Form:  Identical to the Chapter 13 CMI Form And Chapter 13 Disposable Income Form, But With the Addition of Ms. Aquino's Signature**

While Ms. Aquino signed Plan #1 prior to filing,[199] the Chapter 13 CMI Form and Chapter 13 Disposable Income Form were filed on October 20, 2019 without her signature, electronic or otherwise.[200]  A week later, on October 27, 2019, the Amended Chapter 13 CMI Form[201] and the Amended Chapter 13 Disposable Income Form[202] were filed bearing Ms. Aquino's signature.  Curiously, the signatures on the Amended Chapter 13 CMI Form and the Amended Chapter 13 Disposable Income Form are dated October 12, 2019 -- over two weeks prior to filing.[203]  Aside from the addition of Ms. Aquino's signature, the content of the signed and unsigned versions of those documents is identical.[204]

8.    **Facts Derived From the Amended Chapter 13 Schedules**

The Amended Chapter 13 Schedules[205] on October 27, 2019, exactly one week after the initial Chapter 13 Schedules had been filed.[206]

a.    **Amended Chapter 13 Schedules:  Assets**

As shown in the summary table below,[207] Schedule A/B: Property filed within the Amended Chapter 13 Schedules did not change any of the asset values listed in the Chapter 13 Schedules:

---

[199]ECF No. 37, p. 6 of 6.
[200]ECF No. 38, p. 3 of 3; ECF No. 39, p. 8 of 8.
[201]ECF No. 45.
[202]ECF No. 44.
[203]ECF No. 45, p. 3 of 3; ECF No. 44, p. 8 of 8.  If those documents were actually signed on October 12, 2019, the Court is left to wonder why the signed documents weren't simply filed on October 20, 2019 in lieu of the original unsigned versions.  See ECF No. 38 and 39.
[204]Compare ECF No. 38 with ECF No. 45; and compare ECF No. 39 with ECF No. 44.
[205]ECF No. 46.
[206]ECF No. 36.
[207]Comparing ECF No. 36, pp. 1-5 of 33 with ECF No. 46, pp. 1-5 of 25.

| Item | Chapter 13 Schedules - Schedule A/B Values | Amended Chapter 13 Schedules - Schedule A/B Values | Differential |
|---|---|---|---|
| Total Real Estate | $0 | $0 | $0 |
| Total Vehicles | $15,500.00 | $15,500.00 | $0 |
| Total Personal and Household Items | $2,600.00 | $2,600.00 | $0 |
| Total Financial Assets | $88,570.00 | $88,570.00 | $0 |
| Total Personal Property | $106,670.00 | $106,670.00 | $0 |

**b.    Amended Chapter 13 Schedules:  Liabilities**

As was true with the Chapter 13 Schedules, Schedule D:  Creditors Who Have Claims Secured by Property is not included in the Amended Chapter 13 Schedules.  The summary table below[208] confirms that the amount of unsecured debt listed in Schedule E/F: Creditors Who Have Unsecured Claims as filed in the Amended Chapter 13 Schedules is identical to the amount of unsecured debt disclosed in the initial Chapter 13 Schedules:

| Item | Chapter 13 Schedules - Schedule E/F Debts | Amended Chapter 13 Schedules - Schedule E/F Debts | Differential |
|---|---|---|---|
| Domestic Support Obligation | $2,964.00 | $2,964.00 | $0 |
| Non-Priority Unsecured Claims | $404,355.00 | $404,355.00 | $0 |
| Total Scheduled Unsecured Debt | $407,319.00 | $407,319.00 | $0 |

**c.    Amended Chapter 13 Schedules:  Monthly Income**

As shown in the following summary table,[209] the amount of Ms. Aquino's monthly income as shown on Schedule I:  Your Income filed within the Chapter 13 Schedules is identical to the amount listed in the Amended Chapter 13 Schedules:

---

[208]Comparing ECF No. 36, pp. 8-19 of 33 with ECF No. 46, pp. 8-19 of 25.
[209]Comparing ECF No. 36, pp. 22-23 of 33 with ECF No. 46, pp. 22-23 of 25.

| | Chapter 13 Schedules - Schedule I | Amended Chapter 13 Schedules - Schedule I | Non-Filing Spouse – Chapter 13 Schedules - Schedule I | Non-Filing Spouse – Amended Chapter 13 Schedules - Schedule I |
|---|---|---|---|---|
| Monthly gross wages, salary and commissions | $7,134.42 | $7,134.42 | N/A | N/A |
| Estimated monthly overtime pay | $1,705.71 | $1,705.71 | N/A | N/A |
| Gross Monthly Income | $8,840.13 | $8,840.13 | N/A | N/A |
| Payroll Deductions: | | | | |
| Tax, Medicare, and Social Security | $1,691.78 | $1,691.78 | N/A | N/A |
| Mandatory contributions for retirement Plans | $0.00 | $0.00 | N/A | N/A |
| Voluntary contributions for retirement Plans | $1,509.50 | $1,509.50 | N/A | N/A |
| Insurance | $259.17 | $259.17 | N/A | N/A |
| Total payroll deductions | $3,460.45 | $3,460.45 | N/A | N/A |
| Total monthly take-home pay | $5,379.68 | $5,379.68 | N/A | N/A |
| Calculation of monthly income | $5,379.68 | $5,379.68 | N/A | N/A |

### d.  Amended Chapter 13 Schedules:  Retirement Plan Contributions

The amount of monthly retirement plan contributions disclosed on Schedule I within the Amended Chapter 13 Schedules is identical to the amount disclosed in the Chapter 13 Schedules.[210]  The Amended Chapter 13 Schedules continued to reflect that Ms. Aquino was making monthly retirement plan contributions totaling $1,509.50,[211] despite the fact that the Chapter 7 Schedules and Amended Chapter 7 Schedule I revealed total monthly retirement plan contributions of just $612.90.[212]

### e.  Amended Chapter 13 Schedules:  Monthly Expenses

Likewise, Schedule J:  Your Expenses filed within the Amended Chapter 13 Schedules contains exactly the same monthly expense information shown in the Chapter 13 schedules.  A summary table[213] follows below:

---

[210]Compare ECF No. 36, p. 23 of 33, Lines 5b and 5c with ECF No. 46, p. 23 of 25, Lines 5b and 5c.

[211]ECF No. 46, p. 23 of 25, Lines 5b and 5c.

[212]ECF No. 1, p. 37 of 55, Lines 5b and 5c; ECF 20, p. 2 of 4, Lines 5b and 5c.

[213]Comparing ECF No. 36, pp. 24-25 of 33 with ECF No. 46, pp. 24-25 of 25.

| Item | Chapter 13 Schedules: Schedule J | Amended Chapter 13 Schedules: Schedule J | Differential |
|---|---|---|---|
| Rental or home ownership expense | $1,535.00 | $1,535.00 | $0 |
| Property, homeowner's or renter's insurance | $40.00 | $40.00 | $0 |
| Home maintenance, repair, and upkeep expenses | $50.00 | $50.00 | $0 |
| Utilities | | | |
|    Electricity, heat, natural gas | $175.00 | $175.00 | $0 |
|    Water, sewer, garbage collection | $0.00 | $0.00 | $0 |
|    Telephone, cell phone, internet, satellite, and cable services | $375.00 | $375.00 | $0 |
| Food and housekeeping supplies | $700.00 | $700.00 | $0 |
| Childcare and children's education costs | $500.00 | $500.00 | $0 |
| Clothing, laundry, and dry cleaning | $150.00 | $150.00 | $0 |
| Personal care products and services | $150.00 | $150.00 | $0 |
| Medical and dental expenses | $250.00 | $250.00 | $0 |
| Transportation, including gas, maintenance, bus or train fare. | $300.00 | $300.00 | $0 |
| Charitable Contributions and religious donations | $200.00 | $200.00 | $0 |
| Insurance | | | |
|    Life insurance | $0.00 | $0.00 | $0 |
|    Health insurance | $0.00 | $0.00 | $0 |
|    Vehicle insurance | $460.00 | $460.00 | $0 |
| Installment or lease payments | | | |
|    Car payments for Vehicle 1 | $380.00 | $380.00 | $0 |
| Other payments you make to support others who do not live with you. Specify: | $0.00 | $0.00 | $0 |
| Calculate your monthly expenses | $5,265.00 | $5,265.00 | $0 |

### f.    Amended Chapter 13 Schedules:  Summary

Comparing the Chapter 13 Schedules with the Amended Chapter 13 Schedules reveals that they contain exactly the same substantive financial information.  Careful comparison of those documents shows that: (a) while an Amendment Cover Sheet bearing Ms. Aquino's signature was filed contemporaneously with the initial Chapter 13 Schedules on October 20, 2019,[214] the Amended Chapter 13 Schedules were not signed by Ms. Aquino;[215] and (b) the only

---

[214]ECF No. 40.
[215]See generally ECF No. 46.

40

apparent difference between the Chapter 13 Schedules and the Amended Chapter 13 Schedules is the presence of initials on the lower right corner of the pages within the Amended Chapter 13 Schedules.[216]

### 9.    TSOP #1 and Facts Derived From the Statistical Summary

On November 1, 2019, Trustee filed TSOP #1,[217] recommending dismissal under Section 1307(c)(1) and (c)(4) for a variety of reasons.  Those reasons included Ms. Aquino's payment delinquencies and failure "to cooperate with the Trustee as necessary to enable the Trustee to perform her duties pursuant to 11 U.S.C. § 521(a)(3), § 704, and /or § 1302."[218] In TSOP #1 Trustee also opposed confirmation of Plan #1 under Section 1322, citing a lack of feasibility for failure to address the claim of Toyota Motor Credit Corporation, and because:

> The Plan fails to provide for all of the Debtor(s)' disposable income pursuant to 11 U.S.C. § 1325(a)(3) and (b) based on:
>
>> •Trustee objects to $1,509.50 retirement contribution while paying 0% to unsecured creditors.[219]

TSOP #1 was served electronically on Ms. Aquino's counsel when it was filed.[220]  TSOP #1 was also served on both Ms. Aquino and her counsel by U.S. Mail on November 1, 2019.[221]

After being served with TSOP #1, and apparently recognizing that the Amended Chapter 13 Schedules had been filed with the Court without any evidence of Ms. Aquino's signature, counsel for Ms. Aquino on November 4, 2019 filed the Statistical Summary, the last page of which is a Declaration About an Individual Debtor's Schedules.[222]  That declaration bears Ms. Aquino's signature dated October 29, 2019, over a certification that reads as follows:

> Under penalty of perjury, I declare that I have read the ***summary and schedules filed with this declaration*** and that they are true and correct.[223]

---

[216]Compare ECF No. 36 with ECF No. 46.
[217]ECF No. 48.
[218]ECF No. 48, pp. 1-2 of 4.
[219]Id.
[220]ECF No. 48.
[221]ECF No. 48, p. 4 of 4.
[222]ECF No. 49.
[223]ECF No. 49, p. 3 of 3 (emphasis added).

41

But no schedules were attached to the Statistical Summary. Ms. Aquino's signature on the Statistical Summary was dated two days _**after**_ the Amended Chapter 13 Schedules were filed with the Court on October 27, 2019.[224] And the Statistical Summary was filed eight days after the Amended Chapter 13 Schedules were filed on October 27, 2019.[225]

### 10. Facts Derived From Plan #2

Having been served with Trustee's TSOP #1, on November 4, 2019, Ms. Aquino filed Plan #2.[226] A comparison of the key provisions of Plan #1[227] and Plan #2[228] is set forth in the table below:

| Item | Plan #1 | Plan #2 | Differential |
|---|---|---|---|
| Commitment Period [Section 2.2] | 60 Months | 60 Months | None. |
| Liquidation Value [Section 2.4] | $0.00 | $0.00 | None. |
| Monthly Payments [Section 2.5] | $400.00 | $600.00 | $200.00 |
| Total Monthly Payments [Section 2.5] | $24,000.00 | $36,000.00 | $12,000.00 |
| Additional Monthly Payments [Section 2.6] | $0.00 | $15,000.00[229] | $15,000.00 |
| Total Trustee Fee Payments [Section 2.7] | $2,400.00 | $5,100.00 | $2,700.00 |
| Debtor's Attorney Fees | $6,523.00 | $6,000.00 | <-$523.00>[230] |
| Secured Claim of Toyota Financial re Debtor's 2019 Toyota CHR | $16,275.00 | $28,021.33 | $11,746.33[231] |

---

[224]Compare ECF No. 46, p. 3 of 3 with ECF 49, p. 1 of 25.

[225]Compare ECF No. 46 with ECF No. 49

[226]ECF No. 50.

[227]ECF No. 37.

[228]ECF No. 50.

[229]ECF No. 50, p. 2 of 6. The source of these payments was not monthly disposable income, but a $3,000.00 annual lump sum to be funded by Ms. Aquino's anticipated 2019-2023 federal tax refunds. Curiously, Plan #1 already required Ms. Aquino to "turn over to the Trustee and pay into the plan the non-exempt portion of all tax refunds for" each of those same tax years, but did not indicate that the refunds would generate any payments at all for creditors. See ECF No. 37, pp. 1-4 of 6, Sections 2.6, 2.8, and 5.4.

[230]Plan #1 indicates that Ms. Aquino had paid her counsel $2,523.00 prior to filing the petition in Ms. Aquino's case. ECF 37, p. 2 of 6, Section 2.10. Plan #2 shows that Ms. Aquino had paid her attorney only $2,000.00. prior to filing. ECF 50, p. 2 of 6, Section 2.10. Both proposed plans show that Ms. Aquino's attorney would be paid $4,000.00 by Trustee through the Plan.

[231]Plan #1 showed Toyota Financial's claim secured by Ms. Aquino's 2019 Toyota CHR to be $15,500.00, and provided for repayment at an interest rate of 2%. Plan #2 showed that

42

| Priority Unsecured Claims Paid in Full | $0.00 | $4,000.00 | $4,000.00[232] |
| Payments on Non-Priority Unsecured Claims | $0.00 | $9,878.67 | $9,878.67 |

Plan #2 was not accompanied by either an updated Chapter 13 CMI Form, or an updated Chapter 13 Disposable Income Form.[233]  Resultantly, Plan #2 was still predicated upon the information in the Amended Chapter 13 Disposable Income Form,[234] which reported current monthly income of $8,840.00, claimed allowable deductions under Section 707(b)(2)(A) of $7,078.00, and an additional $1,509.50[235] deduction for voluntary retirement plan contributions, leaving Ms. Aquino's reported monthly disposable income under Section 1325(b)(2) at just $252.50.[236]  The sum of $252.50 is $147.50 less than the $400.00 monthly payments to Trustee required under Plan #1, and is $347.50 less than the $600 monthly payments to Trustee required under Plan #2.

At first blush the $51,000.00 in anticipated total payments to Trustee under Plan #2 appears to be a significant increase over the $24,000.00 in such payments under Plan #1.  On closer examination, of the $27,000.00 differential, only $12,000.00 is generated by Ms. Aquino's monthly disposable income.  The $15,000.00 remainder results from five annual payments of $3,0000.00, expected to be generated by Ms. Aquino's federal tax refunds for tax years 2019-2023.[237]

From the $51,000.00 in total plan payments under Plan #2:

- $5,100.00 would be paid to Trustee;[238]

- $4,000.00 would be paid to Ms. Aquino's attorney as a priority unsecured claim;[239]

---

same Toyota Financial secured claim to be $24,014.37, a difference of $8,514.27, and provided for repayment at an interest rate of 6.5%.

[232]Plan #1 did not provide for payment of Ms. Isso's attorney fees as a priority unsecured claim.  Plan #2 did.

[233]ECF No. 50.

[234]ECF No. 44.

[235]See note 38, supra.

[236]ECF No. 44, p. 7 of 8, Part 2, lines 39 – 45, inclusive; see note 38, supra.

[237]See note 228, supra.

[238]ECF No. 50, p. 2 of 6, Section 2, para. 2.9.

[239]ECF No. 50, p. 2 of 6, Section 2, para. 2.10 and p. 3 of 6, para. 5.1.

- $28,021.33 would be paid to Toyota Financial on its claim secured by Ms. Aquino's 2019 Toyota CHR;[240] and

- While subtracting those payments from the $51,000.00 in total plan payments would leave a remainder of $13,878.67, unsecured creditors would receive payments of $9,878.67.[241]

In summary, under Plan #2, Ms. Aquino proposed to pay administrative expenses and the debt secured by her 2019 Toyota CHR in full, and to pay unsecured creditors their pro rata share of just $9,787.67 over 5 years (i.e., unsecured creditors would receive their pro rata share of $1,957.53 annually). Meanwhile, during the term of Plan #2, she planned to make a total of $90,600.00 in contributions to her own retirement plan.

### 11.    Facts Derived From the Claims Register

The Court's September 17, 2019 Notice of Chapter 13 Bankruptcy Case, docketed after Ms. Aquino voluntarily converted her case from Chapter 7 to Chapter 13, set a November 26, 2019 deadline for creditors (other than governmental units) to file their proofs of claim.[242]

A total of twelve proofs of claim were filed in Ms. Aquino's bankruptcy case. All of them were timely, as they were all filed in advance of the November 26, 2019 bar date. When added together, the twelve claims filed in Ms. Aquino's case total $90,105.55. [243]

As noted previously, eliminating Ms. Aquino's voluntary retirement contributions entirely from the disposable income analysis under Section 1325(b)(2) as calculated using the Chapter 13 Disposable Income Form increases her monthly disposable income figure to $1,762.00. Over the applicable 60-month commitment period, a $1,762.00 monthly disposable income figure yields a total dividend to creditors of $105,720.00. A dividend of $105,720.00 would be sufficient to pay all timely filed claims in full, leaving a surplus of $15,614.45.

If the $511.00 figure the UST calculated as equating to 6 percent of Ms. Aquino's

---

[240]ECF No. 50, p. 3 of 6, Section 4, para. 4.4.
[241]ECF No. 50, p. 4 of 6, Section 5, para. 5.1 -5.4, inclusive.
[242]ECF No. 32, p. 2 of 2, Item 8. Although not relevant to the issues before the Court, the deadline for governmental units to file proofs of claim was March 16, 2020. Id.
[243]See generally Claims Register.

monthly gross income[244] is used as the amount of her total post-conversion monthly retirement plan contributions, disposable income under Section 1325(b)(2) as calculated using the Chapter 13 Disposable Income Form increases to $1,251.00.  Over the applicable 60-month commitment period, a $1,251.00 monthly disposable income figure yields a total dividend to creditors of $75,060.00.  A dividend of $75,060.00 would be sufficient to repay 83.30% of all timely filed claims.

If the $612.90 figure shown in Ms. Aquino's Amended Chapter 7 Schedule I[245] is used as the amount of her post-conversion monthly retirement plan contributions, disposable income under Section 1325(b)(2) as calculated using the Chapter 13 Disposable Income Form increases to $1,149.10.  Over the applicable 60-month commitment period, a $1,149.10 monthly disposable income figure yields a total dividend to creditors of $68,946.00.  A dividend of $68,946.00 would be sufficient to repay 76.52% of all timely filed claims.

From another perspective, if Plan #2 were confirmed, during the 60-month plan term Ms. Aquino would make a total of $90,600.00 in voluntary contributions to her retirement plans.  Those voluntary retirement plan contributions alone would be enough to pay 100% of the $90,105.55 in timely claims filed in her case and leave a surplus of $494.45.  But under Plan #2, Ms. Aquino would retain all of her voluntary retirement plan contributions, administrative expenses and the debt secured by her 2019 Toyota CHR would be paid in full, and unsecured creditors would only receive their pro rata share of $9,787.67 over 5 years (i.e., unsecured creditors would receive their pro rata share of $1,957.53 annually).

**12.    Facts Derived From the Parties' Papers Addressing Dismissal And the Propriety of Confirming Plan #2**

On January 30, 2020, Trustee filed the Dismissal Motion,[246] alleging among other things:

•Debtor(s) is/are delinquent in plan payments.  11 U.S.C. § 1307(c)(1)

•Debtor(s) failed to comply with notice/re-notice requirements.  Failure to set a confirmation hearing according to 11 U.S.C. § 1324(b).  F.R.B.P. 2002(a) & (b)

---

[244]ECF No. 26, p. 3 of 32, para. 11; ECF No. 26, p. 28 of 32, Line 5c.
[245]ECF No. 20, p. 2 of 4, Part 2, Lines 5b and 5c.
[246]ECF No. 60.

& 11 U.S.C. § 1307(c)(1)

•The Plan fails to provide for all of the Debtor(s)' Disposable Income pursuant to 11 U.S.C. § 1325(a)(3) and (b) based on:  Debtor contributes [$1,509.50][247] per mo to her 401(k) while paying 0% to general unsecured creditors.  11 U.S.C. sec. 1325(a)(3).  Trustee objects to the voluntary retirement contribution as this expense is not permitted during the pendency of the bankruptcy case.  Parks v. Drummond, 475 B.R. 703 (9th Cir. B.A.P. 2012).

•Debtor failed to cooperate with the Trustee as necessary to enable the Trustee to perform her duties pursuant to 11 U.S.C. § 521(a)(3), § 704, and/or §1302.  This failure to cooperate has caused unreasonable delay that is prejudicial to creditors under 11 U.S.C. § 1307(c)(1) as the Debtor(s) did not provide the following documents:

> •Verification of Childcare and education costs of $500; verify charitable contributions of $200.

> •Amendment to Plan:  Section 2.3 [Disposable income of $0.00] is not correct;[248] Section 5.1 [payment of $4,000.00 to Ms. Aquino's attorney as a priority claim] – clarify treatment of this claim and a Proof of Claim or other order will be required in order for the Trustee to pay this claim.

> •Amendment to Schedule J.  Current Expenditures of Individual Debtor(s): to remove vehicle payment of $380 for the 2019 Toyota C-HR unless intent is to pay directly.[249]

Notice of Trustee's Dismissal Motion was served electronically on Ms. Aquino's attorney upon filing, and was also served on Ms. Aquino and her attorney via U.S. Mail.[250]

Having already filed her Dismissal Motion, but mindful of the recent filing of Plan #2, on

---

[247]See note 38, supra.

[248]As noted previously, Ms. Aquino's Amended Chapter 13 Disposable Income Form showed monthly disposable income under Section 1325(b)(2) of $252.50.  ECF No. 44, p. 7 of 8, Part 2, lines 39 – 45, inclusive; see note 38, supra.

[249]ECF No. 60, pp. 1-2 of 2 (underlining in original).

[250]ECF No. 61.

February 10, 2020, Trustee doubled down and filed TSOP #2.[251]  In TSOP #2, Trustee reiterated several of the factual allegations in Dismissal Motion, including the following[252]:

> •Debtor(s) is/are delinquent in plan payments.  <u>11 U.S.C. § 1307(c)(1)</u>

> •The Plan fails to provide for all of the Debtor(s)' Disposable Income pursuant to <u>11 U.S.C. § 1325(a)(3) and (b)</u> based on:

>> •  Debtor contributes $1,509 per mo to her 401(k) while paying 0% to general unsecured creditors.  11 U.S.C. sec. 1325(a)(3).  Trustee objects to the voluntary retirement contribution as this expense is not permitted during the pendency of the bankruptcy case.  Parks v. Drummond, 475 B.R. 703 (9th Cir. B.A.P. 2012).

> •Debtor failed to cooperate with the Trustee as necessary to enable the Trustee to perform her duties pursuant to <u>11 U.S.C. § 521(a)(3)</u>, <u>§704</u>, and/or <u>§1302</u>  This failure to cooperate has caused unreasonable delay that is prejudicial to creditors under <u>11 U.S.C. § 1307(c)(1)</u> as the Debtor(s) did not provide the following documents and/or amendments:

>> •Verification of Childcare and education costs of $500; verify charitable contributions of $200.

>> •Amendment to Plan:  Section 2.3 [Disposable income of $0.00] is not correct;[253] Section 5.1 [payment of $4,000.00 to Ms. Aquino's attorney as a priority claim] – clarify treatment of this claim and a Proof of Claim or other order will be required in order for the Trustee to pay this claim.

>> •Amendment to Schedule J.  Current Expenditures of Individual Debtor(s): to remove vehicle payment of $380 for the 2019 Toyota C-HR unless intent is to pay directly.

---

[251]ECF No. 65.

[252]ECF No. 65, pp. 1-2 of 3.

[253]As noted previously,Ms. Aquino's CDI form showed monthly disposable income under Section 1325(b)(2) of $252.00.  ECF No. 39, p. 7 of 8, Part 2, lines 39 – 45, inclusive.

In summary, as of February 10, 2020, Ms. Aquino had proposed Plan #2.[254] Trustee had filed two papers seeking dismissal of Ms. Aquino's case,[255] one of which also sought to deny confirmation of Plan #2.[256]

On February 27, 2020, Ms. Aquino filed an Objection to Trustee's Motion to Dismiss.[257] In her Objection to Dismissal, Ms. Aquino stated among other things that:

> • "Since the [Dismissal] Motion was filed, the Debtor has become current in her plan payments."[258]  This allegation was made without a scintilla of supporting evidence.

> • "The Debtor's disposable income under 11 U.S.C. § 1325(a)(3) and (6) and 11 U.S.C. § 541(b)(7)(A) is $-514.00 per month, but as an accommodation to her creditors she has proposed a plan that pays $600.00 per month."[259]

> • "The Debtor is entitled to continue making contributions to her retirement account during the case in the same manner she made those contributions in the six months before the case was filed."[260]

> • "Although the Ninth Circuit's Bankruptcy Appellate Panel has held that its opinions are binding on all bankruptcy courts in the circuit, absent contrary authority from the district court [. . . . .] that court's opinion on the matter is not necessarily binding on this Court."[261]

> • "This Court has an independent obligation to faithfully execute the Constitution and laws of the United States, and it must be guided by that obligation unless its hands are tied by a superior court."[262]

---

[254]ECF No. 50.

[255]ECF No. 60 and ECF No. 65.

[256]ECF No. 65.

[257]ECF No. 66 ("Objection to Dismissal").

[258]ECF No. 66, p. 2 of 7, para. 4.

[259]ECF No. 66, p. 2 of 7, para. 7.

[260]ECF No. 66, p. 2 of 7, para. 8.

[261]ECF No. 66, p. 2 of 7, para. 8; omitted citation to In re Proudfoot, 144 B.R. 876 (9th Cir. BAP 1992).

[262]ECF No. 66, p. 2 of 7, para. 8, citing Nat'l Sign & Signal v. Livingston (In re Livingston), 379 B.R. 711 (Bankr. W.D. Mich. 2007).

• "The Bankruptcy Appellate Panel is not a 'superior court' to the Bankruptcy Court because appeals from the bankruptcy court are only heard by the Bankruptcy Appellate Panel with the consent of the parties. [ . . . . .]  Therefore its decisions should not be construed as binding upon the bankruptcy courts, except to the extent that it determines the particular rights of the actual parties to the appeal."[263]

• "The *Parks* decision was wrongly decided and should not be followed by this Court."[264]

• After noting a split of authority as to whether it is permissible for a debtor to make voluntary retirement plan contributions at the expense of creditors during the pendency of a chapter 13 case, "[t]he Debtor suggests the proper test for this Court to adopt here is that proposed by the Sixth Circuit's Bankruptcy Appellate Panel in In re Seafort, 437 B.R. 204 (6th Cir. BAP 2010)."[265]

### 13.    Summary

In summary, as of February 27, 2020, Plan #2 was pending.[266]   Trustee had filed two papers seeking dismissal of Ms. Aquino's case,[267] one of which also sought to deny confirmation of Plan #2.[268]  Ms. Aquino had also filed her Objection to Dismissal.[269]

As discussed above, after argument at the related hearings, the Court entered its original order denying confirmation of Plan #2, but did not dismiss Ms. Aquino's case.[270]  Rather than

---

[263]ECF No. 66, pp. 2-3 of 7, para. 9; omitted citation to FED. R. BANKR. P. 8005 (providing that appeals from the bankruptcy court shall be heard by the District Court if any party makes an election).  Implicit in Ms. Aquino's argument is that this Court *is* bound by the decisions of the Ninth Circuit Court of Appeals, such as Egebjerg v. Anderson (*In re* Egebjerg), 574 F.3d 1045 (9th Cir. 2009).

[264]ECF No. 66, p. 3 of 7, para. 10; citing In re Bruce, 484 B.R. 387 (Bankr. W.D. Wa. 2012); In re Anh-Thu Thi Vu, 2015 Bankr. LEXIS 1967 (Bankr. W.D. Wa. Case No. 15-41405-BDL, June 16, 2015).

[265]ECF No. 66, p. 4 of 7, para. 13.

[266]ECF No. 50.

[267]ECF Nos. 60 and 65.

[268]ECF No. 65.

[269]ECF No. 66.

[270]ECF No. 78.

filing a third proposed plan, on June 17, 2020, Ms. Aquino filed a motion seeking a more expansive explanation as to why confirmation of Plan #2 had been denied.[271]  The Court, having acceded in that request,[272] writes this Memorandum and Order in response to it, and also to bring closure to Trustee's broader request for dismissal of Ms. Aquino's case.

Decisions regarding dismissal and plan confirmation in Chapter 13 cases are weighty ones, particularly when a party overtly asks for a departure from existing in-circuit precedent on an issue that has for years vexed the courts and generated an ever-widening split of authority. The facts collected above underpin the Court's decisions as to whether Ms. Aquino's case should be dismissed, and separately, whether confirmation of Plan #2 should be denied.

## CONCLUSIONS OF LAW

### A.    Jurisdiction; Venue; Core Proceedings

The Court has jurisdiction over Ms. Aquino's chapter 13 bankruptcy case under 28 U.S.C. §§ 1334(a) and 157(a), in tandem with the order of reference at LR 1001(b)(1).  Venue of Ms. Aquino's bankruptcy case is appropriate in the District of Nevada pursuant to 28 U.S.C. § 1408(1).

As required by 28 U.S.C. § 157(b)(3), and on its own motion, the Court concludes that the confirmability of Plan #2,[273] Trustee's Dismissal Motion,[274] and TSOP #2[275] all present issues that are statutorily core proceedings under 28 U.S.C. § 157(b)(2)(A), (B) and (L).  The Court further concludes that those matters, individually and collectively, are constitutionally core proceedings because they "arise under" specific provisions of the Bankruptcy Code,[276] and "arise in" Ms. Aquino's pending chapter 13 bankruptcy case.  See Marshall v. Stern (*In re* Marshall), 600 F.3d 1037, 1055-56 (9th Cir. 2010) ("We agree with Pierce Marshall that our case law presents a two-step approach.  A bankruptcy judge may only determine a claim that meets

---

[271]ECF No. 80.
[272]ECF No. 86.
[273]ECF No. 50.
[274]ECF No. 60.
[275]ECF No. 65.
[276]Trustee cites to Section 1307(c) as statutory support for dismissal, and to Section 1325(a) in opposing confirmation of Plan #2.  Ms. Aquino's responsive arguments are predicated, in part, upon Section 541(a)(7).

Congress' definition of a core proceeding *and* arises under or arises in title 11."), aff'd sub. nom. Stern v. Marshall, 564 U.S. 462 (2011); Certain Underwriters at Lloyds v. GACN, Inc. (*In re* GACN, Inc.), 555 B.R. 684, 693 (9th Cir. BAP 2016), appeal dismissed, 2017 WL 4513499 (9th Cir. May 10, 2017) (noting that "the terms 'arising under title 11' and 'arising in a case under title 11' are terms of art which the courts have defined. A proceeding 'arises under' title 11 if it presents claims for relief created or controlled by title 11. In contrast, the claims for relief in a proceeding 'arising in' a title 11 case are not explicitly created or controlled by title 11, but such claims nonetheless would have no existence outside of a bankruptcy case.") (internal citations omitted).

**B.    Trustee's Dismissal Motion and Dismissal "Recommendation" Are Denied**

The text of the Code is the analytical starting point in resolving the Dismissal Motion, as well as Trustee's "recommendation" that Ms. Aquino's case be dismissed. It is well established that when the language of the Code is plain, the sole function of the Court -- at least where the disposition required by the statutory text is not absurd -- is to enforce it according to its terms. Dale v. Maney (*In re* Dale), 505 B.R. 8, 11 (9th Cir. BAP 2014), citing Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004) (citations omitted).

**1.    The Controlling Statutory Text As to Dismissal:  Section 1307(c)**

Trustee filed three documents contending that Ms. Aquino's chapter 13 case should be dismissed.[277]  All of them cite to Section 1307(c) as the statutory predicate for dismissal. Section 1307(c) provides in relevant part:

**§ 1307.  Conversion or dismissal**

. . . . .

(c)    Except as provided in subsection (f) of this section,[278] on request of a party in interest or the United States trustee and after notice and a hearing, the court *may* convert a case under this chapter to a case under chapter 7 of this title, or *may* dismiss a case under this

---

[277]TSOP #1 (ECF No. 48), Dismissal Motion (ECF No. 60), and TSOP #2 (ECF No. 65).

[278] Relating to conversion of cases filed by farmers, and not relevant to the Court's analysis.

chapter, whichever is in the best interests of creditors and the

estate, for cause, including –

(1)    unreasonable delay by the debtor that is prejudicial to creditors;

. . . . .

(4)    failure to commence making timely payments under section 1326

of this title[.]

Section 1307(c) provides a bankruptcy court with discretion to either dismiss or convert a chapter 13 case to chapter 7 for cause, "whichever is in the best interests of creditors and the estate." In resolving a motion seeking relief under Section 1307(c), the first analytical step is to determine whether "cause" for conversion or dismissal exists. While the Code does not provide an all-encompassing definition of "cause," Section 1307(c)(1)-(11) provides a nonexclusive list of items that fall within the definition of that term. If the court finds that "cause" for conversion or dismissal under Section 1307(c) does exist, and then determines in its discretion that conversion or dismissal is warranted, the court must then choose between the remedies of conversion and dismissal. The court should choose the remedy that will promote the best interests of creditors and the estate. Phillips v. Leavitt (In re Phillips), 2015 WL 2180321, at * 2 (9th Cir. BAP May 8, 2015), citing Nelson v. Meyer (In re Nelson), 343 B.R. 671, 674-75 (9th Cir. BAP 2006) and de la Salle v. U.S. Bank, N.A. (In re de la Salle), 461 B.R. 593, 605 (9th Cir. BAP 2011).

A chapter 13 case may be converted or dismissed under Section 1307(c)(1) based on a finding of cause in the form of unreasonable delay by the debtor that is prejudicial to creditors. "A debtor's unjustified failure to expeditiously accomplish any task required either to propose or confirm a chapter 13 plan may constitute cause for dismissal under § 1307(c)(1)." Phillips at *3, quoting Ellsworth v. Lifescape Med. Assocs., P.C. (In re Ellsworth), 455 B.R. 904, 915 (9th Cir. BAP 2011).

Likewise, a chapter 13 case may be converted or dismissed under Section 1307(c)(4) when a finding of cause is made based upon the debtor's failure to make the pre-confirmation payments to the trustee required by Section 1326(a)(1)(A). Zapata v. United States Trustee (In

*re* Zapata), 2012 WL 4466283, at *5 (9th Cir. BAP Sept. 28, 2012), <u>aff'd</u>, 656 Fed. App'x 357 (9th Cir. Aug. 3, 2016)  ("Failure to make the payments required by § 1326(a) is a sufficient ground for dismissal of the chapter 13 case.  § 1307(c)(4).")," <u>citing</u> <u>In re Maali</u>, 452 B.R. 325 (D. Mass. 2010); <u>Miller v. Sapir</u> (*In re* Miller), 2009 WL 174902, at * 2 (S.D.N.Y. 2009); <u>In re Skinner</u>, 2008 WL 2695650, at * 5 (Bankr. D. Or. 2008); <u>In re Huerta</u>, 137 B.R. 356, 375 (Bankr. C.D. Cal.1992).

## 2.    The Burden And Standard of Proof When Dismissal Is Sought Under Section 1307(c)

When a dismissal motion is filed under Section 1307(c), the movant bears the burden of proving that cause exists to convert or dismiss the case.  <u>Ellsworth</u>, 455 B.R. at 918 (noting that "[u]nder section 1307(c), the objecting [party] bears the burden of proof."), <u>quoting</u> <u>In re Lancaster</u>, 280 B.R. 468, 474 (Bankr. W.D. Mo. 2002) <u>and</u> <u>In re Virden</u>, 279 B.R. 401, 407-11 (Bankr. D. Mass. 2002).  The objecting party must prove that cause exists for dismissal or conversion under Section 1307(c) by a preponderance of the evidence.  <u>Grogan</u> v. <u>Garner</u>, 498 U.S. 279, 286 (1991) ("Because the preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants, we presume that this standard is applicable in civil actions between private litigants 'unless particularly important individual interests or rights are at stake.  [. . . . .] We have previously held that a debtor has no constitutional or 'fundamental' right to a discharge in bankruptcy.") (citations omitted).

## 3.    Trustee Failed to Prove By a Preponderance of the Evidence That Cause Exists to Dismiss Ms. Aquino's Case Under Section 1307(c)(1)

Trustee's Dismissal Motion, as well as the subsequently filed TSOP #2 both recite that Ms. Aquino's case is subject to dismissal under Section 1307(c)(1) because Ms. Aquino "is/are delinquent in plan payments."[279] Neither of those documents is supported by a declaration, an affidavit, an exhibit in the form of the page(s) of Trustee's ledgers showing the alleged

---

[279]ECF No. 60, p. 1 of 2; ECF No. 65, p. 1 of 3.  As no plan has ever been confirmed in Ms. Aquino's case, the purportedly delinquent "plan payments" referenced in Trustee's papers apparently refer to the pre-confirmation payments required under Section 1326(a)(1)(A).

delinquency in plan payments, or any other admissible evidence.  There is simply no evidence in the record from which the Court can discern when Ms. Aquino's alleged plan payment delinquency accrued, which payments were made and missed, or even how much the alleged payment delinquency was when Trustee's papers were filed with the Court.

The Dismissal Motion asserts that Ms. Aquino had failed to set a confirmation hearing on Plan #2 in accordance with Section 1324(b) and Rules 2002(a) and (b), resulting in undue delay prejudicial to creditors within the ambit of Section 1307(c)(1).[280]  That contention was not advanced in the subsequently filed TSOP #2.[281]  Close review of the docket explains why.

Plan #2 was filed on November 4, 2019.[282]  Ms. Aquino's attorney filed a certificate of service nine days later on November 13, 2019.[283]  That certificate of service purports to confirm that "Amended Chapter 13 Plan Number 2 (Docket #50)" and a "Notice of Hearing on Confirmation of Amended Chapter 13 Plan Number 2 (Docket #51)" had been served along with other documents.[284]  While a NOH purportedly scheduling a confirmation hearing on Plan #2 for December 19, 2019 at 1:30 p.m. is indeed attached to the certificate of service, that NOH was never separately filed by Ms. Aquino's attorney.  The NOH attached to the  certificate of service couldn't possibly have been "Docket #51" either, since "Doc 51" is stamped on the certificate of service itself.

Apparently having learned of that docketing snafu, nine days later on November 22, 2019, counsel for Ms. Aquino filed an untitled document shown on the docket as an "Amended Notice of Hearing on Confirmation."[285]  That filing wasn't an amendment to anything, though, since Ms. Aquino's attorney hadn't actually filed a NOH regarding confirmation of Plan #2 in the first place.  It also confusingly refers to "Amended Chapter 13 Plan #1"[286] instead of "Chapter 13 Plan #2," the latter being the title found in the caption of Ms. Aquino's then-pending

---

[280]ECF No. 60, p. 1 of 2.
[281]ECF No. 65, pp. 1-2 of 3.
[282]ECF No. 50.
[283]ECF No. 51.
[284]ECF No. 51, p. 2 of 7.  Hereafter, the acronym "NOH" refers to a Notice of Hearing related to Plan #2 prepared and/or filed by counsel for Ms. Aquino.
[285]ECF No. 52.
[286]ECF No. 52, p. 1 of 10, lines 13-14.

plan.[287]  The caption of the document still suggested that a confirmation hearing would take place in Ms. Aquino's case on December 19, 2019 at 1:30 p.m.  Perhaps predictably, on November 25, 2019, the Clerk of Court issued a Notice of Docketing Error, advising Ms. Aquino's counsel "to file an amended pleading or file [the NOH] in the correct case immediately" and that the December 19, 2019 confirmation hearing "will NOT be set."[288]

Almost a month later, on December 24, 2019, Ms. Aquino's attorney filed another NOH in another attempt to set a confirmation hearing on Plan #2.[289]  In this iteration of the NOH, the words "NOTICE OF CONFIRMATION HEARING" did appear in the caption, as did a new confirmation hearing date of January 30, 2020 at 9:30 a.m.  But it still did not comply with the Court's local rules.  The caption incorrectly showed that Ms. Aquino's case was pending before the Court under Chapter 7 instead of Chapter 13.  Resultantly, the Clerk of Court issued another Notice of Docketing Error on December 26, 2019, directing Ms. Aquino's attorney to "file an amended pleading or file [the NOH] in the correct case immediately."[290]

When Trustee's Dismissal Motion was filed a month later on January 30, 2020, Ms. Aquino's attorney had yet to file a corrected NOH regarding Plan #2.  Perhaps prompted by Trustee's pending Dismissal Motion, on February 2, 2020, Ms. Aquino's counsel filed yet another NOH.[291]  The title shown in the caption was "Notice of Hearing."  The caption also showed a hearing date of March 12, 2020 at 1:30 p.m.  The first paragraph of text referred to Ms. Aquino's "Amended Chapter 13 Plan #2."  Perhaps predictably, the caption still misidentified Ms. Aquino's case as a Chapter 7 case, despite the fact it was pending under Chapter 13 of the Bankruptcy Code.  This time, though, the NOH survived scrutiny by the Clerk of Court, and on February 3, 2020, the confirmation hearing on Plan #2 was finally set for March 12, 2020 at 1:30 p.m.[292]  So, when Trustee filed TSOP #2 on February 10, 2020, failure to set and notice a

---

[287]ECF No. 50, p. 1 of 6.
[288]ECF No. 53.
[289]ECF No. 55.
[290]ECF No. 57.
[291]ECF No. 63.
[292]ECF No. 64.

confirmation hearing on Plan #2 was no longer a reason for dismissal of Ms. Aquino's case.[293]

Both the Dismissal Motion, as well as the subsequently filed TSOP #2, state that Trustee "objects to the Debtor paying for daughter's car insurance since she is working per testimony (Rav4)."[294]  But Trustee's papers are unsupported by any evidence as to how Ms. Aquino's payment of her daughter's car insurance caused any undue delay in case administration in the context of Section 1307(c)(1), or is relevant in any way to the timeliness of Ms. Aquino's required plan payments under Section 1307(c)(4).

Both the Dismissal Motion, as well as the subsequently filed TSOP #2, assert that "[c]ompensation of Debtor(s)' attorney requires an independent review by the court.  Trustee requests that Debtor(s)' attorney file an application for compensation pursuant to 11 U.S.C. § 330."[295]  But as pointed out in Ms. Aquino's opposing papers, nothing in the Code requires court approval of attorney fees as a precondition to confirmation of a chapter 13 plan.  The absence of a fee application, while it drew the ire of Trustee, was not the cause of undue delay in the context of Section 1307(c)(1), nor was it relevant in any way to the timeliness of Ms. Aquino's required plan payments under Section 1307(c)(4).

Both the Dismissal Motion, as well as the subsequently filed TSOP #2, posit that undue delay prejudicial to creditors resulted from Ms. Aquino's failure to provide Trustee with "the following documents and/or amendments":

•Verification of Childcare and education costs of $500; verify charitable contribution of $200.

•Amendment to Plan:  Section 2.3 [Disposable income of $0.00] is not correct; Section 5.1 [payment of $4,000.00 to Ms. Aquino's attorney as a priority claim] – clarify treatment of this claim and a Proof of Claim or other order will be required in order for Trustee to pay this claim.

•Amendment to Schedule J. Current Expenses of Individual Debtor(s):  to remove vehicle

---

[293]The Court notes that any delay in setting the confirmation hearing was attributable to the actions of Ms. Aquino's attorney, and not to the conduct of Ms. Aquino herself.

[294]ECF No. 60, p. 2 of 2, lines 5-6; ECF No. 65, p. 1 of 3, lines 23-24.

[295]ECF No. 60, p. 2 of 2, lines 1-2; ECF No. 65, p. 2 of 3, lines 14-16.

payment of $380 for the Toyota C-HR unless intent is to pay directly.[296]

Once again, however, Trustee failed to provide any evidence at all of how, how often, or when she made requests for verification of Ms. Aquino's childcare and education costs or charitable contributions. While Trustee wanted Ms. Aquino to amend Sections 2.3 and 5.1 of Plan #2, nothing in the Code provides that a Trustee's preapproval of the terms of a proposed plan is a prerequisite to plan confirmation, or that a dispute with Trustee regarding the terms of a proposed plan results in undue delay in case administration. Likewise, though Trustee wanted Ms. Aquino to amend Schedule J, Trustee's concurrence with the contents of that schedule is not a prerequisite to plan confirmation, or anything near *per se* proof of undue delay in case administration in the context of Section 1307(c)(1). The record is bereft of any evidence of how any of those matters resulted in undue delay prejudicial to creditors, or what relevance they have to the timeliness of the payments required under Plan #2.

Finally, Trustee's Dismissal Motion and subsequently filed TSOP #2 both object to Ms. Aquino's $1,509.50[297] voluntary monthly 401(k) retirement plan contributions, claiming that they run afoul of Sections 1325(a)(3) and (b).[298] Ms. Aquino's retirement plan contributions are manifestly relevant to the issue of whether Plan #2 is confirmable. But no evidence supports Trustee's contention that Ms. Aquino's retirement plan contributions resulted in either undue delay in case administration prejudicial to creditors, or untimely preconfirmation payments by Ms. Aquino.

### 4.    Summary

As the movant under the Dismissal Motion, and having "recommended" dismissal under Sections 1307(c)(1) and (4) in TSOP #2, Trustee shouldered the burden of proving by a preponderance of the evidence that "cause" exists for dismissal of Ms. Aquino's chapter 13 case.[299] Careful review of the record in Ms. Aquino's case, and the absence of any admissible

---

[296]ECF No. 60, p. 2 of 2, lines 6-12; ECF No. 65, p. 2 of 3, lines 7-13.

[297]See note 38, supra.

[298]ECF No. 60, p. 2 of 2, lines 2-5; ECF No. 65, p. 2 of 3, lines 2-6.

[299]The Court notes here that Trustee's filings do not allege that dismissal of Ms. Aquino's case for bad faith is warranted, although it is well established that bad faith may certainly serve as cause for dismissal under Section 1307(c).

evidence to support Trustee's contention that "cause" for dismissal exists under either Section 1307(c)(1) or Section 1307(c)(4), leads inextricably to the conclusion that Trustee failed to sustain her burden of proof even by the relatively low preponderance of the evidence standard. The Court therefore denies Trustee's Dismissal Motion and expressly rejects the "recommendation" in TSOP #2 that Ms. Aquino's case be dismissed.

**C.    Confirmation of Plan #2 Is Denied**

The text of the Bankruptcy Code is also the analytical starting point in determining whether, as advocated by Trustee in TSOP #2, confirmation of Plan #2 should be denied. As noted previously, it is well established that when the language of the Bankruptcy Code is plain, the sole function of the Court (at least where the disposition required by the text is not absurd) is to enforce it according to its terms. Dale v. Maney (*In re* Dale), 505 B.R. 8, 11 (9th Cir. BAP 2014), citing Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004).

**1.    The Controlling Statutory Text:  Section 1325**

Confirmation of chapter 13 payment plans is generally governed by Section 1325 of the Code. As relevant to the confirmation issues raised in TSOP #2, Section 1325 provides:

**§ 1325.  Confirmation of plan**

(a)    Except as provided in subsection (b), the court shall confirm a plan if –

. . . . .

(3)    the plan has been proposed in good faith and not by any means forbidden by law;

. . . . .

(b)

(1)    If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan –

. . . . .

(B)    the plan provides that all of the debtor's projected disposable income to be received in the applicable

commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.

(2)   For purposes of this subsection, the term 'disposable income' means current monthly income received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) less amounts reasonably necessary to be expended –

(A)(i)   for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and

(ii)   for charitable contributions (that meet the definition of 'charitable contribution' under section 548(d)(3)) to a qualified religious or charitable entity or organization (as defined in section 548(d)(4)) in an amount not to exceed 15 percent of gross income of the debtor for the year in which the contributions are made.

. . . . .

(3)   Amount reasonably necessary to be expended under paragraph (2), other than subparagraph (A)(ii) of paragraph (2), shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2) if the debtor has current monthly income, when multiplied by 12, greater than –

. . . . .

(B)   in the case of a debtor in a household of 2, 3, or 4 individuals, the highest median family income of the

applicable State for a family of the same number or fewer individuals [.]

    (4)    For purposes of this subsection, the 'applicable commitment period' –

        (A)    subject to subparagraph (b), shall be –

            (i)    3 years; or

            (ii)    not less than 5 years, if the current monthly income of the debtor and the debtor's spouse combined, when multiplied by 12, is not less than –

                . . . . .

                (II)    in the case of a debtor in a household of 2, 3, or 4 individuals, the highest median family income of the applicable State for a family of the same number or fewer individuals; [and]

        . . . . .

        (B)    may be less than 3 or 5 years, whichever is applicable under subparagraph (a), but only if the plan provides for payment in full of all allowed unsecured claims over a shorter period.

Under Section 1325(b)(1), when a chapter 13 trustee objects to confirmation of a proposed plan, the plan cannot be confirmed unless it provides that all of the debtor's projected disposable income to be received during the applicable commitment period will be applied to make payments to unsecured creditors.[300] Section 1325(b)(2) defines the term "disposable income" as the debtor's "current monthly income [. . . . .] less amounts reasonably necessary to be expended [. . . . .] for the maintenance and support of the debtor" or a dependent of the

---

[300] Davis v. Helbling (*In re* Davis), 960 F.3d 346, 350 (6th Cir. 2020).

debtor.[301]  Section 1325(b)(3) establishes that when a debtor's income exceeds the applicable state median income level, as is true for Ms. Aquino, the "amounts reasonably necessary to be expended" for the support and maintenance of the debtor and his or her dependents in the disposable income calculus are determined by reference to national and local expense standards promulgated by the Internal Revenue Service.[302]

The phrase "projected disposable income" as used in Section 1325(b)(1) is not defined in that section, or anywhere else in the Code.[303]  The United States Supreme Court has, however, held that projected disposable income is simply the debtor's disposable income as calculated under Section 1325(b)(2), adjusted for any "changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation."[304]

Ultimately then, determining a debtor's projected disposable income is a two-step process.[305]  The first step is to establish the debtor's current "disposable income" under the formula found in Section 1325(b)(2).[306]  The second step is to adjust that amount for any changes "known or virtually certain" to occur during the applicable commitment period.[307]  As in most cases, when a debtor does not expect any changes in financial circumstances, the debtor's projected disposable income under Section 1325(b)(1) is simply his or her disposable income calculated under Section 1325(b)(2) multiplied by the applicable commitment period.[308]  Calculation of both "disposable income" and "projected disposable income" under Section 1325(b) would be a seemingly straightforward task in the absence of any other Code provision referring to the term "disposable income."  But in 2005, changes to another section of the Code complicated the "disposable income" calculus under Section 1325(b) in a way that has led to a legion of divergent decisions in cases involving facts like those present in Ms. Aquino's case.

---

[301]Id.
[302]Id.
[303]Id.
[304]Davis, 960 F.3d at 350, quoting Hamilton v. Lanning, 560 U.S. 505, 524 (2010).
[305]Davis, 960 F.3d at 350, citing Hamilton v. Lanning, 560 U.S. 505, 519 (2010).
[306]Id.
[307]Id.
[308]Id.

### 2.    The "Hanging Paragraph":  Section 541(a)(7)

When Congress enacted the Bankruptcy Abuse Prevention and Consumer Protection Act[309] in 2005, Section 541(b)(7) was added to the Code.  As relevant here, Section 541(b)(7) reads:

**§ 541.  Property of the estate**

. . . . .

    (b)    Property of the estate does not include –

. . . . .

        (7)    any amount –

            (A)    withheld by an employer from the wages of employees for payment as contributions –

                (i)    to –

                    (I)    an employee benefit plan that is subject to title I of the Employee Retirement Income Security Act of 1974 [commonly known as a 401(k) retirement plan][310] or under an employee benefit plan which is a government plan under section 414(d) of the Internal Revenue Code of 1986;

. . . . .

***except that such amount under this subparagraph shall not constitute disposable income as defined in section 1325(b)(2)*** (emphasis added).

As noted by the Sixth Circuit Court of Appeals:

The emphasized portion [above] is known as the "hanging paragraph."  Its meaning has led to considerable disagreement among courts and litigants

---

[309]Pub. L. No. 109-8, 119 Stat. 23 (2005) ("BAPCPA").
[310]<u>Davis</u>, 960 F.3d at 351.

nationwide.

<u>Davis</u>, 960 F.3d at 351.  The Sixth Circuit's observation in <u>Davis</u> is an adroit understatement. This Court is heedful of the chasm in the judicial landscape noted in <u>Davis</u>, conscious that the confirmation issues joined by Plan #2 and TSOP #2 have a significant impact upon the effective administration of chapter 13 cases within the Ninth Circuit (and elsewhere), and mindful of Ms. Aquino's request for amplification of this Court's prior order denying confirmation of Plan #2. Those factors compel the Court to explain in full detail the legal analysis underpinning its decision to deny confirmation of Plan #2.

### 3.    The Burden And Standard of Proof As to Plan Confirmation And Objections Thereto Under Section 1325

In TSOP #2, Trustee asserts that because Ms. Aquino proposes to make voluntary 401(k) retirement plan contributions of $1,509.50[311] each month, Plan #2 impermissibly "fails to provide for all of the Debtor(s)' disposable income pursuant to 11 U.S.C. § 1325(a)(3) and (b)."[312]  Section 1325(a)(3) is a prerequisite to confirmation of a proposed chapter 13 plan, and requires that "the plan has been proposed in good faith and not by any means forbidden by law." Separately, Section 1325(b) operates to bar confirmation of a proposed chapter 13 plan where "the trustee or the holder of an allowed unsecured claim objects" and the plan fails to "provide that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan."  To bolster her objection to confirmation of Plan #2 under Section 1325(b), Trustee further avers that Ms. Aquino's voluntary $1,509.50[313] contributions to her 401(k) retirement plan each month are "not permitted during the pendency of the bankruptcy case" citing the Ninth Circuit Bankruptcy Appellate Panel's decision in <u>Parks v. Drummond</u>, 475 B.R. 703 (9th Cir. BAP 2012).[314]

Ms. Aquino retorts that Plan #2 was filed in good faith, that the <u>Parks</u> case is both

---

[311] <u>See</u> note 38, <u>supra</u>.
[312] ECF No. 65, p. 2 of 3.
[313] <u>Id.</u>
[314] <u>Id.</u>

wrongly decided by the Ninth Circuit Bankruptcy Appellate Panel and not binding on this Court, and that Plan #2 should therefore be confirmed.[315]  In resolving the dispute between the parties as to whether Plan #2 should be confirmed, the Court must first ascertain the applicable burden and standard of proof.

> **a.**    **The Burden And Standard of Proof on the Issue of Disposable Income Under Section 1325(b)(1)(B)**

When confirmation of a proposed plan is sought by a chapter 13 debtor under Section 1325, and a trustee or other party in interest has objected to confirmation under Section 1325(b)(1)(B), the applicable burden of proof is a shifting one.  As explained by the United States Bankruptcy Court for the Eastern District of California:

> [T]he burden is transient when the issue is available disposable income. "Only the chapter 13 trustee or an allowed unsecured claimant may bring an objection to confirmation raising § 1325(b)(1)(B). The objector has the initial burden of proof to show that the debtor is not applying all disposable income to plan payments." In re Lopez, 574 B.R. 159, 171 (Bankr. E.D. Cal. 2017) (citing Itule v. Heath (In re Heath), 182 B.R. 557, 560-61 (9th Cir. BAP 1995). The objector has the initial burden of proof to show that the debtor is not applying all disposable income to plan payments. Id. at 560-61. The burden then shifts to the debtor, "as the party with most access to proof on the point, to show ... that the objection lacks merit." Lopez, 574 B.R. at 171 (citing In re Crompton, 73 B.R. 800, 809 (Bankr. E.D. Pa. 1987) (citation omitted)).

In re Rodriguez, 606 B.R. 410, 415 (Bankr. E.D. Cal. 2019).  The party bearing the burden of proof as it shifts must meet the burden by a preponderance of the evidence.  Grogan v. Garner, 498 U.S. at 286.

> **b.**    **The Burden And Standard of Proof on the Issue of Good Faith Under Section 1325(a)(3)**

---

[315]ECF No. 66, pp. 2-7 of 7.

When a chapter 13 debtor seeks confirmation of a proposed plan under Section 1325, and a trustee or other party in interest opposes confirmation under Section 1325(a)(3) by challenging the debtor's good faith in proposing that plan, decisions within the Ninth Circuit have specifically addressed the applicable burden of proof. "When seeking confirmation of a plan, the debtor, as plan proponent, has the burden of proof on the issues of whether both the case and the plan were filed in good faith. § 1325(a)(3), (7)." In re Ellsworth, 455 B.R. 904, 918 (9th Cir. BAP 2011). In order to meet that burden in the context of Section 1325(a)(3), the debtor must prove by a preponderance of the evidence that the plan under consideration was filed in good faith. Grogan v. Garner, 498 U.S. at 286 ("Because the preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants, we presume that this standard is applicable in civil actions between private litigants 'unless particularly important individual interests or rights are at stake. [. . . . .] We have previously held that a debtor has no constitutional or 'fundamental' right to a discharge in bankruptcy.") (citations omitted).

### 4.    Overview of Relevant Case Law

#### a.    Pre-BAPCPA Case Law

Before BAPCPA added Section 541(b)(7)(A) and the "hanging paragraph" to the text of the Code in 2005, "the 'overwhelming consensus' among bankruptcy courts was that wages voluntarily withheld as 401(k) contributions formed part of a debtor's disposable income" under Section 1325(b).[316] Review of the pre-BAPCPA cases embodying that "overwhelming consensus" shows that an uncomplicated construction of the plain language of the Code, and Section 1325(b) in particular, underpins them. The passage of BAPCPA, and specifically the addition of Section 541(b)(7)(A) and the "hanging paragraph," changed all of that. Since then, courts faced with the question of whether voluntary 401(k) contributions constitute disposable income under Section 1325(b) have reached no less than four different conclusions.[317]

---

[316] Davis, 960 F.3d at 350 (collecting cases).
[317] Davis, 960 F.3d at 352-53 (6th Cir. 2020).

**b.    Post-BAPCPA Cases Holding That Voluntary Contributions to Qualified Retirement Plans Are Always Disposable Income In Chapter 13 Cases Filed By Debtors With Above-Median Income Levels**

## I.    In re Prigge

Several of the cases holding that voluntary 401(k) contributions are always disposable income under Section 1325(b) in chapter 13 cases filed by above-median income debtors were penned by courts within the Ninth Circuit.  That line of cases is often traced back to In re Prigge, 441 B.R. 667 (Bankr. D. Mont. 2010).[318]  In Prigge, the debtor was an above-median income FedEx aircraft mechanic whose original chapter 13 plan provided for $1,100 monthly payments to his 401(k) retirement plan while proposing to make sixty $100 monthly plan payments to his creditors.[319]  Confirmation objections were filed asserting that "the Plan was not filed in good faith as required by § 1325(a)(3), as shown by the small amount proposed to be paid to [the objecting creditor] on their unknown claim" and that  "the Debtor failed to satisfy the disposable income test of § 1325(b)."[320]  Facing stiff opposition to confirmation of his plan, the debtor in Prigge:

> [A]mended his schedules I and J to show a monthly net income of $307.00.  Prigge testified that he reduced his 401(k) contribution to $900 on Schedule I, although he has not yet told the [401(k)] plan administrator to reduce his contribution amount.  He filed his amended Plan, Dkt. 62, proposing monthly payments in the sum of $100 for 4 months and then $300 per month for 56 months.  He admitted that the amended Plan does not pay all unsecured creditors in full, and that he raised his payment by reducing his 401(k) contribution.[321]

---

[318]The Prigge opinion was authored by Hon. Ralph B. Kirscher.  Prigge, 441 B.R. at 667.

[319]Prigge, 441 B.R. at 670-71.  Over the 60 month term of his original proposed plan, Prigge's 401(k) contributions would total $66,000.00.  His creditors would receive just $6,000.00.

[320]Prigge, 441 B.R. at 670-71.

[321]Prigge, 441 B.R. at 671.  Over the 60 month term of his amended proposed plan, Prigge's 401(k) contributions would total $54,000.00.  His creditors would receive $17,200.00.

In addressing the question of how voluntary 401(k) contributions factor into the disposable income calculation under Section 1325(b), the Prigge court focused first on the text of Section 1325(b)(2), which defines "disposable income" as "current monthly income received by the debtor [. . . . .] less *amounts reasonably necessary* to be expended for the support and maintenance of the debtor[.]" (emphasis added).  The Prigge court then turned its analytical focus to the question of whether voluntary 401(k) contributions fall within the ambit of the phrase "amounts reasonably necessary" as used in the  Section 1325(b)(2).  Noting that Section 1325(b)(3) "requires that amounts reasonably necessary 'shall be determined' under § 707(b)(2)," the Prigge court looked to the Ninth Circuit Court of Appeals decision in Egebjerg v. Anderson (*In re* Egebjerg), 574 F.3d 1045 (9th Cir. 2009) to inform its decision.[322]

The Prigge court observed that in Egebjerg, the Ninth Circuit Court of Appeals had stated that "We also note that the IRS guidelines themselves provide that '[c]ontributions to voluntary retirement plans are not a necessary expense.'"[323]  From there, the Prigge court concluded that:

> [i]n the context of contributions to voluntary retirement plans such as Prigge's $1,181.08 contribution listed on Line 60 of Form 22C, under controlling Ninth Circuit Authority the IRS guidelines provide specific guidance that they are not a necessary expense, in any amount.[324]

The court in Prigge also specifically considered, and expressly rejected, the argument

---

[322]Prigge, 441 B.R. at 676-77.  Egebjerg is a chapter 7 case in which the Ninth Circuit Court of Appeals framed the issue before it as "whether a debtor's repayment of a 401(k) loan constitutes a 'monthly payment on account of secured debts' or an '[o]ther [n]ecessary expense' that can be deducted from a debtor's monthly income for purposes of calculating the debtor's disposable monthly income under § 707(b)(2)."  On direct appeal from the bankruptcy court's dismissal of the debtor's case as a presumptive abusive under Section 707(b)(2), the Egebjerg court answered that question in the negative.  Egebjerg, 574 F.3d at 1047.  In reaching that conclusion, the Egebjerg court noted that "[w]hen it introduced the means test, Congress provided, by reference to the IRS guidelines, specific guidance as to what qualifies as a necessary expense for the purposes of applying that test.  [. . . . .] [T]he bankruptcy court erred by allowing Egebjerg to deduct his 401(k) repayment from disposable income for purposes of the means test."  574 F.3d at 1052.

[323]Prigge, 441 B.R at 676, quoting Egebjerg, 574 F.3d at 1052.  For that proposition, the Ninth Circuit in Egebjerg cited to the Internal Revenue Manual issued by the Internal Revenue Service, and more particularly to IRM § 5.15.1.23.  Id.

[324]Prigge, 441 B.R. at 676, citing Egebjerg, 574 F.3d at 1052.

67

advanced by Ms. Aquino in this case predicated upon the "hanging paragraph" of Section 541(a)(7).  In doing so, the <u>Prigge</u> court first observed:

> Prigge suggests that *Egebjerg* is inapplicable because it discusses 401(k) loan repayments in a Chapter 7 case, not 401(k) contributions in a Chapter 13 case. That argument ignores § 1325(b)(3), which specifically requires that amounts reasonably necessary "shall be determined under" § 707(b)(2).

<u>Prigge</u>, 441 B.R. at 677.

Turning next to the debtor's argument predicated on the statutory text of Section § 1322(f),[325] the <u>Prigge</u> court noted:

> Next, Prigge mis-cites *Egebjerg* by a reference to a non-existent "page 6388": "Here in BAPCPA, Congress expressly gave Chapter 13 debtors the ability to deduct 401(k) payments from their disposable income calculation, § 1322(f), but did not included [sic] any similar exemption for Chapter 7 debtors."  574 F.3d at 1050.

> Section 1322(f) provides:  "A plan may not materially alter the terms of a loan

---

[325]Section 1322(f) specifically addresses only a chapter 13 debtor's ***outstanding loans from*** qualified retirement plans - - not a debtor's ***voluntary contributions to*** such plans - - and reads:

> **§ 1322.  Contents of plan**
> . . . . .
> (f)    A plan may not materially alter the terms of a loan described in section 362(b)(19), and ***any amounts required to repay such loan*** shall not constitute "disposable income" under section 1325.

As relevant here, Section 362(b)(19)(A) generally provides that the automatic stay does not prohibit "withholding of income from a debtor's wages and collection of amounts withheld, under the debtor's agreement authorizing that withholding and collection for the benefit of a pension, profit-sharing, stock bonus, or other plan established under section 401, 403, 408, 408A, 414, 457, or 510(c) of the Internal Revenue Code of 1986, that is sponsored by the employer of the debtor, or an affiliate, successor, or predecessor of such employer, ***to the extent that the amounts withheld and collected are used solely for payments relating to a loan from a plan*** under section 408(b)(1) of the Employee Retirement Income Security Act of 1974 or is subject to section 72(p) of the Internal Revenue Code of 1986[.]" (emphasis added).

described in section 362(b)(19) and any amounts required to repay such loan shall not constitute 'disposable income' under section 1325." This section highlights another reason why Prigge's voluntary contribution to his 401(k) plan is not an allowable expense under the facts of this case. *Egebjerg* held that it was error to allow the debtor to deduct his 401(k) loan repayment from disposable income for purposes of the means test, even though § 1322(f) would specifically allow repayment of a loan from a 401(k) plan in a chapter 13. The instant case does not involve repayment of a loan, however, but instead involves Prigge's voluntary contributions to his 401(k) plan.

Prigge, 441 B.R. at 677.

Having drawn a careful distinction in the chapter 13 disposable income calculus between the treatment of 401(k) loan repayments specifically dealt with under the plain language of Section 1322(f) on the one hand, and voluntary contributions to 401(k) plans that are not addressed in Section 1322(f) on the other, Judge Kirscher turned to the canons of statutory construction to further bolster his analysis:

No provision similar to § 1322(f) (excluding repayment of 401(k) loans from disposable income) is cited by the Debtor as authority to exclude voluntary 401(k) contributions, and the Court is aware of none. Another canon of statutory construction provides: "Where Congress includes particular language in one section of a statute but omits it in another, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Keene Corp. v. United States,* 508 U.S. 200, 208, 113 S. Ct. 2035, 2040, 124 L.Ed.2d 118 (1993) (internal quotation marks and alterations omitted.). If Congress had intended to exclude voluntary 401(k) contributions from disposable income it could have drafted § 1322(f) to provide for such an exclusion, or provided one elsewhere. The absence of any exclusion of voluntary 401(k) contributions from the Code simply reinforces the Court's conclusion that *Egebjerg* and the IRS guidelines provide that contributions to voluntary retirement plans are not a

necessary expense. *Egebjerg,* 574 F.3d at 1052.
Prigge, 441 B.R. at 677.

The Prigge Court was aware of and considered the "hanging paragraph" at this point in its analysis by way of footnote 5, which reads:

> Section 541(b)(7) "broadly excludes from 'property of the estate' funds 'withheld by an employer from the wages of employees' as contributions to specified types of employee-benefit plans, deferred compensation plans, and tax-deferred annuity plans. ***It seems intended to protect amounts withheld by employers from employees that are in the employer's hands at the time of filing bankruptcy, prior to remission of the funds to the plan.***" 5 COLLIER ON BANKRUPTCY, ¶ 541.22C[1] (15th ed. rev.) This subparagraph further provides that such amounts do "not constitute disposable income, as defined in section 1325(b)(2)." 11 U.S.C. § 541(b)(7).

Prigge, 441 B.R. at 677 n. 5.

After noting that mandatory plan contributions "would not be voluntary and prohibited under Egebjerg," the Prigge court concluded:

> In sum, the Court finds that the Debtor has failed to satisfy his burden of proof under the disposable income test of § 1325(b)(2) and (3), and § 707(b)(2)(A). Confirmation of Debtor's amended Plan must be denied because of his exclusion from plan payments of $1,181.08 in voluntary contributions to his 401(k) plan.[326]

## II.    In re McCullers

Not long after Prigge was decided, other courts within the Ninth Circuit were faced with the same vexing issue: how to properly address an above-median income chapter 13 debtor's voluntary 401(k) contributions in the chapter 13 disposable income calculus in a manner consistent with the "hanging paragraph" of Section 541(b)(7). In In re McCullers, 451 B.R. 498 (Bankr. N.D. Cal. 2011),[327] when calculating disposable income, the above-median income

---

[326]Prigge, 441 B.R. at 677-78.
[327]The McCullers decision was penned by Hon. Thomas E. Carlson.

debtor claimed a total deduction of $1,921.00 per month related to his 401(k) retirement plan. That sum included both a loan repayment component and ongoing voluntary plan contribution component. McCullers, 451 B.R. at 499. Although the debtor's claimed $1,921.00 monthly 401(k) plan deduction did not specify how much of the total was attributable to loan repayment and how much resulted from voluntary plan contributions, the McCullers court noted that in the last prepetition pay period, the debtor "made a new contribution of $1,768 and a loan payment of $721. Debtor acknowledges that his employer does not require him to make any contributions to his 401(k) plan, and that all proposed contributions to that plan are voluntary." McCullers, 451 B.R. at 499-500.

The chapter 13 trustee in McCullers objected to confirmation of the debtor's proposed plan. The trustee's objection was summarized by Judge Carlson in the following fashion:

> Trustee contends that as a matter of law Debtor is not entitled to deduct any voluntary retirement contributions in calculating his disposable income. Trustee acknowledges that under sect 1322(f) Debtor is entitled to deduct payments necessary to repay the loan from his 401(k) plan, but contends that the loan will be repaid after 32 months, and that plan payments should be increased once the loan is repaid.

McCullers, 451 B.R. at 500.

The McCullers court described the above-median income chapter 13 debtor's argument in response to the trustee's confirmation objection this way:

> Debtor contends that, under section 541(b)(7), he is entitled to deduct contributions in the maximum amount permissible under a 401(k) plan, and that the total amount deducted over the life of the plan does not exceed the deductions authorized under section 1322(f) and section 541(b)(7). Debtor further contends that his ongoing contributions are reasonable and necessary to provide for his retirement in light of his age and existing retirement savings.

McCullers, 451 B.R. at 499. Judge Carlson then framed the issue before him:

> Trustee's second objection to confirmation raises a more difficult question,

71

whether subsection 541(b)(7) authorized Debtor to deduct voluntary postpetition contributions to his 401(k) retirement plan in determining the disposable income he must devote to payment of his creditors.

McCullers, 451 B.R. at 502.

Looking first to the statutory framework controlling that issue, the McCullers court observed that:

Section 541(b)(7) provides the only means by which an *above-median-income* chapter 13 debtor[328] can make *voluntary* postpetition contributions to a qualified retirement plan over the objection of a creditor or the trustee. Under section 1325(b)(1), a chapter 13 plan can be confirmed over the objection of the trustee or an unsecured creditor only if the debtor contributes all "projected disposable income" to the plan. The calculation of "projected disposable income" begins with the calculation of "disposable income," which is defined as current monthly income less necessary expenses. § 1325(b)(2). For an above-median income debtor, necessary expenses are limited to those recognized in IRS debt-collection guidelines. §§ 707(b)(2) and 1325(b)(3). Under the IRS guidelines, mandatory retirement contributions are deductible, but voluntary contributions are not. *Egebjerg v. Anderson* (*In re Egebjerg*), 574 F.3d 1045, 1051-52 (9th Cir. 2009); *In re Prigge*, 441 B.R. 667, 676-77 (Bankr. D. Mont. 2010). Debtor does not contend that any of the contributions he seeks to deduct are required by his employer. Thus, the question presented is whether the very specific provisions of subsection 541(b)(7), discussed below, override the more general provisions of subsections 707(b)(2) and 1322(b) just described.

McCullers, 451 B.R. at 501 (emphasis in original).

The McCullers court recognized that the cases addressing the interplay between the

---

[328] At footnote 6 in McCullers, Judge Carlson noted that "[p]ost-petition retirement contributions of below-median-income debtors are not governed by section 707(b) and the IRS guidelines, and are instead governed by more general principles of necessity and reasonableness. §1325(b)(2), (3)." 451 B.R. at 501.

"hanging paragraph" in Section 541(b)(7) and the disposable income calculus under Section 1325(b) were anything but consistent:

> The reported decisions on section 541(b)(7) are split among three highly divergent interpretations:  (1) that the debtor may continue to contribute at the rate he or she contributed prepetition; (2) that the debtor may contribute the maximum amount permitted under the statute governing the type of plan at issue; and (3) that section 541(b)(7) does not authorize postpetition contributions in any amount.

McCullers, 451 B.R. at 501.

The court in McCullers conducted a thorough review of each of the three lines of cases it had identified, including in that review an analysis of the Prigge decision and the cases cited by Ms. Aquino in support of confirmation of Plan #2.  In conducting that review, Judge Carlson noted:

> Finally, one bankruptcy court held that section 541(b)(7) does not authorize a chapter 13 debtor to make voluntary postpetition retirement contributions in any amount.  *In re Prigge*, 441 B.R. 667, 676-78 (Bankr. D. Mont. 2010); *cf. In re Braulick*, 360 B.R. 327, 330-21 (Bankr. D. Mont. 2006) (similarly interpreting § 541(b)(7) regarding a deferred compensation plan).
>
> *Prigge* noted that in enacting section 1322(f), Congress expressly excluded from disposable income all amounts necessary to repay a loan from the debtor's retirement plan, and placed that exclusion within the confines of chapter 13 itself. *Prigge* noted that Congress did not adopt a similarly broad and unambiguous exclusion for postpetition contributions to a retirement plan.  The court concluded from this pattern that Congress did not intend to create any exclusion for postpetition retirement contributions, and that the function of section 541(b)(7) was merely to clarify that retirement contributions withheld prepetition and still in the possession of the employer on the petition date are neither property of the estate nor postpetition income to the debtor.  *Id.* at 677 n. 5.

McCullers, 451 B.R. at 503.

In ultimately deciding that the logic of the Prigge decision was more persuasive than the other lines of cases he had identified, Judge Carlson stated:

> Section 541(b)(7) provides that certain contributions to qualified plans are excluded from property of the estate, and concludes with the language at issue here:  "*except that* such amount under this paragraph shall not constitute disposable income. (emphasis added).  Use of the term "except that" suggests that the purpose of the language is merely to counteract any suggestion that the exclusion of such contributions from property of the estate constitutes postpetition income to the debtor.  If Congress had intended to exclude prepetition contributions from the calculation of disposable income more generally, it would have been much more natural for Congress to provide that such contributions are excluded from property of the estate "and" in the calculation of disposable income.
>
> *Prigge's* more limited interpretation is reinforced by the fact that Congress used much more direct language in excluding retirement loan repayments from disposable income.  Section 1322(f) was placed within the confines of chapter 13 itself, and states explicitly "any amounts required to repay such loan shall not constitute 'disposable income' under section 1325."

McCullers, 451 B.R. at 504 (emphasis in original).

Focusing on the "except that" language in the "hanging paragraph" of Section 541(b)(7), the McCullers court observed:

> Congress' use of the words "except that" is entirely consistent with the *Prigge* decision, which held that the purpose of the statute was merely to clarify that the exclusion of certain prepetition contributions from property of the estate did not give rise to disposable income to the debtor.  *Prigge*, 441 B.R. at 677 n. 5.  This court is mindful of its obligation to adopt an interpretation that accords some

effect to the statutory language in question, and that *Prigge* gives that language a very limited effect, because it is unlikely even without the language in question that excluding sums earned by the debtor prepetition from property of the estate would ever be construed as creating postpetition disposable income to debtor. *Prigge's* limited reading is entirely appropriate, however, because the statutory language itself discloses very modest aims.  In using the words "except that," Congress suggests its only purpose was to negate any inference that the exclusion of such contributions from property of the estate gives rise to income to the debtor.

McCullers, 451 B.R. at 504-05.

The McCullers court ultimately sustained the trustee's objection to confirmation of the debtor's plan, holding:

Trustee's objection to confirmation of Debtor's chapter 13 plan is sustained.  In calculating disposable income, Debtor may deduct loan repayments to his 401(k) retirement plan only until that loan is repaid.  So long as Trustee or an unsecured creditor objects, this above-median-income Debtor may not make voluntary postpetition contributions to his retirement plan.  Debtor shall promptly file an amended chapter 13 plan.

McCullers, 451 B.R. at 505.

Judge Carlson made it clear that the holding in McCullers was not a blanket prohibition that would preclude all chapter 13 debtors from making any postbankruptcy contributions to qualified retirement plans:

[T]here are circumstances in which a chapter 13 debtor can make post-petition contributions to a qualified benefit plan.  First, the court need not  determine disposable income or projected disposable income unless the trustee or an unsecured creditor objects to confirmation of the plan.  § 1325.  Thus, it is the trustee and unsecured creditors who determine the reasonableness of voluntary retirement contributions of an above-median-income debtor.  Second,

contributions required by an employer can be deducted in determining disposable income under the IRS guidelines incorporated into section 707(b). *Egebjerg,* 574 F. 3d at 1051-52. Third, the expenses that may be claimed by a below-median-income debtor are not limited to those specified in section 707(b) and the IRS guidelines, and such a debtor may be able to establish that voluntary contributions are reasonable and necessary expenses. In the present decision, the court decided only that section 541(b)(7) does not alter these general rules, but was enacted for the very limited purpose described in *Prigge.*

McCullers, 451 B.R. at 505 n. 8.

### III.    In re Parks

Two weeks after the McCullers decision was issued, Judge Kirscher issued an unpublished decision in a case that invited him to review his legal analysis in Prigge. In re Parks, 2011 WL 2493071 (Bankr. D. Mont. June 22, 2011).[329] In Parks, Judge Kirscher followed the same analytical path he had charted in Prigge, noting:

On the issue of disposable income, this Court previously held in *In re Prigge*, 441 B.R. 667, 676-77 (Bankr. D. Mont. 2010), that Congress expressly excluded from disposable income all amounts necessary to repay a loan from the debtor's retirement plan, and placed that exclusion within the confines of chapter 13 itself. However, the Court also concluded in *Prigge* that Congress did not adopt a similar exclusion for voluntary postpetition contributions to 401(k) and other retirement plans.

Parks, 2011 WL 2493071, at *3.

The debtors in Parks suggested that in deciding the Prigge case, the court had not been presented with an argument predicated upon the "hanging paragraph" of section 541(b)(7). Judge Kirscher swiftly disposed of that contention observing:

---

[329]The unpublished decision in Parks was later appealed to, and affirmed by, the Ninth Circuit Bankruptcy Appellate Panel. The appellate decision is discussed infra. The full citation to the bankruptcy court's decision in Parks is In re Parks, 2011 WL 2493071 (Bankr. D. Mont. June 22, 2011), aff'd, 475 B.R. 703 (9th Cir. BAP 2012).

At this time, Debtors urge the Court to reexamine its holding in *Prigge* "in light of an argument that apparently was not presented to this Court at that time[,]" namely that under 11 U.S.C. § 541(b)(7), Debtors' voluntary contributions to their 401(k) plans do not constitute disposable income.

In *Prigge,* 441 B.R. at 677, this Court addressed § 541(b)(7) in footnote 5, writing:

> Section 541(b)(7) "broadly excludes from 'property of the estate' funds 'withheld by an employer from the wages of employees' as contributions to specified types of employee-benefit plans, deferred compensation plans, and tax-deferred annuity plans.  It seems intended to protect amounts withheld by employers from employees that are in the employer's hands at the time of filing bankruptcy, prior to remission of the funds to the plan." 5 COLLIER ON BANKRUPTCY, ¶ 541.22C[1] (15th ed. rev.)  This subparagraph further provides that such amounts do "not constitute disposable income, as defined in section 1325(b)(2)." 11 U.S.C. § 541(b)(7).

Parks, 2011 WL 2493071, at *3.

In Parks, Judge Kirscher reiterated his view of the proper interpretation of the "hanging paragraph" in section 541(b)(7) the chapter 13 disposable income calculus:

> Section 541 defines what constitutes  property of the estate as of the petition date and consistent with *Prigge*, this Court still adheres to the conclusion that § 541(b)(7) only applies to retirement plan contributions withheld by employers from employees that are in the employer's hands as of a debtor's petition date.

Parks, 2011 WL 2493071, at *3.  Noting that the McCullers court had examined the Prigge decision, conducted an analysis of the decisions that had reached conclusions different from Prigge, found the logic in Prigge to be more persuasive, and had rejected the argument advanced

by the debtors, the <u>Parks</u> court ultimately "decline[d] to reconsider its prior ruling in *Prigge*."[330]

## IV.    In re Green

The United States Bankruptcy Court for the Eastern District of California adopted the holdings in <u>Prigge</u> and <u>McCullers</u> in an unpublished decision.  <u>In re Green</u>, 2012 WL 8255556 (Bankr. E.D. Cal. 2012).[331]  The <u>Green</u> case involved a chapter 13 debtor with above-median income.[332]  Judge Lee noted that in calculating monthly disposable income under Section 1325(b)(2):

> On Line 55 of the Means Test, the Debtor claim[ed] a deduction in the amount of $2,402.21 per month as a "Qualified retirement deduction."  There is no dispute that the Debtor has actually been making a monthly contribution to her 403(b) retirement plan and that the contribution is voluntary, as opposed to mandatory.

<u>Green</u>, 2012 WL 8255556, at *1.[333]

The <u>Green</u> court summarized the impact of the $2,402.21 voluntary retirement plan deduction on the debtor's proposed debt repayment plan:

> With the retirement contribution, the Debtor reports a monthly disposable income on Line 59 of her Means Test in the amount of $1,894.01 ($113,640 over the 60-month term of the Plan).  Her Plan proposes to pay $2,520 per month to the Trustee and distribute 37% to unsecured creditors with claims estimated in the amount of $305,390.32 ($51,916.35).  There is no dispute that the proposed distribution to unsecured creditors satisfies the chapter 7 "best interest" test.  However, without the disputed retirement deduction, the Debtor's monthly disposable income will increase to approximately $4,296.22 (less an appropriate adjustment for any additional income taxes attributable to loss of the tax deferred deduction).  This would result in a substantially higher distribution to the unsecured creditors.

---

[330]<u>Parks</u>, 2011 WL 2493071, at *4.
[331]The <u>Green</u> decision was written by Hon. W. Richard Lee.
[332]<u>Green</u>, 2012 WL 8255556, at *1.
[333]A monthly payment of $2,402.21 over a 60 month term yields the sum of $144,132.60.

Green, 2012 WL 8255556, at *1.

    The debtor in Green sought confirmation of her plan, the chapter 13 trustee objected "on the grounds that it does not provide for all of the Debtor's projected disposable income to be applied to make payments to unsecured creditors in compliance with 11 U.S.C. § 1325(b)(1)(B)." Judge Lee framed the issue before him as follows:

> This issue before the court is whether *voluntary* contributions made by an above-median income debtor to a qualified retirement plan, such as a 401(k) or as here, a 403(b) plan, may be deducted from a debtor's current monthly income for the purpose of determining, prospectively, how much the debtor can and should pay to her unsecured creditors. The ultimate question is whether the "exclusion" (from disposable income) language in § 541(b)(7)(A)(i)(III) and (B)(i)(III) applies to all qualified retirement contributions or just to prepetition contributions.

Green, 2012 WL 8255556, at *1-2.

    After observing that the arguments of the parties had been well briefed, the Green court held:

> The court has reviewed the various cases and considered the three competing theories and concludes that the cases in support of the Trustee's Objection reach the correct result. *In re Prigge,* 441 B.R. 667 (Bankr. D. Montana 2010); *In re McCullers,* 451 B.R. 498 (Bankr. N.D. Cal. 2011). The Debtor may not take a deduction, in her disposable [income] calculation, for contributions she wishes to make voluntarily to a 403(b) retirement plan.[334]

### V.    Parks BAP

    Meanwhile, the debtors in Parks, chagrined that confirmation of their plan had been denied, appealed Judge Kirscher's decision to the Ninth Circuit Bankruptcy Appellate Panel. Parks v. Drummond (*In re* Parks), 475 B.R. 703 (9th Cir. BAP 2012).[335] In Parks BAP, the

---

[334]Green, 2012 WL 8255556, at *2.

[335]For clarity and avoidance of doubt, the Court will refer to this appellate decision as "Parks BAP."

panel framed the issue before it as follows:

> Whether a chapter 13 debtor's voluntary post-petition retirement contributions are excluded from his or her disposable income under § 541(b)(7).[336]

Parks BAP, 475 B.R. at 706.

In conducting its review of Judge Kirscher's decision at the bankruptcy court level, the panel in Parks BAP made it clear that it viewed the issue before it as one of statutory interpretation:

> Our resolution of this case turns on the interpretation of § 541(b)(7)(A), which was added to the list of exclusions from property of the estate in 2005 with the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"), Pub. L. No. 109-8, 119 Stat 23.
>
> . . . . .
>
> Questions of statutory interpretation begin with the plain language of the statute. Lamie v. U.S. Trustee, 540 U.S. 526, 534, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004). If the statute is clear, the inquiry is at its end, and we enforce the statute on its terms. United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241, 109 S. Ct. 1026, 103 L. Ed. 2d 290 (1989). If the plain meaning of the statutory language is not clear, the statute's context within the overall statutory framework should be examined. Davis v. Mich. Dept. of Treasury, 489 U.S. 803, 809, 109 S. Ct. 1500, 103 L. Ed. 2d 891 (1989) ("[S]tatutory language cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall

---

[336]The scope of the issue framed by the Parks BAP panel is, in this Court's view, more properly limited to chapter 13 cases filed by above-median income chapter 13 debtors in which a creditor or trustee has objected to confirmation due to the debtor's voluntary (as distinguished from mandatory) post-petition retirement plan contributions. As explained by Judge Carlson in McCullers, the issue identified in Parks BAP does not arise in the absence of a creditor or trustee objection, if the contested post-petition retirement plan contributions are mandatory, or in chapter 13 cases filed by under-median chapter 13 debtors. See McCullers, 451 B.R. at 505 n. 8.

1    statutory scheme.").

2    Parks BAP, 475 B.R. at 707.

3    The panel in Parks BAP had little trouble finding both that the "hanging paragraph" was

4    ambiguous, and that it had spawned divergent decisions from various courts:

5    As with other provisions contained in BAPCPA, applying statutory interpretation

6    rules to discern Congress's intent in adding § 541(b)(7) is easier said than done.

7    In this case, the statute's placement within § 541 instead of chapter 13 and its

8    reference to disposable income under § 1325(b)(2) in the hanging paragraph

9    reflects its ambiguity.  These contextual conundrums have split the courts

10   nationwide.  Compare *Baxter v. Johnson* (*In re Johnson*), 346 B.R. 256, 263

11   (Bankr. S.D. Ga. 2006) (holding that § 541(b)(7) excludes all voluntary retirement

12   contributions, both pre and postpetition, from disposable income) and the cases

13   following *Johnson* with *In re Prigge*, 441 B.R. 667 (holding § 541(b)(7) does not

14   permit exclusion of postpetition voluntary retirement contributions in any amount

15   when determining disposable income); *In re McCullers,* 451 B.R. 498, 503-05

16   (Bankr. N.D. Cal. 2011) (same); *Seafort v. Burden* (*In re* Seafort), 669 F.3d 662,

17   673-74 (6th Cir. 2012) (same).[337]  Although none of these decisions are binding

18   on us, we find the *Prigge* line of cases persuasive.

19   Parks BAP, 475 B.R. at 707.

20   To resolve the perceived ambiguity created by the "hanging paragraph" in Section

21   541(b)(7), and provide detail as to why it found Prigge and its progeny more persuasive than the

22   disparate holdings from courts outside of the Ninth Circuit, the Parks BAP panel turned first to

23   the "language and structure of § 541, which defines property of the estate generally, as well as its

24   relationship to § 1306, which completes the definition of property of the estate for purposes of

25   chapter 13."  Parks BAP, 475 B.R. at 707.  The panel in Parks BAP observed:

26   Section 541(a)(1) defines property of the estate as including "all legal or equitable

27   interest of the debtor in property as of the commencement of the case" and

28

---

[337]The Seafort case is examined in more detail infra.

81

§ 541(a)(6) states that "earnings from services performed by an individual debtor after the commencement of the case" are not brought into the estate.  Under the plain reading, "as of the commencement of the case", a debtor's postpetition earnings are not included in property of the estate.  However, because this is a chapter 13 case, we cannot ignore the relationship between § 541 and § 1306.  Section 1306(a) states:

> Property of the estate includes, in addition to the property specified in section 541 of this title –
>
> . . . . .
>
> (2)    earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 11, or 12 of this title, whichever occurs first.

"Section 1306(a) expressly incorporates § 541.  Read together, § 541 fixes property of the estate as of the date of filing, while § 1306 adds to the 'property of the estate' property interests which arise post-petition." *In re Seaport*, 669 F.3d at 667.  It is § 1306(a)(2) which operates to bring the debtor's earnings from postpetition services into his or her estate."

Parks BAP, 475 B.R. at 707-08.

Having reviewed the controlling provisions of the Code, the Parks BAP panel next examined the meaning of Section 541(b)(7) and its "hanging paragraph":

> Given this statutory framework, the question then becomes what is "excluded" from property of the estate under § 541(b)(7)(A) which also does not constitute disposable income?  In answering this question, we keep in mind that statutory provisions are to be read in harmony in the context of the whole statute. *Hougland v. Lomas & Nettleton Co. (In re Hougland)*, 886 F.2d 1182, 1184 (9th Cir. 1989) (citing *Davis v. Mich. Dept. of Treasury*, 489 U.S. at 809, 109 S. Ct. 1500).  All parts of a statute are to be read as a whole, and in harmony with one

82

another, and not in conflict.  *Culver, LLC v. Chiu (In re Chiu),* 266 B.R. 743, 747, 750 (9th Cir. BAP 2001), *aff'd*, 304 F.3d 905 (9th Cir. 2002).  In light of these principles, by reading § 541(a)(1) and § 541(b)(7) together, the most reasonable interpretation of § 541(b)(7)(A) is that it excludes from property of the estate only those 401(k) contributions made before the petition date.  *In re Seafort,* 669 F.3d at 673; *In re McCullers*, 451 B.R. at 503-05; *see also In re Prigge*, 441 B.R. at 677 n. 5 (noting that § 541(b)(7) "seems intended to protect amounts withheld by employers from employees that are in the employer's hands at the time of filing bankruptcy, prior to remission of the funds to the plan."  5 COLLIER ON BANKRUPTCY, ¶ 541.22C[1] (15th ed. rev.)).  Otherwise, as noted by the Sixth Circuit in *In re Seafort*, if "contributions to a qualified retirement plan never constitute property of a bankruptcy estate . . . Congress would not have needed to include an additional provision in § 541(b)(7)(A) stating that such contributions are excluded from disposable income."  669 F.3d at 673.

Parks BAP, 475 B.R. at 708.[338]

In order to give substantive meaning to the entire text of the "hanging paragraph" in Section 541(b)(7), given its placement within the Code section defining property of the estate, the Parks BAP held:

From here, it follows that "such amount" referred to in the hanging paragraph of § 541(b)(7)(A) means that only prepetition contributions shall not constitute disposable income.  *In re McCullers*, 451 B.R. at 503-04.  As a consequence, we are persuaded that the term "except that" in the hanging paragraph was designed simply to clarify that the voluntary retirement contributions excluded from property of the estate are not postpetition income to the debtor.  *Id.* at 504-05.  Finally, to give meaning to the words "under this subparagraph" found in the hanging paragraph, it is reasonable to conclude that "Congress intentionally limited the type of contributions to qualified retirement plans that would be

---

[338]The Seafort decision referenced in Parks BAP is discussed in more detail below.

excluded from disposable income, namely those 'under this subparagraph', §
541(b)(7)(A), which in turn governs only those contributions in effect as of the
commencement of a debtor's bankruptcy case, per §541(a)(1)." *In re Seafort,* 669
F.3d at 673.

Parks BAP, 475 B.R. at 708.

Like the Prigge and McCullers courts, Parks BAP highlighted the fact that in adopting
changes to chapter 13 of the Code under BAPCPA, Congress expressly excluded retirement plan
loan payments from disposable income,[339] but did not provide an express exclusion for voluntary
retirement plan contributions:

> We also attach significance to the fact that § 1306(a)(2) makes postpetition
> earnings of a debtor part of his or her estate but nowhere in chapter 13 are
> voluntary retirement contributions excluded from disposable income.  To the
> contrary, when Congress amended [sic] BAPCPA, it chose to exclude the
> repayment of 401(k) loans from disposable income in § 1322(f).  "Where
> Congress includes particular language in one section of a statute but omits it in
> another, it is generally presumed that Congress acts intentionally and purposely in
> the disparate inclusion or exclusion." *Keene Corp. v. United States*, 508 U.S.
> 200, 208, 113 S. Ct. 2035, 124 L. Ed. 2d 118 (1993).  Accordingly, it is likely
> "that Congress did not intend to treat voluntary 401(k) contributions like 401(k)
> loan repayments, because it did not similarly exclude them from 'disposable
> income' within Chapter 13 itself." *In re Seafort*, 669 F.3d at 672.  ***Simply put,***
> ***without a clearer direction comparable to the carve out from disposable income***
> ***for the repayment of retirement loans in § 1322(f), it seems unlikely that***
> ***Congress intended § 541(b)(7)(A) to bestow a benefit on above-median chapter***
> ***13 debtors while their creditors absorbed an even greater loss.***

---

[339]Section 1322(f), supra.

<u>Parks BAP</u>, 475 B.R. at 708-09 (emphasis added).[340]

Like the bankruptcy courts in <u>Parks</u> and <u>McCullers</u>, the <u>Parks BAP</u> panel also looked to the Ninth Circuit's holding in <u>Egebjerg</u> in the course of its analysis, noting:

> Further support for the *Prigge* holding comes from other sections of the Code as well. Section 1325(b)(2)(A)(i) states that "disposable income means current monthly income received by the debtor . . . less amounts reasonably to be expended . . . for the maintenance or support of the debtor . . . ." Here, because debtors' income exceeded the state median, the "amounts reasonably needed to be expended" are determined by the "means test" set forth in § 707(b)(2). § 1325(b)(3). Voluntary contributions to 401(k) retirement plans are not mentioned as "reasonable and necessary expenses" under the "means test" set forth in § 707(b)(2)(A) & (B). *In re Seafort,* 669 F.3d at 672; *see also In re Prigge,* 441 B.R. at 676 (citing *Egebjerg v. Anderson (In re Egebjerg)*, 574 F.3d 1045, 1052 (9th Cir. 2009) (citing Internal Revenue Manual § 5.15.1.23)). Congress's failure to mention contributions to 401(k) retirement plans as reasonable and necessary expenses in § 707(b)(2) suggests that Congress did not intend § 541(b)(7)(A) to exclude postpetition 401(k) contributions from disposable income.

<u>Parks BAP</u>, 475 B.R. at 709.

The <u>Parks BAP</u> panel was mindful that <u>Egebjerg</u> was not a chapter 13 case, but a chapter

---

[340]This portion of the logic set forth in <u>Parks BAP</u> is entirely consistent with Congress' stated intent when it enacted BAPCPA, and the means test embodied in it. As has been expressly recognized by the United States Supreme Court:

"Congress enacted the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA or Act) to correct perceived abuses of the bankruptcy system." <u>Milavetz, Gallop & Milavetz, P.A. v. United States</u>, 559 U.S. 229, 231 – 232, 130 S. Ct. 1324, 1329, 176 L. Ed. 2d 79 (2010). ***In particular, Congress adopted the means test—"[t]he heart of [BAPCPA's] consumer bankruptcy reforms," H.R. Rep. No. 109–31, pt. 1, p. 2 (2005) (hereinafter H.R. Rep.), and the home of the statutory language at issue here— to help ensure that debtors who can pay creditors do pay them. See, e.g., ibid. (under BAPCPA, "debtors [will] repay creditors the maximum they can afford"***).

<u>Ransom v. FIA Card Services, N.A.</u>, 562 U.S. 61, 64 (2011) (emphasis added).

7 case in which the debtor had unsuccessfully argued that 401(k) loan repayments qualified as an "other necessary expense" in the means testing process under Section 707(b)(2).[341] Finding that procedural difference to be inconsequential, the Parks BAP court stated:

> We also agree that the Ninth Circuit's decision in *In re Egebjerg*, 574 F.3d 1045, which was heavily relied upon by the *Prigge* court, lends support to the interpretation discussed above notwithstanding the nuanced difference of the issues. There, the Ninth Circuit rejected the chapter 7 debtor's argument that his 401(k) loan repayments qualified as an "other necessary expense" for purposes of applying the means test under § 707(b)(2). In doing so, the Court noted that "[w]hen it introduced the means test, Congress provided, by reference to the IRS guidelines, specific guidance as to what qualifies as a necessary expense for the purposes of applying that test." 574 F.3d at 1052. The 401(k) loan repayments were neither listed in any of fifteen categories as expenses which may be considered necessary nor were the repayments of the same kind and character of the expenses allowed elsewhere in the guidelines. *Id.* at 1051-52. The court also noted that "the IRS guidelines themselves provide that '[c]ontributions to voluntary retirement plans are not a necessary expense.' " *Id.* at 1052. Although the IRS guidelines do not prevail over a plain reading of § 541(b)(7)(A), they do provide the "specific guidance that [401(k) contributions] are not a necessary expense, in any amount." *In re Prigge*, 441 B.R. at 676.

Parks BAP, 475 B.R. at 709.

Having travelled the same analytical course charted by the Prigge and McCullers courts, the Parks BAP panel reached the following conclusion:

> For all these reasons, we hold that § 541(b)(7) does not authorize chapter 13 debtors to exclude voluntary postpetition retirement contributions in any amount

---

[341] As noted previously, the means testing process under Section 707(b)(2) is the specific process to be used by bankruptcy courts in addressing the "other necessary expenses" component of the "disposable income" calculus in cases filed by above-median income chapter 13 debtors like Ms. Aquino. See Section 1325(b)(3).

for purposes of calculating their disposable income.  Accordingly, we AFFIRM.[342]

### c. Post-BAPCPA Cases Holding That If An Above-Median Income Chapter 13 Debtor Has Regularly Made Voluntary Contributions to a Qualified Retirement Plan Prior to Bankruptcy, Post-Petition Contributions In the Pre-Petition Amount Can Be Excluded From Disposable Income

At almost exactly the same time as the Ninth Circuit Court of Appeals published its Egebjerg decision, an issue similar to the one now before this Court arose in the United States Bankruptcy Court for the District of Kentucky.

### I.    In re Seafort

In the case of In re Seafort, 2009 WL 1767627 (Bankr. E.D. Ky. June 22, 2009),[343] the bankruptcy court was faced with the following factual scenario:

> [Debtors in two consolidated cases] are each eligible participants in their employers' ERISA-qualified retirement plans, each of which is a 401(k) plan funded by voluntary deductions from the Debtor's earnings.  Prior to the filing of their respective Chapter 13 petitions, the Debtors had ceased making contributions to their retirement plans and had taken out 401(k) loans.  The monthly deductions currently being taken by the Debtors are noted on Schedule I of each plan.
>
> The 401(k) loans are each scheduled to be paid in full prior to completion of the Debtors' respective Chapter 13 plans.  The Debtors have proposed to continue

---

[342]Parks BAP, 475 B.R. at 709.  The scope of the holding in Parks BAP panel is, in this Court's view, more properly limited to chapter 13 cases filed by above-median income chapter 13 debtors in which a creditor or trustee has objected to confirmation due to the debtor's voluntary (as distinguished from mandatory) post-petition retirement plan contributions.  See note 336, supra.

[343]The Egebjerg decision was first issued on May 29, 2009, two weeks prior to Seafort, and was subsequently amended on August 3, 2009.  Egebjerg, 574 F.3d at 1045.

their payroll deductions as 401(k) contributions after their loans are paid out.

Under this course of action, the Debtors' chapter 13 plan payments would not

increase on account of their satisfaction of their 401(k) loans.  The Trustee,

however, contends that in order to present a confirmable plan, each Debtor must

propose a step plan in which monthly Chapter 13 plan payments would increase

by an amount equal to each Debtor's present 401(k) loan payment.

Seafort, 2009 WL 1767627, at *1.[344]

Focusing on the concept of property of the estate under Sections 541 and 1306, and

without addressing the separate issue of whether voluntary 401(k) contributions are "amounts

reasonably necessary to be expended for the support and maintenance of the debtor" in the

context of Section 1325(b)(2), the Seafort court stated:

Section 1306 provides in pertinent part that "[p]roperty of the estate includes, in

addition to the property specified in section 541 of this title, all property of the

kind specified in such section that the debtor acquires after the commencement of

the case but before the case is closed, dismissed, or converted to a case under

chapter 7, 11, or 12 of this title, whichever occurs first[.]"  11 U.S.C.  §1306(a)(1)

The Debtors contend that nothing in this language evidences an intent to limit the

exclusion provided in section 541(b)(7).  This court agrees.

Seafort, 2009 WL 1767627, at *2.

In reliance on cases that had addressed the question of whether voluntary contributions to

qualified retirement plans ran afoul of the good faith confirmation requirements of Section

§ 1325(a)(3), citing its understanding of the "hanging paragraph," and based upon its sense of

Congress' intent when it enacted BAPCPA, the Seafort court stated:

The Debtors cite several cases in support of their position.  In In re Mati, 390 B.R.

11 (Bankr. D. Mass. 2008), the court considered the trustee's good faith challenge

to the debtor's 401(k) contributions:

---

[344]It is not clear from the bankruptcy court's decision in Seafort whether the debtors'
income was above or below the applicable median income level.

> [B]y excluding 401(k) contributions from property of the estate and expressly removing them from the definition of disposable income under section 1325(b), *see* 11 U.S.C. § 541(b)(7), Congress has implemented a policy of protecting and encouraging retirement savings.[345]  As noted by the court in *In re Johnson*, 346 B.R. 256, 262-63 (Bankr. S.D. Ga. 2006), BAPCPA's amendments to section 1325(b) alter the good faith inquiry under section 1325(a)(3) by narrowing the scope of judicial discretion and excluding certain sources of income that do not need to be committed to Chapter 13 plans.  In particular, debtors, pursuant to section 541(b)(7), may shelter contributions to certain qualified employee benefit plans.  *Id.* at 263.  The court in *Johnson* concluded that the debtors could fund their 401(k) plans in good faith as long as their contributions did not exceed the limits legally permitted by their 401(k) plans.

Seafort, 2009 WL 1767627, at *2 (emphasis added).[346]

Ultimately, the Seafort court confirmed the debtors' plans, holding:

> This court agrees with the Mati court's interpretation of the relevant statutory provisions and its understanding of congressional intent.  The trustee argues that contributions to a retirement plan are excluded from property of the estate and consideration as disposable income only if the contributions are being made at the time the petition is filed.  The court believes, however, that participation in a 401(k) plan is an ongoing endeavor, and while loan payments may take the place of contributions for the life of the 401(k) loan, the income stream that funds both loan payments and plan contributions is the same.  Loan payments and plan

_____

[345]When the Seafort decision was issued, the United States Supreme Court had not yet written its Ransom opinion.  Ransom contains a much different perspective on the intent of Congress when it enacted BAPCPA.  See note 340, supra.  The same is true with respect to the 2008 decision in Mati, relied upon by the Seafort court.

[346]The Seafort court also noted that "[i]n Johnson, the debtors were making contributions to their 401(k) plans and repaying loans from those plans at the same time."  Seafort at *2.  Thus, the facts in Seafort and Johnson are both distinguishable from the facts in Ms. Aquino's case.  Ms. Aquino's case doesn't involve loan repayments at all.

contributions are alternative participation vehicles, and neither needs to be committed to the Debtors' Chapter 13 plans under the reasoning of <u>Mati</u>.[347]

## II.    <u>Seafort BAP</u>

Dissatisfied with the bankruptcy court's holding, the chapter 13 trustee in <u>Seafort</u> appealed that decision to the Sixth Circuit Bankruptcy Appellate Panel.  <u>Burden v. Seafort</u> (<em>In re</em> Seafort), 437 B.R. 204 (6th Cir. BAP 2010).[348]  The <u>Seafort BAP</u> panel framed the issue before it as follows:

> The issue raised in this appeal is whether a chapter 13 debtor who is repaying a 401(k) loan, but not making any 401(k) contributions at the time the bankruptcy petition is filed, may use the income which becomes available when the loans are repaid to start making contributions to the debtor's 401(k) plan rather than committing the extra income to repay creditors.

<u>Seafort BAP</u>, 437 B.R. at 205-06.

The <u>Seafort BAP</u> summarized the facts of the consolidated cases underpinning the appeal in the following manner:

> On November 20, 2008, Deborah Seafort filed a petition for relief under chapter 13 of the Bankruptcy Code.  On November 25, 2008, Frederick C. Schuler and Carrie A. Schuler filed a joint petition for relief under chapter 13 of the Bankruptcy Code.  At the time the debtors filed their respective petitions for

---

[347]<u>Seafort</u>, 2009 WL 1767627, at *2.  This Court finds <u>Seafort's</u> apparent analytical conflation of payments on loans from, and voluntary contributions to, a qualified retirement plan based upon the concept that the same income stream is used to fund them, to be a conundrum.  As noted previously, **payment obligations on loans from** a qualified retirement plan are expressly excluded from disposable income under the forward-looking provisions of Section 1325(f), a section located within the specific parameters of Chapter 13 of the Code.  No similar forward-looking disposable income exclusion for **voluntary contributions to** a qualified retirement plan is contained in Section 1306(a) or anywhere else within the specific parameters of Chapter 13 of the Code.  The more general provisions of Section 541(a) governing the scope of the bankruptcy estate when a bankruptcy petition is filed, including the "hanging paragraph," do not alter that fact, as noted and carefully considered by the courts in <u>Prigge</u>, <u>McCullers</u>, and <u>Parks</u>.

[348]For clarity and avoidance of doubt, the Court will refer to this appellate decision as "<u>Seafort BAP</u>."

relief, Deborah Seafort and Frederick C. Shuler (hereinafter collectively "Debtors") were both eligible participants in their respective employers' ERISA qualified 401(k) retirement plans.  The Debtors were not making contributions to their plans at the time they filed for bankruptcy relief; however, each Debtor was repaying a 401(k) loan.  Seafort was paying her loan at the rate of $254.71 per month, and Schuler was paying $815.86 per month.

Seafort BAP, 437 B.R. at 206.

The Seafort BAP panel then summarized the debtors' plans and the trustee's responsive confirmation objections:

The Debtors each filed a proposed chapter 13 plan which provided for a commitment period of five years.[349]  Under their respective proposed plans, the loans would be repaid in full before completion of the plans.  The plans proposed to complete repayment of the loans and then continue payroll deductions as 401(k) contributions in the same amount as the loan payments.  The plan payments would not, therefore, increase after the loans were paid in full.  The Trustee objected to confirmation of both plans asserting that because the Debtors were not making 401(k) contributions as of the commencement of their bankruptcy cases the Debtors must increase their plan payments by the amount of the loan payments once the loans were paid in full.

Seafort BAP, 437 B.R. at 206-07.

The Seafort BAP panel next examined how the enactment of BAPCPA impacted repayment of loans from, and voluntary contributions to, qualified retirement plans:

Prior to the adoption of [BAPCPA], a chapter 13 debtor could not make contributions to a 401(k) plan because such funds were considered disposable income which had to be committed to the chapter 13 plan.  *Harshbarger v. Pees* (*In re Harshbarger*), 66 F.3d 775, 777-78 (6th Cir. 1995).  For the same reason,

---

[349]This finding at least suggests, but does not confirm with certainty, that the debtors in Seafort were above-median income earners.  See Section 1325(b)(4)(A)(ii).

chapter 13 debtors were also prohibited from repaying a 401(k) loan during the life of a chapter 13 plan, regardless of any adverse consequences which might result from nonpayment. *Id.* The adoption of BAPCPA, however, resulted in several changes to the treatment of ERISA qualified employee benefit plans ("Qualified Plans"). In particular, BAPCPA amended § 541 to add subsection (b)(7) which allows debtors to shelter contributions to certain Qualified Plans from property of the estate. As a result, a debtor may now exclude contributions to Qualified Plans, including contributions to a 401(k) plan, up to the permitted amount of the plan from his bankruptcy estate. *In re Nowlin*, 366 B.R. 670, 676 (Bankr. S.D. Tex. 2007) (citing *In re Johnson*, 346 B.R. 256, 263 (Bankr. S.D. Ga. 2006), *aff'd*, No. 07-2446, 2007 WL 4623043 (S.D. Tex. Dec. 28, 2007), *aff'd*, 576 F.3d 258 (5th Cir. 2009). In addition, BAPCPA added subsection (f) to 11 U.S.C. § 1322 which prohibits a chapter 13 plan from altering the terms of a 401(k) loan and excludes "any amounts" used to repay loans from Qualified Plans from the calculation of a debtor's "disposable income." 11 U.S.C. § 1322(f). In sum, BAPCPA changed the way contributions to Qualified Plans and loan payments to such plans are treated in chapter 13 cases.

Seafort BAP, 437 B.R. at 207.

Looking next at how the enactment of BAPCPA impacted the plan confirmation analysis under Section 1325, the Seafort BAP panel observed:

BAPCPA also made changes to 11 U.S.C. § 1325, the Code section which spells out the requirements for confirmation of chapter 13 plans; however, the amendments did not directly address how to treat the income which becomes available when a 401(k) loan is repaid during the applicable commitment period. The Fifth and Eighth Circuit Courts of Appeal have classified the resulting available funds as projected disposable income which must be committed to the debtor's chapter 13 plan. *McCarty v. Lasowski* (*In re Lasowski*), 575 F.3d 815, 820 (8th Cir. 2009); *Nowlin v. Peake* (*In re Nowlin*), 576 F.3d 258 (5th Cir. 2009).

> However, no court has addressed the precise question presented by this appeal:
> whether a debtor, who was not contributing to an ERISA qualified plan when the
> case was filed, may begin making 401(k) contributions once the 401(k) loan has
> been repaid.

Seafort BAP, 437 B.R. at 207.[350]

Summarizing the three arguments raised by the trustee on appeal, the Seafort BAP panel stated:

> The Trustee makes three arguments in support of her position that the bankruptcy
> court erred in permitting these Debtors, who were not making contributions to
> their 401(k) plans at the commencement of their cases, to exclude the income
> which became available once their 401(k) loans were repaid from projected
> disposable income and then use that income to make contributions to a 401(k)
> plan.  First, pursuant to fundamental rules of statutory construction, the Trustee
> Argues that chapter 13 debtors may only exclude contributions they are making to
> a 401(k) plan as of the commencement of their case from property of the estate
> and disposable income.  Second, the Trustee asserts that the Debtors' proposed
> plans did not comply with the disposable income requirements of § 1325(b)(1).
> Lastly, the Trustee contends that the Debtors' plans were not proposed in good
> faith.

Seafort BAP, 437 B.R. at 207-08.

Turning first to the trustee's statutory construction argument, the Seafort BAP panel began its analysis with the text of Section 541(a), noted from that text that the bankruptcy estate is created upon "the commencement of the case," and stated:

> The definition of "property of the estate" is exceptionally broad and designed to
> "'bring anything of value that the debtors have into the [bankruptcy] estate.'"
> Lyon v. Eiseman (In re Forbes), 372 B.R. 321, 330 (6th Cir. BAP 2007) (citation

---

[350]The facts in Seafort, as reiterated in Seafort BAP, are distinguishable from those present in Ms. Aquino's case.  Ms. Aquino was making voluntary contributions to a qualified plan when her case was filed, and hadn't taken out a loan from her 401(k) plan.

omitted).  While reaching broadly to bring a wide variety of property into the estate, § 541 also provides for a number of exclusions.  Subsection (b) lists certain interests which may exist as of the commencement of the case, but are nevertheless excluded from property of the estate.  BAPCPA amended § 541(b) by adding subsection (b)(7) to the list of property which could be excluded from property of the estate.

Seafort BAP, 437 B.R. at 208.

After examining the text of Section 541(b)(7) and the "hanging paragraph" within it, the Seafort BAP panel disagreed with the bankruptcy court's statutory analysis:

> In this case, the bankruptcy court concluded that because § 541(b)(7) excludes contributions to a 401(k) plan from property of the estate and excludes the amount of those contributions from being considered disposable income, contributions which commence after the filing of the case must also be excluded from property of the estate.  The Panel disagrees.  The Panel concludes that the language of § 541(a) is clear.  Property of the estate under § 541(a)(1) and exclusions from property of the estate under § 541(b) must both be determined on the date of the filing of the case.  As provided in the statute, § 541(a) specifically states that "the commencement of a case . . . creates an estate."  Section 541(b) excludes certain property from the definition of "property of the estate."  Read together, § 541(a) and (b) establish a fixed point in time at which parties and the bankruptcy court can evaluate what assets are included or excluded from property of the estate.  Section 541(a) clearly establishes this point as the commencement of the case.  ***Therefore, only 401(k) contributions that are being made at the commencement of the case are excluded from property of the estate under § 541(b)(7).***  The Panel is not concluding that property which the debtor acquires after the commencement of the case is not subject to the Bankruptcy Code.  Instead, the Panel holds that a debtor's ability to exclude property acquired post-petition from the claims of creditors is not controlled by 11 U.S.C. § 541.

94

Seafort BAP, 437 B.R. at 208-09 (emphasis added).

Having established that Section 541 operated to establish the scope of the bankruptcy estate at the commencement of the case, the panel in Seafort BAP then examined the forward-looking text of Section 1306, which expands the bankruptcy estate in chapter 13 cases by bringing the debtor's postpetition income into it:

> This panel's construction of § 541(a) and (b) is consistent with the manner in which "property of the estate" is defined in a Chapter 13 bankruptcy proceeding. Section 1306 provides:
>
>> (a) Property of the estate includes, in addition to the property specified in section 541 of this title –
>>
>>> (1) all property of the kind specified in such section that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 11, or 12 of this title whichever occurs first; and
>>>
>>> (2) earnings from services performed by the debtor after commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 11, or 12 of this title whichever occurs first.
>
> 11 U.S.C. § 1306. Notably, this section, which addresses property and earnings that come into existence *after* the debtor files a petition for relief does not exclude 401(k) contributions from property of the estate. Rather, § 401(k) contributions are only excluded in § 541 which specifically applies to property in existence at the commencement of the case. Because Congress identified 401(k) contributions as excluded in § 541, but not in § 1306, the Panel concludes that the absence of any reference in § 1306 to 401(k) contributions was intentional. *Hildebrand v. Petro (In re Petro)*, 395 B.R. 369, 375 (6th Cir. BAP 2008) ("If a statute uses a particular phrase in one section, but not in another, courts should assume the inclusion or exclusion to have been intentional.") Congress did not intend for

income which becomes available post-petition to be excluded from property of the chapter 13 estate or from the calculation of projected disposable income. Seafort BAP, 437 B.R. at 209.

Recognizing a distinction between the fixed concept of "disposable income" and the forward-looking concept of "projected disposable income," the Seafort BAP panel noted that:

> The Panel's conclusion that § 541(b)(7) does not exclude income which becomes available post-petition in order to start making contributions to a 401(k) plan, is also supported by the language in § 541(b)(7) and its reference only to "disposable income." Conspicuously, § 541(b)(7) makes no reference to "projected disposable income." Projected disposable income is based on debtor's income as of confirmation and also allows for "consideration of reasonably certain future events." *Nowlin v. Peake* (*In re Nowlin*), 576 F.3d 258 (5th Cir. 2009). Had Congress intended to protect income which becomes available after the petition is filed, Congress could easily have written § 541(b)(7) to read "any amount withheld by an employer ... shall not constitute disposable income as defined in 11 U.S.C. § 1325(b)(2) or projected disposable income under § 1325(b)(1)(B)." Income which becomes available after the filing of a case is "projected disposable income" and that income is not excluded from property of the estate. Projected disposable income must be used to pay creditors pursuant to § 1325(b)(1)(B) and may not be used to commence making payments to a 401(k) plan.

Seafort BAP, 437 B.R. at 209-10.

Turning to the question of Congressional intent in enacting BAPCPA, the Seafort BAP panel noted:

> This panel's construction of § 541(a) and (b) and § 1325 is also consistent with the stated objective of BAPCPA. A primary objective of BAPCPA, insofar as consumer bankruptcy was concerned, was to "ensure that debtors repay creditors the maximum they can afford." H.R. Rep. No. 109-31, pt. 1, at 2 (2005), U.S.

Code Cong. & Admin. News 2005, pp. 88, 89.  BAPCPA also included various consumer protection reforms.  It "allows debtors to shelter from the claims of creditors certain education IRA plans and retirement pension funds."  *Id.* at 104.  In explaining the impact of BAPCPA, Congress stated that "[t]he new property-value limitations could make more money available to creditors in some cases, while the exemptions on some retirement . . . savings generally would make less money available."  *Id.* at 115.

Seafort BAP, 437 B.R. at 210.

Wrapping up its analysis of the trustee's statutory construction argument on appeal, the panel in Seafort BAP wrote:

In regard to retirement savings, Congress clearly intended to strike a balance between protecting debtors' ability to save for their retirement and requiring that debtors pay their creditors the maximum amount they can afford to pay.  ***This balance is best achieved by permitting debtors who are making contributions to a Qualified Plan at the time their case is filed to continue making contributions, while requiring debtors who are not making contributions at the time a case is filed to commit post-petition income which becomes available to the repayment of creditors rather than their own retirement plan.***  To conclude otherwise encourages the improvident behavior that BAPCPA sought to discourage.  If the bankruptcy court is affirmed, debtors who were not contributing to their tax qualified plan and borrowing against their own retirement savings may file bankruptcy, repay themselves, and, once the loan is repaid, start contributing again to their own retirement savings.  Allowing debtors to do so would tip the delicate balance struck by BAPCPA impermissibly in favor of debtors.  On the other hand, allowing debtors who are making contributions at the commencement of the case to continue making those contributions furthers the goal of encouraging retirement savings.  ***Limiting those projections to contributions in place at the time debtors file their petitions also protects the goal of ensuring***

*that debtors pay creditors the maximum amount debtors can afford to pay.*

Seafort BAP, 437 B.R. at 210 (emphasis added).

At the inception of its analysis of the trustee's second argument, that the Debtors' proposed plans did not comply with the projected disposable income requirements of § 1325(b)(1), the Seafort BAP made it plain that it agreed with the trustee:

> The bankruptcy court also erred in confirming the Debtors' proposed plans because the plans do not comply with the projected disposable income requirement of § 1325(b)(1)(B).  Under that section, if the chapter 13 trustee or an unsecured creditor objects to confirmation of a debtor's chapter 13 plan, a court may not confirm the plan unless the debtor pays unsecured creditors the full value of their claims or "the plan provides that all of the debtors' *projected* disposable income to be received in the applicable commitment period . . . will be applied to make payments to unsecured creditors in order to confirm the plan over an objection by the trustee or an unsecured creditor.

Seafort BAP, 437 B.R. at 211.

Drawing a careful distinction between the defined term "disposable income"[351] and the undefined concept of "projected disposable income"[352] in the context of Section 1325, the Seafort BAP court observed:

> The term "projected disposable income" is not defined by the Bankruptcy Code; however, the United States Supreme Court recently concluded that a forward-looking approach should be taken whereby "projected disposable income" is calculated based on both debtor's circumstances as of confirmation, and on "changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation." *Hamilton v. Lanning*, 560 U.S. 505, 130 S. Ct. 2464, 2478, 177 L. Ed. 2d 23 (2010); *see also Darrohn v. Hildebrand* (*In re Darrohn*), No. 095499, 615 F.3d 470 (6th Cir. 2010) (relying on *Lanning* and holding that

---

[351] See Section 1325(b)(2).
[352] See Section 1325(b)(1)(B).

the bankruptcy court violated § 1325 when it failed to consider debtor's changed circumstances in calculating "projected disposable income"). Because repayment of a 401(k) loan during the life of the plan can be reasonably anticipated at the time of confirmation, the Panel concludes that post-petition income which becomes available after 401(k) loans are repaid must be considered as projected disposable income available to unsecured creditors.

Seafort BAP, 437 B.R. at 411. The Seafort BAP panel found further support for its "conclusion that income which becomes available after 401(k) loans are repaid is projected disposable income which must be committed to the repayment of unsecured creditors" in decisions issued by the Fifth and Eighth Circuit Courts of Appeals,[353] and ultimately concluded:

Consistent with these interpretations of "projected disposable income," the Panel concludes that to obtain confirmation of a chapter 13 plan, debtors are required to commit the income which becomes available after their 401(k) loans are repaid to the payment of unsecured creditors.

Seafort BAP, 437 B.R. at 213.[354]

Turning to the trustee's third argument, that the plans at issue had not been proposed in good faith, the Seafort BAP panel opted not to decide that issue in light of its other holdings and

---

[353]Seafort BAP, 437 B.R. at 211-13, citing In re Nowlin, 366 B.R. 670, 676 (Bankr. S.D. Tex. 2007), aff'd, 2007 WL 4623043 (S.D. Tex. Dec. 28, 2007), aff'd, 576 F.3d 258 (5th Cir. 2009) and McCarty v. Lasowski (In re Lasowski), 575 F.3d 815, 820 (8th Cir. 2009).

[354]The majority opinion in Seafort BAP noted that the extensive and vigorous dissent penned by Hon. Marilyn Shea-Stonum "repeatedly argues" that the majority opinion had established an 'irrebuttable presumption' that a debtor may never commence or increase contributions to a tax qualified retirement plan after confirmation of their Chapter 13 plan." In response, the Seafort BAP panel stated "The majority opinion creates no such presumption. The majority ruling only holds that 11 U.S.C. § 1325(b)(1)(B) precludes confirmation of a Chapter 13 plan which provides as part of the plan, that income which becomes available after a 401(k) loan has been repaid, must be used to commence or increase contributions to a Qualified Plan. There is nothing in the majority opinion that would prevent a debtor from making an argument after confirmation that a change in debtor's circumstances justified committing income to a Qualified Plan." Seafort BAP, 437 B.R. at 213. This Court has read and considered Judge Shea-Stonum's dissent in Seafort BAP in its analysis in Ms. Aquino's case, and would address it further here, were it not for the appellate history that followed the Seafort BAP decision. That subsequent appellate history is discussed in more detail below.

the absence of related fact findings at the bankruptcy court level:

> Finally, the Trustee contends that the Debtors have not proposed their plans in good faith because they could pay substantially more into their plans once their 401(k) loans are repaid, but instead are seeking solely to contribute to their 401(k) plans to the detriment of their unsecured creditors.  The bankruptcy court made no findings of fact on this issue.  In light of the Panel's conclusion that the Debtors' proposed plans should not have been confirmed because they cannot commence making contributions to their 401(k) plans once the loans are repaid, the Panel need not reach the merits of the Trustee's appeal on the issue of good faith.

Seafort BAP, 437 B.R. at 213.

Reversing the bankruptcy court, the Seafort BAP panel summarized its holding this way:

> In conclusion, post-petition income which becomes available after a debtor repays a 401(k) loan is not excluded from property of the estate under § 541(a) and (b), is property of the estate in a chapter 13 case pursuant to § 1306(a), and is projected disposable income which must be committed to the chapter 13 plan pursuant to § 1325(b)(1)(B).  Once the Debtors, Seafort and Schuler, have repaid their 401(k) loans, the funds which become available must be committed to the plan for the repayment of unsecured creditors.

Seafort BAP, 437 B.R. at 213.

In opposition to the trustee's dismissal motion, Ms. Aquino "suggests the proper test for this Court to adopt here is that proposed by [Seafort BAP]."[355]  Curiously absent from Ms. Aquino's opposition is any acknowledgement or discussion of the appellate history that followed Seafort BAP.

### III.    Seafort Circuit

Dissatisfied with the decision in Seafort BAP, the debtors sought further appellate review from the Sixth Circuit Court of Appeals.  Seafort v. Burden (In re Seafort), 669 F.3d 662 (6th

---

[355]ECF No. 66, p. 4 of 7, para. 13.

Cir. 2012).[356]

Taking the baton from the Bankruptcy Appellate Panel, in <u>Seafort Circuit</u> the Sixth Circuit Court of Appeals opened its opinion with a concise statement of the issue and its conclusion:

> Chapter 13 of the Bankruptcy Code permits "individual[s] with regular income" whose debt falls within statutory limits, *see* 11 U.S.C. §§ 101(3), 109(e), to keep their property if they agree to a court-approved plan to pay creditors out of their future "disposable income." *See* 11 U.S.C. §§ 1306(b), 1321, 1322(a)(1), 1328(a). However, if a trustee of the plan or an unsecured creditor objects, a Chapter 13 plan can be confirmed only if the debtor contributes "all . . . projected disposable income" to the plan. 11 U.S.C. § 1325(b)(1)(B). The question presented in this consolidated appeal is whether the income that becomes available after the debtors have fully repaid their 401(k) loans (which is allowed by 11 U.S.C. § 1322(f)) is "projected disposable income" to be paid to the unsecured creditors or whether the income can be used to begin making voluntary contributions to the debtors' 401(k) plans and deemed excludable from both disposable income and property of the estate under 11 U.S.C. § 541(a)(1) and (b)(7).
>
> We hold that post-petition income that becomes available to debtors after their 401(k) loans are fully repaid is "projected disposable income" that must be turned over to the trustee for distribution to unsecured creditors pursuant to § 1325(b)(1)(B) and may not be used to fund voluntary 401(k) plans.

<u>Seafort Circuit</u>, 669 F.3d at 663.

The <u>Seafort Circuit</u> court reviewed the facts, noting that the applicable commitment period under Section 1325 was five years in both consolidated bankruptcy cases; that the debtors

---

[356]For clarity and avoidance of doubt, this appellate decision will be referred to as "<u>Seafort Circuit</u>."

were paying on *loans received from* their 401(k) plans but were not making any *contributions to*

those plans when the cases were filed; that the loans would be fully repaid prior to the

completion of the 5 year commitment period; and that the "Debtors proposed to use the income

available after repayment of the 401(k) loans was completed to begin funding their retirement

accounts, instead of using the freed up income to pay unsecured creditors."  Seafort Circuit, 669

F.3d at 663-64.

The Seafort Circuit court also noted that the chapter 13 trustee objected to confirmation

in each of the consolidated cases.  The court also observed that "[s]pecifically, the Trustee

objected to Debtors' attempts to exclude from estate property and projected disposable income

proposed post-petition contributions to their 401(k) retirement plans, since Debtors were not

contributing anything to their qualified retirement plans when their bankruptcy cases began."

Seafort Circuit, 669 F.3d at 664.

The Seafort Circuit summarized the decisions of the bankruptcy court and Seafort BAP

as follows:

> The bankruptcy court held that because § 541(b)(7) excludes contributions to a
> 401(k) plan from property of the estate and disposable income, Debtors were
> allowed to exclude their proposed 401(k) contributions from disposable income.
> [. . . . .] A divided BAP ruled in favor of the Trustee.  The majority held that (1)
> exclusions from property of the estate and disposable income for contributions to
> a qualified retirement plan found in 11 U.S.C. § 541(b)(7) only apply to those
> cases where a debtor is contributing as of the commencement of a bankruptcy
> case, and (2) the post-petition income that becomes available after a debtor
> completed repayment of a 401(k) loan is not excluded from property of the estate
> or disposable income under 11 U.S.C. § 541(b)(7) and must be committed to a
> Chapter 13 plan under 11 U.S.C. § 1325(b).  [. . . . .]  The dissent [in Seafort
> BAP] would have held that the disposable income does not include any amount
> withheld as a qualified contribution based upon the plain language of § 541.

Seafort Circuit, 669 F.3d at 664 (internal citations omitted).

Looking to the statutory text that would provide the framework for its decision, the Seafort Circuit court stated:

> We start with the language of the relevant statutory provisions. *Ransom v. FIA Card Servs. N.A.*, —— U.S. ——, 131 S. Ct. 716, 723–24, 178 L.Ed.2d 603 (2011) (citing *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S. Ct. 1026, 103 L. Ed. 2d 290 (1989)). As noted, if the trustee or an unsecured creditor objects to confirmation of a Chapter 13 plan, "the court may not approve the plan unless ... the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period ... will be applied to make payments to unsecured creditors under the plan." 11 U.S.C. § 1325(b)(1)(B); *see also Hamilton v. Lanning*, ——U.S. ——, 130 S. Ct. 2464, 2469, 177 L. Ed. 2d 23 (2010). "Disposable income" is defined in relevant part as "current monthly income received by the debtor ... less amounts reasonably necessary to be expended ... for the maintenance or support of the debtor." 11 U.S.C. § 1325(b)(2)(A)(i). For debtors whose income exceeds the state median, as in this case, the "amounts reasonably necessary to be expended" is determined by the "means test" set forth in § 707(b)(2). *See* 11 U.S.C. § 1325(b)(3); *see also Baud v. Carroll,* 634 F.3d 327, 332–34 (6th Cir. 2011) (explaining the appropriate method for calculating "amounts reasonably necessary to be expended") *cert. denied*, —— U.S. ——, 132 S. Ct. 997, 181 L. Ed. 2d 732 (Jan. 9, 2012) (No. 10A1008, 11–27), 2012 WL 33293.

Seafort Circuit, 669 F.3d at 665.

Drawing the distinction between the defined term "disposable income" and the undefined concept of "projected disposable income" in the same fashion as the panel in Seafort BAP, the Seafort Circuit court noted:

> "Projected disposable income" is not defined in the Bankruptcy Code, but the Supreme Court recently explained that "when a bankruptcy court calculates a debtor's projected disposable income, the court may account for changes in the

debtor's income or expenses that are known or virtually certain at the time of confirmation." *Lanning,* 130 S. Ct. at 2478; *Darrohn v. Hildebrand* (*In re Darrohn*), 615 F.3d 470 (6th Cir.2010) (applying *Lanning* to the debtors' monthly mortgages, an otherwise deductible expense, because they intended to surrender the properties securing the mortgages). Because the Trustee here objected to Debtors' proposed plans, the bankruptcy court appropriately took into account the post-petition income available upon repayment of the 401(k) loans. Thus, we must decide whether that income is "projected disposable income" that must be committed to the Chapter 13 plan and paid out to unsecured creditors or instead is otherwise excluded.

Seafort Circuit, 669 F.3d at 665.

Focusing next on the changes the enactment of BAPCPA had on payments related to qualified retirement plans, the Seafort Circuit court explained:

> Prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), both 401(k) loans and 401(k) contributions were considered "disposable income." *See Behlke v. Eisen* (*In re Behlke*), 358 F.3d 429, 435–36 (6th Cir. 2004) (holding that voluntary contributions to a 401(k) plan were "disposable income"); *Harshbarger v. Pees* (*In re Harshbarger*), 66 F.3d 775, 777–78 (6th Cir.1995) (holding that the debtor's voluntary repayment of 401(k) loans should be treated as disposable income in the bankruptcy estate). However, the BAPCPA added two exclusionary sections of importance here. The first, § 1322(f), is clear: It states in relevant part that "any amounts required to repay such loan shall not constitute 'disposable income' under section 1325." 11 U.S.C. § 1322(f).
>
> The second provisions, § 541(b)(7) is less so. *See In re Egan*, 458 B.R. 836, 842-43 (Bankr. E.D. Pa. 2011) (commenting that "like many provisions of the Bankruptcy Code added by BAPCPA, the text of § 541(b)(7) is less than clear").

104

Seafort Circuit, 669 F.3d at 665-66.

After reviewing the statutory text of Section 541(a)(1) and (b)(7), the Seafort Circuit court observed that under Section 541(a) the bankruptcy estate is created, and under Section 541(b) statutory exclusions from it are established as of the commencement of the case.[357] Noting that the text of Section 541(b)(7) and its "hanging paragraph" "is found outside the confines of Chapter 13," and that the text of Section 1306(a) expanded the scope of the bankruptcy estate by including certain post-petition assets and earnings in chapter 13 proceedings, the court in Seafort Circuit stated:

> Section 1306(a) expressly incorporates § 541. Read together, § 541 fixes property of the estate as of the date of filing, while § 1306 adds to the "property of the estate" property interests which arise post-petition.

Seafort Circuit, 669 F.3d at 666-67.

The Seafort Circuit court recognized that the ambiguity created by Section 541(b)(7) and the "hanging paragraph" contained in it had triggered a split of authority, and under the heading "Competing Views" stated:

> Although no circuit has addressed the question presented here, several bankruptcy and district courts have, with divergent results. *See, e.g., In re Egan*, 458 B.R. 836, 843–44 (Bankr. E.D. Pa.2011) (listing various approaches); *In re McCullers*, 451 B.R. 498, 501 (Bankr. N.D. Cal. 2011) (same). The first view, adopted by [Seafort BAP], reads §§ 541 and 547(b)(7) as limiting voluntary retirement contributions to those amounts being made as of the petition date[.] The second view, typified by the *Johnson* decision[358] holds that all voluntary retirement contributions, both pre- and post-petition, are permitted under § 541(b)(7), limited only by the good faith requirement of § 1325(a)(3). A third view, articulated in *In re Prigge*, 441 B.R. 667 (Bankr. D. Mont. 2010), holds that

---

[357] Seafort Circuit, 669 F.3d at 666-67.

[358] In re Johnson, 346 B.R. 256, 263 (Bankr. S.D. Ga. 2006)

§ 541(b)(7) does not permit post-petition voluntary retirement contributions in any amount regardless of whether the debtor was making pre-petition retirement contributions.

Seafort Circuit, 669 F.3d at 667.

After a comprehensive and thoughtful review of the competing views it had identified,[359] the court in Seafort Circuit generally adopted the logic of Prigge and its progeny:

As in *Baud*,[360] we are faced with a statute that is "inelegantly drafted" and therefore we must adopt an interpretation from competing theories "that is not only more consistent with the language of the statute than the competing interpretation[s], but that also is consistent with the legislative history and the overriding purpose of BAPCPA." *Baud*, 634 F.3d at 357. **Upon careful inspection, we think the view espoused by the *Prigge* and *McCullers* courts is the correct interpretation.**

Seafort Circuit, 669 F.3d at 672 (emphasis added).

The Seafort Circuit court laid out several reasons for generally aligning itself with the holdings in Prigge and McCullers:

We begin with the assumption, as we must, that Congress's placement of 401(k) loan repayments within Chapter 13 itself and placement of the exclusion for voluntary retirement contributions elsewhere was deliberate. *See Keene Corp. v. United States*, 508 U.S. 200, 208, 113 S. Ct. 2035, 124 L. Ed. 2d 118 (1993) ("Where Congress includes particular language in one section of a statute but omits it in another, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotation marks and alterations omitted); *City of Chicago v. Envtl. Defense Fund,* 511 U.S. 328, 338, 114 S. Ct. 1588, 128 L. Ed. 2d 302 (1994) ("[I]t is generally presumed that

---

[359]Specifically, the Seafort Circuit canvassed the line of cases consistent with Seafort BAP (669 F. 3d at 667-68), those cases aligned with the Johnson decision, (669 F.3d at 668-70), and those cases that followed the analysis in Prigge (669 F.3d at 669-71).

[360]Baud v. Carroll, 634 F.3d 327 (6th Cir. 2011), cert. denied, 565 U.S. 1110 (2012).

Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another.") (internal quotation marks and citation omitted);  *Hildebrand v. Petro* (*In re Petro*), 395 B.R. 369, 375 (6th Cir. BAP 2008) (same).

Seafort Circuit, 669 F.3d at 672.

From there, the Seafort Circuit court reasoned:

> The easy inference is that Congress did not intend to treat voluntary 401(k) contributions like 401(k) loan repayments, because it did not similarly exclude them from "disposable income" within Chapter 13 itself. *See* § 1322(f) (stating that "any amounts required to repay such loan shall not constitute 'disposable income' under  section 1325"). *See McCullers*, 451 B.R. at 503–04;  *Prigge*, 441 B.R. at 677. Congress also does not consider voluntary contributions as "reasonable and necessary expense[s]" deductible from "disposable income," *see* § 1325(b)(3), because it did not list them in  § 707(b)(2)(A) & (B). In fact, it expressly excluded them from the list of "necessary expenses" in Official Form 22C, which provides the formula for calculating "reasonable and necessary expenses" of above-median income debtors. *See* Official Form 22C, Chapter 13 Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income, line 31 (Dec. 2010). *See generally Lanning*, 130 S. Ct. at 2470 n. 2 ("The formula for above-median-income debtors is known as the 'means test' and is reflected in a schedule (Form 22C) that a Chapter 13 debtor must file.");  *Baud*, 634 F.3d at 333–34. Line Item 31, entitled "Other Necessary Expenses: involuntary deductions for employment," unequivocally instructs that in calculating "Deductions from Income" the above-means Chapter 13 debtor may "[e]nter the total average monthly deductions that are required for your employment, such as mandatory retirement contributions .... **Do not include discretionary amounts, such as voluntary 401(k) contributions**." Official Form 22C, line 31. *See generally Prigge*, 441 B.R. at 677 (observing that the IRS

guidelines state that voluntary retirement contributions are not a necessary

expense).

Seafort Circuit, 669 F.3d at 672 (emphasis in original).

Turning to the proper interpretation of and meaning to be afforded to the "hanging

paragraph" in Section 541(b)(7), the Seafort Circuit court stated:

> Notwithstanding, § 541(b)(7) must provide some sort of protection for voluntary
> retirement contributions in Chapter 13 cases, because it says that such
> contributions "shall not constitute disposable income as defined in  section
> 1325(b)(2)."  § 541(b)(7) (the so-called "hanging paragraph"). But Congress said
> this in the larger context of  § 541(a)(1). As the *McCullers* court pointed out,
> "[t]his structure suggests that  section 541(b)(7) excludes from property of the
> estate only property that would otherwise be included in the estate under  section
> 541(a). Thus, the most natural reading of  section 541(b)(7) is that it excludes
> from property of the estate only those contributions made before the petition
> date." *McCullers*, 451 B.R. at 503–04. To this extent, we think [Seafort BAP]
> properly read  §§ 541(a)(1) and  (b) together, as defining "property of the estate"
> by what is included and excluded at a fixed point in time—as of commencement
> of the bankruptcy case. We agree with *McCullers* that for this reason, the
> *Johnson* line of cases are not persuasive because they do not read  § 541(b)(7)
> within the larger context of  § 541 as a whole.

Seafort Circuit, 669 F.3d at 672-73.

Focusing next on the significance of the placement of Section 541(b)(7) outside of

chapter 13 of the Code, and the need to give meaning to the phrase "except that" contained in the

"hanging paragraph," the court in Seafort Circuit observed:

> We find it is also significant that Congress placed the "disposable income"
> exception for voluntary retirement contributions within the confines of
> § 541(b)(7), rather than in Chapter 13 itself. Like the *McCullers* court, we think
> that "the most natural reading of  section 541(b)(7) is that it excludes from

108

property of the estate only those contributions made before the petition date" as "indicated by its specifying the contributions excluded from property of the estate and then stating that 'such amount' shall not constitute disposable income." *McCullers*, 451 B.R. at 503–04. Furthermore, as the *McCullers* court observed, the term "except that" in the hanging paragraph was designed simply to clarify that the voluntary retirement contributions excluded from the property of the estate are not post-petition income to the debtor. *McCullers*, 451 B.R. at 504–05. Restated, the function of § 541(b)(7) was merely to clarify that pre-petition retirement contributions do not constitute property of the estate or post-petition disposable income. *See Prigge*, 441 B.R. at 677 & n. 5 (citing *Collier on Bankruptcy*). Here, the [Seafort BAP's] reasoning fell short because it did not take into account the words "except that such amount" at the beginning of the hanging paragraph excluding retirement contributions from disposable income. Seafort Circuit, 669 F.3d at 673.

Rejecting the debtors' argument that voluntary 401(k) contributions are excluded from Chapter 13 plans on the theory that Section 1306(a) incorporates Section 541 in its entirety, the court in Seafort Circuit stated:

> Similar to the analysis in *Egan*,[361] Debtors argue that voluntary 401(k) contributions are excluded from Chapter 13 plans because § 1306(a) incorporates § 541 in toto, including § 541's exclusions. However, as just stated, this argument ignores § 541(b)(7)'s express relationship with § 541(a)(1), whereby only those interests in property set forth in § 541(b)(7)(A) in existence as of the commencement of a debtor's case are excluded from property of the estate. Only by reading § 541(a)(1) and § 541(b)(7)(A) together can sufficient meaning be given to both sections of § 541. Furthermore, if Debtors' theory that contributions to a qualified retirement plan never constitute property of a bankruptcy estate was correct, Congress would not have needed to include an additional provision in

---

[361] In re Egan, 458 B.R. 836 (Bankr. E.D. Pa. 2011).

§ 541(b)(7)(A) stating that such contributions are excluded from disposable income.

Seafort Circuit, 669 F.3d at 673.

The Seafort Circuit next explained why, in its view, it was important to consider whether a debtor was making voluntary 401(k) contributions at the commencement of their bankruptcy case in determining how much (if any) of those contributions could be excluded from disposable income:

> This distinction—between qualified retirement plan contributions in effect as of the commencement of a bankruptcy case and those cases where contributions are not in effect as of commencement—is further clarified by the phrase "under this subparagraph" found in the hanging paragraph of § 541(b)(7)(A). If all contributions to qualified retirement plans were excluded from disposable income, regardless of whether they were in effect as of the commencement of the bankruptcy case, the phrase "under this subparagraph" would be superfluous, and § 541(b)(7) would simply read "such amount [qualified retirement plan contributions] shall not constitute disposable income as defined in  section 1325(b)(2)." As it is written though, Congress intentionally limited the type of contributions to qualified retirement plans that would be excluded from disposable income, namely those "under this subparagraph",  § 541(b)(7)(A), which in turn governs only those contributions in effect as of the commencement of a debtor's bankruptcy case, per § 541(a)(1).

Seafort Circuit, 669 F.3d at 673.

As to why it was persuaded by the logic of the line of cases spawned by Prigge and McCullers instead of a competing view espoused by another court, the Seafort Circuit court explained:

> Ultimately then, we find that the *Prigge/McCullers* interpretation is the most persuasive because it gives effect to every word in the statute. *See Penn. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 562, 110 S. Ct. 2126, 109 L. Ed. 2d 588

(1990) ("Our cases express a deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment."); *Mackey v. Lanier Collection Agency & Serv., Inc.,* 486 U.S. 825, 837 & n. 11, 108 S. Ct. 2182, 100 L. Ed. 2d 836 (1988) (same). ***Although "awkward" perhaps, we conclude, based on the language and structure of Chapter 13, incorporating § 541, that Congress intended to exclude from disposable income and projected disposable income available for unsecured creditors only voluntary retirement contributions <u>already in existence</u> at the time the petition is filed.***

<u>Seafort Circuit</u>, 669 F.3d at 673-74 (emphasis added).  In a footnote at the end of this text, the <u>Seafort Circuit</u> court also stated:

> The Trustee "concedes" that if a debtor is making voluntary retirement contributions when the bankruptcy petition is filed, such continuing contributions may be excluded from disposable income.  ***We do not agree with this assertion, for the reasons stated in Prigge.  However, our view is not relevant here, because this issue is not presently before us.***

<u>Seafort Circuit</u>, 669 F.3d at 674 note 7 (emphasis added).

Footnote 7 suggests that the <u>Seafort Circuit</u> holding was intended to be very narrow in scope.  In <u>Seafort Circuit</u>, the Sixth Circuit Court of Appeals fully aligned itself with the holdings in the <u>Prigge</u>/<u>McCullers</u>/<u>Parks BAP</u> line of cases, but only in cases:  (a) filed by an above-median chapter 13 debtor, (b) who was not making voluntary contributions to a qualified retirement plan on the petition date, but (c) who did have an outstanding loan from a qualified retirement plan that would be paid off during the applicable commitment period, (d) who filed a proposed a repayment plan providing that when the loan from the qualified plan was paid off, the funds that had previously been used to pay the loan would be used to make voluntary contributions to the plan, instead of making payments to creditors, which triggered (e) an objection from the trustee or the holder of an allowed unsecured claim.  In footnote 7, the <u>Seafort Circuit</u> court expressly rejected the trustee's "concession" that voluntary retirement contributions that were being made when the bankruptcy petition was filed could be excluded from disposable

111

income, and stated plainly that it did "not agree" with the trustee "for the reasons stated in Prigge"; *i.e.,* that voluntary retirement contributions are simply not "reasonable and necessary expense[s]" deductible from "disposable income" under Section 1325(b)(3), which incorporates the means test from Section 707(b)(2)(A) and (B).  In Footnote 7, the Seafort Circuit court plainly left the question of whether an above-median chapter 13 debtor who **was** making voluntary contributions to a qualified retirement plan when the petition was filed could continue to make such voluntary contributions post-petition and exclude some or all of them from the disposable income calculus, since "this issue is not presently before us."[362]

Addressing the issue of Congressional intent when BAPCPA was enacted, and the competing concepts of debt repayment on the one hand, and protection of retirement savings on the other, the Seafort Circuit court observed:

> It is true, as Debtors assert, that BAPCPA added new protections for retirement funds that did not exist under pre-BAPCPA law, namely § 1322(f) and § 541(b)(7). There is legislative history to this effect. *See* H.R. REP. NO. 109–31, pt. 1, p. 2–3 (2005), 2005 U.S.C.C.A.N. 88, 89 ("S. 256 also includes various consumer protection reforms.... S. 256 allows debtors to shelter from the claims of creditors certain education IRA plans and retirement pension funds.").  On the other hand, as we recognized in *Baud*, BAPCPA's "core purpose" is to ensure that debtors devote their full disposable income to repaying creditors and maximizing creditor recoveries.  *Baud*, 634 F.3d at 343, 356 (citing *Lanning* and *Ransom*). The legislative history supports this reading too. *See* H.R. Rep. No. 109–31, pt. 1, p. 2–3 (2005), 2005 U.S.C.C.A.N. 88 at 89 ("The heart of the bill's consumer bankruptcy reforms consists of the implementation of an income/expense screening mechanism ("needs-based bankruptcy relief" or "means testing"), which is intended to ensure that debtors repay creditors the maximum they can afford."); *Ransom,* 131 S. Ct. at 721 (stating that Congress enacted the BAPCPA

---

[362]This more specific issue would present itself to the Sixth Circuit soon enough.  See In re Davis, 960 F.3d 346 (6th Cir. 2020).

"to correct perceived abuses of the bankruptcy system," and enacted the "means test" of § 707(b) in particular, "to help ensure that debtors who can pay creditors do pay them.") *Ransom*, 131 S. Ct. at 721. Thus, as in *Baud*, "we adopt the interpretation of [§§ 541(a)(1), 541(b)(7), and 1325] that is not only more consistent with the language of the statute[s] than the competing interpretation, but that is also consistent with the legislative history and the overriding purpose of BAPCPA as recognized in *Lanning* and *Ransom*." *Baud*, 634 F.3d at 357.

Seafort Circuit, 669 F.3d at 674.

The Seafort Circuit then closed its analysis by plainly summarizing its holding under the specific facts of the consolidated cases before it:

In sum, for the foregoing reasons, we hold that the income made available once Debtors' 401(k) loan repayments are fully repaid is properly committed to the debtors' respective Chapter 13 plans for distribution to the unsecured creditors and may not be used to make voluntary retirement contributions.[363]

## IV.    In re Anh-Thu Thi Vu

The disposable income issue presented by Section 541(b)(7) and the "hanging paragraph" came before the United States Bankruptcy Court for the Western District of Washington in the unpublished case of In re Anh-Thu Thi Vu, 2015 WL 6684227 (Bankr. W.D. Wash. June 16, 2015).[364] Judge Lynch summarized the salient facts in Vu this way:

There is no dispute that Debtor's income is above-median, pursuant to her Form B22C–1 [ECF no. 13]. During the six months prior to filing her petition, Debtor voluntarily contributed an average of $877 per month to her Thrift Savings Plan ("TSP") retirement program offered by her employer. On her Form B22C–2 ("Means Test"), Debtor entered $877 on Line 41 for "all qualified retirement

---

[363]Seafort Circuit, 669 F.3d at 674.

[364]Hon. Bryan D. Lynch.  Judge Lynch had previously considered a similar issue in the published decision of In re Bruce, 484 B.R. 387 (Bankr. W.D. Wash. 2012).  The Vu decision is discussed in more depth here, as it is more recent and references Bruce in its analysis.

deductions," resulting in monthly disposable income of $74 on Line 45 [ECF no. 13]. Debtor's Plan proposes monthly payments of $80 for 60 months [ECF no. 12] Vu, 2015 WL 6684227, at *1.

The Vu court then examined the basis of the trustee's confirmation objection, and observed:

> Trustee objected to confirmation of the Plan, arguing that Debtor's voluntary retirement contribution is not an allowable deduction on her Means Test. Over the life of the Plan, unsecured creditors will receive a total of $4,619, approximately nine percent of Debtor's $50,343 scheduled unsecured debt, while Debtor will contribute over $50,000 to her TSP. Trustee first argues that Debtor has not correctly calculated her disposable income by taking the retirement deduction. Elimination of Debtor's voluntary retirement contribution would increase her monthly disposable income to $951, which would be sufficient to pay her unsecured creditors in full. Trustee also argues that the level of Debtor's contribution, which will fund her retirement ten times more than she is paying to unsecured creditors, renders her plan not filed in good faith.

Vu, 2015 WL 6684227, at *1.

Citing to United States Supreme Court authority that addressed the meaning of "projected disposable income" in the context of Section 1325(b)(1)(B), the Vu court noted:

> If a chapter 13 trustee objects to confirmation of a debtor's plan, the Court may not confirm a chapter 13 plan unless it provides for the full repayment of unsecured claims or provides that "all of the debtor's projected disposable income to be received in the applicable commitment period ... will be applied to make payments" in accordance with the terms of the plan. 11 U.S.C. § 1325(b)(1)(B); *Hamilton v. Lanning*, 560 U.S. 505, 509, 130 S. Ct. 2464, 177 L.Ed.2d 23 (2010). "Projected disposable income" is not defined in the Bankruptcy Code; however, the Supreme Court of the United States has adopted the "forward-looking" approach which begins with "calculating disposable income," subject to the

114

Court's discretion to account for "known or virtually certain" changes in the debtor's future income or expenses. *Hamilton v. Lanning*, 560 U.S. at 519. <u>Vu</u>, 2015 WL 6684227, at *1.

The <u>Vu</u> court acknowledged the fatal flaw in any argument by an above-median income chapter 13 debtor that voluntary contributions to qualified retirement plans are an "amount reasonably necessary" to be deducted from current monthly income in determining disposable income under Section 1325(b):

> For purposes of complying with § 1325(b)(1)(B)'s "projected disposable income" requirement, the Code defines "disposable income" as "current monthly income ... less amounts reasonably necessary" for the maintenance or support of the debtor or the debtor's dependents. 11 U.S.C. § 1325(b)(2). Above-median income debtors who pursue the "amounts reasonably necessary" path quickly meet a dead end: Section 1325(b)(3) provides that, for above-median-income debtors, "amounts reasonably necessary" are determined by sections 707(b)(2)(A) and (B), neither of which provide for voluntary retirement contributions as an allowable, necessary expense. As discussed *infra*, some courts hold that for the purposes of calculating "disposable income" under § 1325(b)(2), voluntary retirement contributions cannot be deducted from current monthly income ("CMI") as "amounts reasonably necessary."

<u>Vu</u>, 2015 WL 6684227, at *2.

Next examining the statutory text of Section 541(b)(7) and the "hanging paragraph," the <u>Vu</u> court noted the substantial split of authority that had resulted from it:

> Section 541(b)(7)(A) and the hanging paragraph have caused wide disagreement among courts nationwide. The majority have followed the approach of *In re Johnson*, 346 B.R. 256, 263 (Bankr. S.D. Ga. 2006), holding that voluntary retirement contributions do not constitute disposable income, regardless of whether the debtor was making contributions at commencement of the case. *See also In re Drapeau*, 485 B.R. 29, 34 (Bankr. D. Mass. 2013) (collecting cases).

115

Following the Sixth Circuit Bankruptcy Appellate Panel in [Seafort BAP], some courts have held that voluntary retirement contributions do not constitute disposable income, but only to the extent that those contributions were being made by the debtor as of the petition date. [Seafort BAP], 437 B.R. at 209, *aff'd on other grounds*, 669 F.3d 662 (6th Cir. 2012); *In re Jensen*, 496 B.R. 615, 621 (Bankr. D. Utah 2013). Finally, other courts have held that voluntary retirement contributions may not be excluded from disposable income at all. *In re Prigge*, 441 B.R. 667, 677 (Bankr. D. Mont. 2010); *see also In re McCullers*, 451 B.R. 498, 505 (Bankr. N.D. Cal. 2011); [Parks BAP], 475 B.R. 703, 707 (B.A.P. 9th Cir. 2012) ("we find the *Prigge* line of cases persuasive").

Vu, 2015 WL 6684227, at *3.

After reviewing treatise commentary on Prigge, McCullers, Parks BAP, and Seafort Circuit,[365] the Vu court noted that Parks BAP served as the primary authority underpinning the Trustee's objection:

Trustee's objection relies primarily on [Parks BAP], the Ninth Circuit Bankruptcy Appellate Panel's adoption of the *Prigge* approach. [Parks BAP], 475 B.R. at 707 ("we find the *Prigge* line of cases persuasive. To avoid repetition, we borrow heavily from these decisions.") The [Parks BAP] panel held that "the most reasonable interpretation of § 541(b)(7)(A) is that it excludes from property of the estate only those [voluntary retirement] contributions made before the petition date." *Id*. at 708. [Parks BAP] reconciled *Prigge's* result with the language of § 541(b)(7)(A)(i)'s hanging paragraph by explaining that "such amount" means that only pre-petition contributions shall not constitute disposable income, and that "except that" simply clarifies that the voluntary retirement contributions excluded from property of the estate are not post-petition income to the debtor. *Id*. (citing *McCullers*, 451 B.R. 503–505).

Vu, 2015 WL 6684227, at *3.

---

[365]Vu, 2015 WL 6684227, at *2-3.

116

Noting that it had previously faced a similar issue in a chapter 13 case filed by a below-median income debtor, the <u>Vu</u> court stated:

> This Court has previously attempted to reconcile the holding in [Parks BAP] that under § 541(b)(7)(A) only pre-petition voluntary retirement contributions are excluded from property of the estate, and therefore only pre-petition contributions are excluded from "disposable income" as defined in § 1325(b)(2) with an interpretation that qualified retirement contributions do not "constitute disposable income as defined in section 1325(b)(2) ..." *In re Bruce*, 484 B.R. 387, 394 (Bankr. W.D. Wash. 2012). In *Bruce*, the Court went beyond the analysis of *Prigge* and [Parks BAP], holding that § 541(b)(7)(A)(i)'s hanging paragraph excludes pre-petition voluntary retirement contributions from the calculation of "current monthly income," *i.e.*, those contributions made during the six-month CMI look-back period. *Id*. If those contributions are deducted before determining the debtor's income during that six-month period pre-petition, those contributions are not "disposable income" as that term is defined in § 1325(b)(2), and the monthly average of the contributions during the six month period pre-petition should not be included in the calculation of CMI for purposes of calculating disposable income. *Id*.

<u>Vu</u>, 2015 WL 6684227, at *3.

The <u>Vu</u> court expounded further on the rationale underpinning its analysis of the debtor's voluntary retirement plan contributions:

> While *Bruce* involved a below-median-income debtor, its reasoning regarding deducting voluntary retirement deductions from CMI is applicable to all chapter 13 debtors because calculating current monthly income is the starting point for determining "disposable income" under § 1325(b)(2), regardless of whether the debtor is above- or below-median-income. This result is also in harmony with a plain reading of the hanging paragraph, which provides that any amount withheld by an employer from the wages of employees for payment as contributions to a

qualified retirement plan "shall not constitute disposable income as defined in §

1325(b)(2)." ***Using this approach, for all chapter 13 debtors, voluntary***

***retirement contributions may be excluded from the calculation of disposable***

***income, to the extent that those contributions were being made pre-petition***

***during the six-month look-back period used to determine CMI.***

<u>Vu</u>, 2015 WL 6684227, at *4 (emphasis added).

Ultimately, the <u>Vu</u> court summarized its decision in the following manner:

This interpretation gives substantive application to the hanging paragraph, unlike

the very narrow interpretation of that paragraph in *Prigge et al.*; it also results in

above- and below-median debtors being treated the same, as opposed to having

different rules for deductibility of voluntary retirement contributions;[366] and it

fosters the overall policy seen throughout the 2005 amendments to the

Bankruptcy Code of protecting debtors' retirement contributions.  *See, e.g., In re*

*Smith,* No. 09–64409, 2010 WL 2400065 *3 (Bankr. N.D. Ohio, June 15, 2010)

("the enactment of  section 541(b)(7) injected a policy favoring retirement savings

into the bankruptcy code. Therefore, the harsh approach toward 401(k)

contributions taken by courts pre-BAPCPA is no longer warranted."). Using this

approach, Debtor would not have treated her voluntary retirement contributions as

a deduction in Line 41 of her Form B22C–2; rather, she should have subtracted

those contributions made in the six-month pre-petition period in calculating CMI.

***In practice, this will result in virtually the same projected disposable income as***

***Debtor's approach because she made the same contributions during each of the***

***six months used to calculate CMI.***

<u>Vu</u>, 2015 WL 6684227, at *4 (emphasis added).

The <u>Vu</u> court denied the trustee's confirmation objection. It did not reach the issue of

whether a lack of good faith in the filing of debtor's chapter 13 plan was established by her

---

[366]The concept of treating above-median and below-median chapter 13 debtors the same way in this context appears, at least to this Court, to be inconsistent with the plain language of Section 1325(b)(3).  <u>See</u> note 328, <u>supra</u>.

voluntary post-petition contributions to her qualified retirement plan, noting that "[i]f the parties do not resolve their differences based on the Court's ruling herein, they should contact the Court to arrange a hearing on this issue."  Vu, 2015 WL 6684227, at *4 (emphasis added).

## V.    Davis v. Helbling (*In re* Davis)

The specific issue reserved by the Sixth Circuit Court of Appeals in footnote 7 to Seafort Circuit reached that court in the case of Davis v. Helbling (*In re* Davis), 960 F.3d 346 (6th Cir. 2020).  The chapter 13 debtor in Davis owed over $200,000 in debt, $189,000 of which was unsecured, but had under $39,000 in assets.  The Davis court summarized the facts as follows:

> Davis proposed a bankruptcy plan that would pay her unsecured creditors a total of $19,380—equal to sixty monthly payments of $323. To obtain court approval, her plan needed to provide for payment of all her "projected disposable income" to her unsecured creditors. *Id.* § 1325(b)(1). Davis believed that $323 represented her monthly disposable income. Although she reported gross monthly income of $5,627, she claimed $5,304 in allowable monthly expenses. One of those claimed expenses was a monthly retirement contribution. Long before her bankruptcy, Davis had authorized her employer to withhold $220.66 from her monthly wages as contributions to a 401(k) retirement plan.  Davis sought to continue those contributions during her bankruptcy.

Davis, 960 F.3d at 349.

The trustee in Davis objected to confirmation, contending that "wages withheld as voluntary 401(k) contributions are considered disposable income under the Code" and that resultantly the "proposed plan would not pay all her projected disposable income to her unsecured creditors."[367]  The bankruptcy court sustained the trustee's objection, noting that it felt bound by the dicta found in footnote 7 of Seafort Circuit, "which suggested that the Code always counts voluntary retirement contributions as disposable income, even if the debtor began making those contributions prior to bankruptcy."[368]

---

[367] Davis, 960 F.3d at 349.
[368] Id.

The debtor in <u>Davis</u> then filed an amended plan providing for creditor payments of $519 per month.  The increase in her proposed monthly plan payments from $323 to $519 "reflected in part the addition of Davis's monthly 401(k) contributions to her disposable income calculation."[369] The debtor in <u>Davis</u> then objected to her own amended plan to preserve the disposable income issue for appeal; the bankruptcy court confirmed the amended plan over the debtor's objection; and the debtor obtained a certification from the bankruptcy court authorizing a direct appeal to the Sixth Circuit Court of Appeals.[370]

The <u>Davis</u> court began its trek through the disposable income calculus with a review of the text of Section 1325(b):

> We begin with the legal background. Section 1325(b)(1) of the Code provides that, upon objection, a bankruptcy plan cannot be approved "unless ... [it] provides that all of the debtor's projected disposable income to be received in the applicable commitment period ... will be applied to make payments to unsecured creditors."  11 U.S.C. § 1325(b)(1)(B).  Section 1325(b)(2) defines "disposable income" as the debtor's "current monthly income ... less amounts reasonably necessary to be expended ... for the maintenance or support of the debtor." *Id.* § 1325(b)(2)(A)(i). For debtors with above-median income, like Davis, the "amounts reasonably necessary to be expended" are determined by the National and Local Standards promulgated by the IRS. *See id.* § 1325(b)(3). "Projected disposable income," as used in  § 1325(b)(1), is not defined anywhere in the Bankruptcy Code. But the Supreme Court has held that it is simply the debtor's disposable income, under  § 1325(b)(2), adjusted for any "changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation."  *Hamilton v. Lanning*, 560 U.S. 505, 524, 130 S. Ct. 2464, 177 L. Ed. 2d 23 (2010).

<u>Davis</u>, 960 F.3d at 350.

---

[369]<u>Davis</u>, 960 F.3d at 350.
[370]<u>Id.</u>

The <u>Davis</u> court next observed that in <u>Lanning</u>, the United States Supreme Court had established a two-step process for the calculation of "projected disposable income":

> Determining a debtor's "projected disposable income" under § 1325(b)(1) is
> therefore a two-step process. *See* [<u>Lanning</u>] at 519, 524, 130 S. Ct. 2464. First, the
> debtor's current "disposable income" is determined by the formula prescribed in
> § 1325(b)(2). *Id.* at 519, 130 S. Ct. 2464. Second, in certain circumstances, that
> sum is adjusted for changes "known or virtually certain" to occur during the
> commitment period. *Id.* When a debtor expects no changes in financial
> circumstances, as "in most cases," her "projected disposable income" under
> § 1325(b)(1) is simply her "disposable income" as defined in § 1235(b)(2). *Id.*

<u>Davis</u>, 960 F.3d at 350.

The <u>Davis</u> court noted that prior to BAPCPA "the 'overwhelming consensus' among bankruptcy courts was that wages voluntarily withheld as 401(k) contributions formed part of a debtor's disposable income.[371]  Acknowledging that the addition of Section 541(b)(7)(A) and its "hanging paragraph" to the Code when BAPCPA was enacted in 2005 had "led to considerable disagreement among courts and litigants nationwide," the <u>Davis</u> court also noted that "most courts" agreed with the debtor's argument that "the hanging paragraph excludes 401(k) contributions from disposable income for purposes of § 1325(b)(2)."[372]  Citing <u>Baxter v. Johnson</u> (<u>In re</u> Johnson), 346 B.R. 256, 263 (Bankr. S.D. Ga. 2006) as the "leading decisions" supporting the debtor's position, the <u>Davis</u> court stated:

> [In <u>Johnson</u>], the court concluded that the hanging paragraph "plainly state[s] that
> [401(k)] contributions 'shall not constitute disposable income.' " *Id.* (quoting  11
> U.S.C. § 541(b)(7)). In its view, BAPCPA "placed retirement contributions
> outside the purview of a Chapter 13 plan." *Id.* Thus,  Johnson held that a debtor's
> disposable income does not include the wages she contributes to her 401(k)
> plan—whether or not those contributions began prior to bankruptcy. *Id.*

---

[371]<u>Davis</u>, 960 F.3d at 350 (collecting cases).

[372]<u>Davis</u>, 960 F.3d at 350, <u>citing</u> <u>RESFL FIVE, LLC v. Ulysse</u>, 2017 WL 4348897, at *6 (S.D. Fla. Sept. 29, 2017) (collecting cases).

1    Davis, 960 F.3d at 351.

2       Recognizing that it had "squarely rejected Johnson's reasoning" in Seafort Circuit, the

3    Sixth Circuit in Davis noted that:

4           [Seafort Circuit] also opined, in dictum, on the circumstances present here. The

5           trustee in [Seafort Circuit] had conceded that if the debtor had regularly made

6           401(k) contributions prior to filing her petition, she could have excluded those

7           wages from her projected disposable income. See [Seafort Circuit, 669 F.3d] at

8           674 n.7. This court disagreed, endorsing a competing interpretation of the hanging

9           paragraph adopted by In re Prigge, 441 B.R. 667 (Bankr. D. Mont. 2010), which

10          held that a Chapter 13 debtor may never deduct "voluntary post-petition

11          retirement contributions in any amount regardless of whether the debtor [made]

12          pre-petition retirement contributions." [Seafort Circuit], 669 F.3d at 667, 674 n.7.

13          But we acknowledged that the "issue [was] not presently before us." Id. at 674

14          n.7.

15   Davis, 960 F.3d at 351.

16      After canvassing the lines of cases supporting various outcomes on the issue before it, the

17   Sixth Circuit in Davis court summarized the impact of BAPCPA's addition of Section 541(b)(7)

18   and its "hanging paragraph" to the Code:

19          To recap, BAPCPA's insertion of the hanging paragraph into  § 541(b)(7) has

20          taken us from an "overwhelming consensus" among bankruptcy courts, see

21          Johnson, 241 B.R. at 399, to four competing views of whether voluntary

22          retirement contributions constitute disposable income in a Chapter 13 bankruptcy.

23          Compare  Johnson, 346 B.R. at 263, with Prigge, 441 B.R. at 677 n.5, with

24          [Seafort BAP], 437 B.R. at 210, and with Anh-Thu Thi Vu, 2015 WL 6684227, at

25          *4–5. Our decision in  [Seafort Circuit], 669 F.3d at 663, is the only circuit court

26          opinion to consider the issue. See RESFL FIVE, 2017 WL 4348897, at *5–6

27          (collecting cases). And although we rejected the Johnson approach in [Seafort

28          Circuit], we expressly declined to decide between the remaining interpretations.

*See* [Seafort Circuit], 669 F.3d at 674 n.7 ("Our view is not relevant here[ ] because this issue is not presently before us.").

Davis, 960 F.3d at 351-53.

Having completed its overview of the divergent decisions generated by BAPCPA's insertion of Section 541(b)(7) and its "hanging paragraph" to the Code, the Davis court turned to the debtor's argument in the case before it:

> With the legal landscape in view, we turn to Davis's appeal. Davis argues that the hanging paragraph in § 541(b)(7) excludes from her disposable income, as defined in § 1325(b)(2), the amount she contributed monthly to her 401(k) prior to bankruptcy.

Davis, 960 F.3d at 353.

Having noted that at least four very different lines of authority had resulted from prior judicial decisions addressing the issue pending before it, the Davis court observed:

> Among the four competing interpretations of the hanging paragraph, three support Davis's view: *Johnson*,  [Seafort BAP], and [Vu]. But our decision in  [Seafort Circuit], 669 F.3d at 674, rejected the *Johnson* interpretation, so we do not consider it here. *See United States v. Mateen*, 739 F.3d 300, 304 (6th Cir.), *rev'd en banc on other grounds*, 764 F.3d 627 (6th Cir. 2014) (noting that we are bound by a "prior panel's statutory interpretation" where it was "essential to the decision"). That leaves Davis with the  [Seafort BAP] and [Vu] interpretations for support. In contrast, the *Prigge* interpretation supports the Trustee's position, which is that voluntary retirement contributions can never be excluded from disposable income, regardless of whether the debtor was making such contributions prior to her bankruptcy. Davis's appeal asks us to decide between these competing interpretations.

Davis, 960 F.3d at 353.

Although it had previously conducted an exhaustive review of the relevant statutory

framework in its <u>Seafort Circuit</u> decision, the Sixth Circuit in <u>Davis</u> opted to begin anew[373]:

> We start with the text. *See* <u>Jimenez v. Quarterman</u>, 555 U.S. 113, 118, 129 S. Ct. 681, 172 L. Ed. 2d 475 (2009). Section 541(b)(7) excludes from property of the estate "any amount ... withheld by an employer from the wages of employees for payment as contributions" to a 401(k) plan. 11 U.S.C. § 541(b)(7)(A). The hanging paragraph then continues, "except that *such amount* under this subparagraph *shall not constitute disposable income* as defined in Section 1325(b)(2)." *Id.* (emphases added).
>
> We must determine whether "such amount," which "shall not constitute disposable income," encompasses the continued monthly 401(k) contributions Davis sought to exclude from her disposable income in her proposed bankruptcy plan. See id. § 541(b)(7). "Such amount" refers to "any amount ... withheld by an employer from the wages of employees for payment as contributions" to a 401(k) plan. *See id*. Davis's argument implies that the relevant "amount" of those contributions that is excluded from her disposable income is the sum her employer withheld from her wages *each month*. Conversely, the Trustee suggests that the "amount" excluded is simply the aggregate 401(k) contributions that Davis had accumulated in her 401(k) account prior to her bankruptcy.

<u>Davis</u>, 960 F.3d at 353.

In reviewing the parties' arguments as to the proper meaning to be ascribed to Section

---

[373]Judge Readler, in his dissenting opinion in <u>Davis</u>, observed:

> Considering that the federal courts have answered today's question four different ways, it is perhaps no surprise that we too are not of one mind. But in selecting between those approaches, we do not write on a clean slate. In [<u>Seafort Circuit</u>], we all but held that a debtor cannot exclude voluntary retirement contributions from post-petition disposable income, even if the debtor began making contributions before filing for bankruptcy. 669 F.3d 662, 674 n.7 (6th Cir. 2012). While that decision arguably is not controlling, I would give it the weight it deserves. For to my mind, it is correct.

<u>Davis</u>, 960 F.3d at 358 (Readler, J., dissenting) ("<u>Davis Dissent</u>").

124

541(b)(7), the <u>Davis</u> court took issue with both of them:

> Neither reading makes perfect sense of the text. "Amount" is defined as the "total financial value or cost (of something)." *Oxford English Dictionary* (3d ed. 2019). The "something" that is being measured depends on context. It can be an individual number ("the *amount* of the policy is [$]10,000"), or it can be an aggregate number ("the ... *amount* of worthless IOUs collected during each day's business"). *Amount,* Merriam-Webster Unabridged Online, https://unabridged.merriam-webster.com/unabridged/amount (last visited Feb. 20, 2020).
>
> Here, context points in both directions. On the one hand, the hanging paragraph excludes the amount of the debtor's 401(k) contributions from "disposable income as defined in  Section 1325(b)(2)."  11 U.S.C. § 541(b)(7). Disposable income is defined in terms of monthly income and expenses. *Id.* § 1325(b)(2). That suggests that a debtor's monthly contribution is the "amount" that "shall not constitute disposable income." *See  id.* § 541(b)(7). On the other hand, the hanging paragraph is framed as an exception to  § 541(b)(7)'s general rule that "property of the estate" does not include the "amount" of the debtor's 401(k) contributions. There, the relevant "amount" seems to be the debtor's aggregate 401(k) contributions. *See id.* § 541(b).

<u>Davis</u>, 960 F.3d at 353-54.

Having taken issue with both of the parties' arguments as to how Section 541(b)(7) and the "hanging paragraph" should be interpreted, the Sixth Circuit in <u>Davis</u> found little solace in the statutory text itself:

> Further confounding our search for meaning, § 541(b)(7) is a grammatical puzzle. *See* [<u>Seafort Circuit</u>], 669 F.3d at 671 (describing the hanging paragraph as "inelegantly drafted" (citing *Baud v. Carroll,* 634 F.3d 327 (6th Cir. 2011)). The hanging paragraph begins with the conjunction "except that," which, to no one's

surprise, is generally used to introduce an exception to an otherwise-applicable general rule. *See, e.g.,* 2 U.S.C. § 4915(b)(1) ("An unforeseen vacancy ... during an academic year may be filled, *except that* no appointment may be made ... for service to begin on or after October 1 ...." (emphasis added)). Yet the hanging paragraph's exception has no logical connection to § 541(b)(7)'s general rule. Property of the estate and disposable income are wholly independent concepts under the bankruptcy code. *Compare* 11 U.S.C. § 541, *with id.* § 1325. We are therefore tasked with choosing between two interpretations, either of which will do some violence to the text. "The choice is one between the lesser of evils." *See* David Gray Carlson, *The Chapter 13 Estate and Its Discontents*, 17 Am. Bankr. Inst. L. Rev. 233, 233 (2009).

Davis, 960 F.3d at 354.

Mindful of the statutory ambiguity in Section 541(b)(7), the Davis court turned to three well-established canons of statutory construction in its effort to give proper meaning to that section of the Code. Looking first to the reenactment canon, the Sixth Circuit stated:

> [T]he reenactment canon provides that whenever Congress amends a statutory provision, "a significant change in language is presumed to entail a change in meaning." *Arangure v. Whitaker*, 911 F.3d 333, 341 (6th Cir. 2018). Here, Congress enacted BAPCPA against the backdrop of an "overwhelming consensus among bankruptcy courts" that wages withheld by an employer as voluntary 401(k) contributions constituted part of the debtor-employee's disposable income. *See Johnson*, 241 B.R. at 399. BAPCPA's insertion of the hanging paragraph into § 541(b)(7) represents a substantial change to the statutory text. We must therefore presume that the hanging paragraph altered existing law. *Arangure,* 911 F.3d at 341.

Davis, 960 F.3d at 354.

Next, the Davis court looked to the presumption against ineffectiveness in its search for the proper meaning of Section 541(b)(7):

126

The presumption against ineffectiveness offers similar guidance. *See* Antonin
Scalia & Bryan A. Garner, *Reading Law* 63 (2012). That presumption reflects
"the idea that Congress presumably does not enact useless laws." *United States v.
Castleman,* 572 U.S. 157, 178, 134 S. Ct. 1405, 188 L. Ed. 2d 426 (2014) (Scalia,
J., concurring). In other words, when the plain meaning of a provision is not clear,
we should avoid interpretations that render the provision a "dead letter." *United
States v. Hayes*, 555 U.S. 415, 427, 129 S. Ct. 1079, 172 L. Ed. 2d 816 (2009)
(quoting  *United States v. Hayes*, 482 F.3d 749, 762 (4th Cir. 2007) (Williams, J.,
dissenting)).[374] Thus, we should be skeptical of interpretations that deprive the
hanging paragraph of any meaningful effect.

Davis, 960 F.3d at 354.

Lastly, the court in Davis looked to the canon against surplusage in assessing the proper
meaning of Section 541(b)(7), stating:

Finally, the canon against surplusage provides a related command. It conveys the
familiar rule that courts should "give effect, if possible, to every word Congress
used." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, ⸺ U.S. ⸺, 138 S. Ct. 617, 632,
199 L. Ed. 2d 501 (2018) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339,
99 S. Ct. 2326, 60 L. Ed. 2d 931 (1979)). This means that "[i]f a provision is
susceptible of (1) a meaning that gives it an effect already achieved by another
provision ... and (2) another meaning that leaves both provisions with some
independent operation, the latter should be preferred." Scalia & Garner, *supra*, at
176. Here, therefore, we should favor a construction of the hanging paragraph that
leaves both it and  § 1325(b)(2) with independent effect.

Davis, 960 F.3d at 354-55.

With those canons of statutory construction in mind, the Davis court reached the
following conclusion:

---

[374]In 2009, Hayes was reversed on other grounds by the United States Supreme Court and
remanded to the 4th Circuit Court of Appeals.  The complete citation is United States v. Hayes,
482 F.3d 749 (4th Cir. 2007), rev'd on other grounds, 555 U.S. 415 (2009).

Applying those principles to Davis's appeal, we conclude that the hanging paragraph is best read to exclude from disposable income the monthly 401(k)-contribution amount that Davis's employer withheld from her wages prior to her bankruptcy. That interpretation reads the amendment to § 541(b), which added the hanging paragraph, in a way that actually amends the statute. It also gives a meaningful effect—one not already accomplished by § 1325(b)(2)—to Congress's instruction in § 541(b)(7) that 401(k) contributions "shall not constitute disposable income."

 The Trustee's proposed interpretation fails on these objectives. Instead, as the Trustee concedes, its interpretation would read the hanging paragraph as merely "counteract[ing] any suggestion that the exclusion of [accumulated 401(k) ] contributions from property of the estate constitutes postpetition income of the debtor." Appellee Br. at 24. But that interpretation "makes no sense" because assets are not income. 5 *Collier on Bankruptcy* ¶ 541.23[1] (16th ed. 2019). Those accumulated funds "would never be considered ... disposable income" under § 1325(b)(2). *Id.; see McCullers*, 451 B.R. at 505 ("[I]t is unlikely even without the language in question that excluding sums earned by the debtor prepetition from property of the estate would ever be construed as creating postpetition disposable income to [the] debtor."). Thus, the Trustee's interpretation would render the hanging paragraph a "dead letter." *Hayes*, 555 U.S. at 427, 129 S. Ct. 1079.[375]

*Davis*, 960 F.3d at 355.

Having stated that conclusion, the <u>Davis</u> court continued on with its analysis of the text of Section 541(b)(7):

There remains the puzzle of the hanging paragraph's conjunction, "except that." *See* 11 U.S.C. § 541(b)(7). As a subordinating conjunction, it "makes no sense grammatically" in the hanging paragraph. *In re Hall*, No. 12 B 43452, 2013 WL 6234613, at *7 n.4 (Bankr. N.D. Ill. 2013). An exclusion from disposable

---

[375]*See* <u>id.</u>

Case 19-12664-abl    Doc 87    Entered 05/25/21 16:55:57    Page 129 of 191

income—regardless of how it is interpreted—cannot be understood as an exception to an exclusion from property of the estate. *See* 5 *Collier on Bankruptcy, supra,* ¶ 541.23[1]. Indeed, the dissent's interpretation fares no better; it reads the hanging paragraph as accomplishing nothing, which hardly creates an exception to § 541(b)(7)'s general rule. Under any interpretation, the conjunction will remain a "gordian knot" because it ties together two unrelated provisions of the Bankruptcy Code. *See In re Jensen*, 496 B.R. at 620.[376]

Davis, 960 F.3d at 355-56.

Observing that "except that" appears in at least two other sections of the Code,[377] and that those two sections "appear to use 'except that' to mean something like 'moreover' or 'and also'," the Davis Court stated:

> This use of "except that" is certainly not grammatically correct. But Congress's use of "awkward, or even ungrammatical" language does not alleviate our obligation to interpret the statute as best we can. *See Lamie v. U.S. Tr.*, 540 U.S. 526, 534–35, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004). Here, we conclude that the hanging paragraph is best read to allow Davis to exclude from her disposable income the monthly 401(k)-contribution amount that her employer withheld from her wages prior to her bankruptcy.

Davis, 960 F.3d at 356.

The Davis court rejected the trustee's arguments in support of a contrary meaning for the phrase "except that" within the "hanging paragraph" of Section 541(b)(7):

> The counterarguments do not persuade us otherwise. The Trustee argues that the hanging paragraph's location in § 541—which focuses on pre-petition assets— indicates that it does not apply to post-petition 401(k) contributions. But that

---

[376]Like the Sixth Circuit in Davis, the United States Bankruptcy Court for the District of Utah concluded that as to the above-median income chapter 13 debtors involved in Jensen, "voluntary retirement contributions being made as of the date of the petition do not constitute disposable income." In re Jensen, 496 B.R. 615, 625 (Bankr. D. Utah 2013).

[377]Davis, 960 F.3d at 356, citing Sections 351(2) and 724(b).

argument ignores the hanging paragraph's express reference to § 1325(b)(2). *See*
*5 Collier on Bankruptcy, supra,* ¶ 541.23[1] ("[T]he reference to disposable
income under Section 1325(b) ... removes any doubt that postpetition
contributions ... are to be excluded from the disposable income calculation.").
And the Trustee's position fails to recognize the significance of Congress's choice
to reference § 1325(b)(2) rather than § 1325(b)(1). *See* [Seafort BAP], 437 B.R.
at 209 ("Conspicuously, § 541(b)(7) makes no reference to 'projected disposable
income.'" (emphasis added)). Section § 1325(b)(2) measures disposable income
exclusively by the debtor's income in the six-month period prior to filing her
petition. In contrast, § 1325(b)(1) requires courts to forecast the debtor's
"*projected* disposable income." *Hamilton*, 560 U.S. at 524, 130 S. Ct. 2464
(emphasis added). Our interpretation is entirely consistent, therefore, with the pre-
petition focus of § 541. Further, the hanging paragraph's express reference to
§ 1325(b)(2) reinforces our conclusion that Congress intended to allow a debtor to
exclude from her disposable income the 401(k)-contribution amount withheld
from her monthly wages prior to bankruptcy.

Davis, 960 F.3d at 356.

Acknowledging, but rejecting, the arguments of an extensive dissenting opinion[378] which
among other things expressed concern that the Davis majority's conclusions as to the meaning of
Section 541(b)(7) "invites abuse by debtors," incentivizes those in financial distress to "enhance
dramatically" their 401(k) contributions prior to filing, and upsets "settled expectations" based
upon the holding in Seafort Circuit and its statements in note 7 to that earlier decision,[379] the
Davis court ultimately held:

> Our decision today builds on [Seafort Circuit], 669 F.3d 662. Unlike Davis, the
> debtor in [Seafort Circuit] sought to exclude from her disposable income 401(k)
> contributions that she had not been making prior to bankruptcy. *Id.* at 664.

---

[378] Davis Dissent, 960 F.3d at pp. 358-67.
[379] Davis Dissent, 960 F.3d at 358; see note 373, supra.

[Seafort Circuit] rejected *Johnson's* view that the hanging paragraph allowed debtors to begin making 401(k) contributions post-petition and then deduct those contributions from their disposable incomes. *Id.* at 672–73 (concluding that the "larger context" of § 541 establishes a "fixed point in time" on the petition date). We do not disturb that analysis. But [Seafort Circuit] acknowledged that "§ 541(b)(7) must provide some sort of protection for voluntary retirement contributions in Chapter 13 cases," 669 F.3d at 672, and the court expressly declined to decide what that protection included, *id.* at 674 n.7. ***We now conclude that the hanging paragraph is best read to exclude from disposable income a debtor's post-petition monthly 401(k) contributions so long as those contributions were regularly withheld from the debtor's wages prior to her bankruptcy.***

Davis, 960 F.3d at 357 (emphasis added).

Finalizing and expressly limiting the scope of its decision to vacate the bankruptcy court's holding and remand the case to the bankruptcy court for further proceedings, the Davis court stated:

> Our holding is narrow. We do not choose between the [Seafort BAP] and [Vu] interpretations because either would produce the same result in this case. The [Vu] interpretation would allow Davis to deduct the average monthly contribution she made in the six months prior to bankruptcy, [Vu] 2015 WL 6684227, at *4–5, whereas [Seafort BAP] would allow her to deduct the monthly amount she contributed "on a consistent basis pre-petition," *see In re Thompson*, 2018 WL 1320171, at *2 (applying [Seafort BAP], 437 B.R. 204). Here, Davis's employer withheld $220.66 in 401(k) contributions each month from Davis's wages for at least six months prior to her bankruptcy. ***We hold only that a debtor in like circumstances may deduct her monthly 401(k) contributions from her disposable income under § 1325(b)(2).*** *See* 11 U.S.C. § 541(b)(7)(A).

Davis, 960 F.3d at 357 (emphasis added).

Lastly, the <u>Davis</u> court expressly left open the question of whether a debtor's voluntary post-petition contributions to a qualified retirement plan could run afoul of the good faith confirmation standard imposed by Section 1325(a)(3), noting that the issue of good faith had not been raised by the parties:

> Our holding should not be read to curtail the good-faith analysis required by § 1325(a)(3). That provision prohibits a bankruptcy court from confirming a Chapter 13 plan unless the debtor proposed it in good faith. *See Shaw v. Aurgroup Fin. Credit Union*, 552 F.3d 447, 455 (6th Cir. 2009). ***Our reading of the hanging paragraph may necessitate a more searching good-faith analysis to minimize the risk that a debtor contemplating bankruptcy might begin making 401(k) contributions prior to filing to lower the amount she must ultimately repay her creditors.*** Here, however, there is no assertion that Davis proposed her plan in bad faith.

<u>Davis</u>, 960 F.3d at 358 (emphasis added).

> ### d.    Post-BAPCPA Cases Holding That Voluntary Post-Petition Contributions Made By An Above-Median Income Chapter 13 Debtor to a Qualified Retirement Plan Can Be Entirely Excluded From Disposable Income

The case of <u>Baxter v. Johnson</u> (*In re* Johnson), 346 B.R. 256 (Bankr. S.D. Ga. 2006),[380] is the wellspring for the line of cases holding that an above-median income chapter 13 debtor can exclude all voluntary post-petition contributions to a qualified retirement plan from disposable income.  Decided less than a year after BAPCPA became law on October 17, 2005, the facts before the Court in <u>Johnson</u> were these:

> Both cases were filed after October 17, 2005, and therefore are subject to the amendments to the Bankruptcy Code contained in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). Debtors have

---

[380]Hon. John S. Dalis.  The <u>Johnson</u> matter involved two separate cases consolidated for purposes of decision.  <u>Johnson,</u> 346 B.R. at 259.

household incomes that exceed the applicable median family incomes for the State of Georgia. Thomas and Julia Roberts (the "Robertses") are a household composed of two (2) persons, with an annual income of $56,221, which exceeds the applicable median income of $47,327. The Johnsons are a household composed of three (3) persons, with an annual income of $95,854. The applicable median income is $51,545. Neither case presents a presumption of abuse under 11 U.S.C. § 707(b)(2)(A)(i).

Johnson, 346 B.R. at 259.

Aware that the debtors in Johnson earned income above the applicable state median, the court noted that:

Following the passage of BAPCPA, debtors are required to include Form B22C with their petition. This form contains the calculations at 11 U.S.C. §§ 707(b)(2), the so-called means test. For debtors with above-median incomes, the sum of these calculations establishes "disposable income." 11 U.S.C. § 1325(b)(1)-(3).

Johnson, 346 B.R. at 259.

The two consolidated cases at issue in Johnson had different disposable income calculation issues. As to the debtors bearing the name of the case, Judge Dalis observed:

The Johnsons' Schedules I and J indicates a monthly net income in a deficit of - ($104.50). Form B22C indicates an even greater deficit. On it, their monthly disposable income equals –($795.51). In their Chapter 13 plan, the Johnsons propose to pay $303.00 per month for a term of 60 months. The Trustee objects to certain monthly expenses, namely: (1) repayments of loans taken from their 401(k) retirement savings accounts; (2) increased contributions to their 401(k) retirement savings accounts; (3) and auto loan and lease payments of approximately $1,300 per month for three vehicles.

Johnson, 346 B.R. at 260.[381]  If confirmed, the proposed plans before the court in Johnson would

---

[381]The Johnson court was also faced with an issue of whether tax refunds generated by the debtors' pattern of over-withholding resulted in an understatement of income, and/or

1  yield very modest dividends to unsecured creditors.[382]

2          At the beginning of its legal analysis, the <u>Johnson</u> court identified the issues it believed

3  were of particular importance:

4          Aside from matters that pertain only to one case or the other, both cases raise two

5          important legal issues, namely: (I) whether § 1325(b) conclusively determines the

6          amount of net income available for creditors; and (II) how to correct patterns of

7          over-withholding of federal income taxes, so that disposable income is calculated

8          accurately.

9  <u>Johnson</u>, 346 B.R. at 260.

10         Under the heading "Calculating 'Disposable Income' in Good Faith," the <u>Johnson</u> court

11 noted that there were two components of the trustee's objection to confirmation of the plans

12 proposed by the debtors:

13         The Trustee objects to confirmation of these cases on the grounds that the Debtors

14         (1) do not contribute all their disposable income to funding their plans as required

15         by § 1325(b), and (2) have failed to propose their plans in good faith as defined

16         by § 1325(a)(3). According to the Trustee, the Debtors' actual incomes and

17         actual expenses, reflected on their Schedules I and J, indicate that they are able to

18         pay more to their unsecured creditors. The Debtors argue that § 1325(b)

19         conclusively determines the amount of disposable income available for creditors.

20         They contend that § 1325(a)(3) requires no additional inquiry into the sufficiency

21         of their plan payments.

22 <u>Johnson</u>, 346 B.R. at 260-61.

23         The <u>Johnson</u> court initially focused on the impact the enactment of BAPCA had on the

24 issue of good faith in the plan confirmation process:

25 _____

26 constituted bad faith.  No similar issue is presented in Ms. Aquino's case.  <u>See</u> <u>Johnson</u>, 346 B.R. at 260.

27 [382]While providing for post-petition payments on a loan received from, and allowing for voluntary contributions to, their qualified retirement plan, the chapter 13 repayment plan filed by

28 the Johnsons "would yield, at most, a 1.18% dividend" to unsecured creditors.  <u>Johnson</u>, 346 B.R. at 260.

134

> The enactment of BAPCPA did not abolish the requirement that a "plan... [be] ...proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1325(a)(3). To the contrary, BAPCPA extends the requirement of good faith to the filing of the petition.  11 U.S.C. § 1325(a)(7). ***However, I find that BAPCPA does alter the test of good faith with respect to the sufficiency of income committed to the plan.***

Johnson, 346 B.R. at 261 (emphasis added).

The Johnson court observed that the term "good faith" is not defined by the Code.[383] Looking to pre-BAPCPA cases, the court in Johnson noted that the Eleventh Circuit Court of Appeals had adopted a "totality of the circumstances" test for examining a debtor's good faith, and had also propounded a non-exclusive list of 13 factors to be considered in the good faith analysis.[384]  As to the impact of the passage of BAPCPA on the issue of good faith in the confirmation context, the Johnson court stated:

> With the passage of BAPCPA, some of these factors are subsumed by specific provisions of  § 1325(b). I find that the amendments to the disposable income test at  § 1325(b) narrow the scope of the good faith inquiry.

Johnson, 346 B.R. at 261.

The Johnson court then changed its analytical focus from the question of good faith to the issue of whether a proposed plan provides the level of disposable income needed to support confirmation.  Looking first to the history of Section 1325(b), the Johnson court stated:

> Since before BAPCPA, § 1325(b) has prevented me from confirming a Chapter 13 plan over the objection of a trustee or unsecured creditor if the debtor did not commit "all of the debtor's projected disposable income" to funding it.  11 U.S.C. § 1325(b)(1)(B).

---

[383]The Johnson court stated that "the inquiry into good faith is 'broadly speaking . . . whether or not under the circumstances under the circumstances of the case there has been an abuse of the provisions, purpose, or spirit of [Chapter 13] in the [proposed plan].'"  Johnson, 346 B.R. at 261, citing Kitchens v. Ga. R.R. Bank & Trust Co. (*In re* Kitchens), 702 F.2d 885, 888 (11th Cir. 1983) (other internal citations omitted).

[384]Johnson, 346 B.R. at 261, citing Kitchens, 702 F.2d at 888-89.

After Congress adopted § 1325(b) in the Bankruptcy Amendments and Federal
Judgeship Act of 1984, courts divided over its relation to § 1325(a)(3). Some
courts reacted to the addition of § 1325(b) by removing factors related to the
sufficiency of disposable income from their totality of the circumstances tests.
*See, e.g., Noreen v. Slattengren*, 974 F.2d 75, 76 (8th Cir. 1992); *In re Smith*, 848
F.2d 813, 820 (7th Cir. 1988). In the wake of BAPCPA, some additional courts
and commentators have recognized that § 1325(b), rather than § 1325(a)(3),
controls whether a debtor has committed sufficient income to a Chapter 13 plan.
*In re Barr,* 341 B.R. 181 (Bankr. M.D.N.C. 2006), 8 COLLIER ON
BANKRUPTCY ¶ 1325.08[1] (15th ed. rev.2005).

<u>Johnson</u>, 346 B.R. at 261-62.

After reviewing the statutory text of Section 1325(b) as amended by BAPCPA, the
<u>Johnson</u> court posited:

I find that § 1325(b), as amended by BAPCPA, does alter the good faith inquiry
under § 1325(a)(3) in several important ways. The changes do not entirely
eliminate a good faith inquiry into the sufficiency of income. However, they do
narrow the scope of judicial discretion.

<u>Johnson</u>, 346 B.R. at 262.

Looking next to what types of income are properly excluded from disposable income
under Section 1325(b), the <u>Johnson</u> court observed:

Not all sources of income need be committed to a Chapter 13 plan. By
specifically excluding some income from the disposable income analysis,
BAPCPA recasts the totality-of-the-circumstances test set forth in *Kitchens*, the
first factor of which required consideration of "the amount of the debtor's income
from all sources." *Kitchens*, 702 F.2d at 888–89.

Disposable income does not include proceeds from "child support payments,

foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child." 11 U.S.C. § 1325(b)(2).

Johnson, 346 B.R. at 262.

Noting that a debtor's "current monthly income" as defined by the Code[385] is the starting point for the disposable income calculus under Section 1325(b), the Johnson court stated:

Additionally, § 1325(b) treats "current monthly income" as the input for determining "disposable income." By definition, current monthly income excludes "benefits received under the Social Security Act" and also certain payments to victims of terrorism, war, and crimes against humanity. 11 U.S.C. § 101(10A)(B).

Johnson, 346 B.R. at 263.[386]

Turning next to the treatment of voluntary contributions to qualified retirement plans, the Johnson court stated:

Debtors are also permitted to shelter certain contributions to employee benefit plans (EBPs). "*[A]ny amount*" that is either "withheld by" or "received by" a debtor's employer for qualifying EBPs, deferred compensation plans, tax-deferred annuities, or state-law-regulated health insurance plans "shall not constitute disposable income, as defined in section 1325(b)(2)." 11 U.S.C. § 541(b)(7)(A) & (B) (emphasis added).

Among the qualifying programs are any "employee benefit plan[s] ... subject to Title I of the Employee Retirement Income Security Act of 1974" ("ERISA"). *See* 11 U.S.C. § 541(b)(7)(A)(i)(I) & (B)(i)(I). This includes EBPs subject to 26 U.S.C. § 401(k) ("401(k) plans"). *See* 29 U.S.C. §§ 1002(3)(defining "employee

---

[385]Section 101(10A).

[386]Voluntary contributions to qualified retirement plans, however, are not expressly excluded from "current monthly income" as that term is defined by the Code. See Section 101(10A).

benefit plan"), 1003(a) (defining ERISA's coverage). So long as a debtor's contributions are within the limits legally permitted by the EBP, "any amount" of this contribution is exempted from disposable income.

Johnson, 346 B.R. at 263.

The Johnson court separately examined how the repayment of outstanding loans received from a qualified retirement plan should be treated in determining disposable income under Section 1325(b), and found:

> Furthermore, in addition to sheltering EBP contributions, the Code also protects repayments of loans from EBPs, including loans from 401(k) plans.  Section 1322(f) provides:
>
> > A plan may not materially alter the terms of a loan described in section 362(b)(19) [i.e., a loan from a qualifying employee benefit plans or retirement savings accounts], and any amounts required to repay such loan shall not constitute 'disposable income' under  section 1325.
>
> 11 U.S.C. § 1322(f).
>
> Debtors are not required to contribute income from any of these sources to their Chapter 13 plans. Consequently, *in determining good faith under  § 1325(a)(3)*, I may not consider them.

Johnson, 346 B.R. at 263 (emphasis added).

Returning to the specifics of the trustee's confirmation objection, the Johnson court summarized its holding as to repayment of loans from, and voluntary contributions to, a qualified retirement plan as follows:

> In regard to the Johnsons' plan, the Trustee objects to certain monthly payroll deductions they make to (1) fund and (2) repay loans from their respective EBPs. According to the Johnson's Schedule I, Donald Johnson contributes $407.53 per month to a 401(k) plan, and also pays $431.93 per month to repay loans he took from this plan. Carol Johnson contributes $139.26 per month to her 401(k) plan, and also pays $150.00 per month to repay loans she took from it. The Johnsons'

401(k) payroll deductions total $1,128.72 per month. ***Sections 541(b)(7) and 1322(f) both plainly state that these contributions "shall not constitute disposable income." Congress has placed retirement contributions outside the purview of a Chapter 13 plan.***

***Debtors may fund 401(k) plans in good faith, so long as their contributions do not exceed the limits legally permitted by their 401(k) plans.*** Here, the Trustee does not assert that the Johnson's contributions exceed the amounts allowed by their respective 401(k) plans. Therefore, the Trustee's specific objection to the Johnsons' 401(k) contributions is overruled.

Johnson, 346 B.R. at 263 (emphasis added).

This Court is mindful that Johnson has been followed by many courts outside the Ninth Circuit. In fact, the Sixth Circuit in Davis suggested that "[m]ost courts agree" with Johnson. Davis, 960 F.3d at 351, citing RESFL FIVE, LLC v. Ulysse, 2017 WL 4348897, at *6 (S.D. Fla. Sept. 29, 2017 (collecting cases). It is worthy of note, however, that in Davis the Sixth Circuit also recognized that "this court squarely rejected *Johnson's* reasoning in [Seafort Circuit]" and stated that "our decision in [Seafort Circuit] rejected the *Johnson* interpretation, so we do not consider it here." Davis, 960 F.3d at 353 (citing United States v. Mateen, 739 F.3d 3000, 304 (6th Cir.), rev'd en banc on other grounds, 764 F.3d 627 (6th Cir. 2014) for the proposition that "we are bound by a 'prior panel's statutory interpretation' where it was 'essential to the decision.'"). Like the Sixth Circuit Court of Appeals in Seafort Circuit and Davis, courts within the Ninth Circuit have carefully considered the holding in Johnson and declined to follow it.[387]

### e.    Summary

In written materials placed on the docket in this case, Ms. Aquino through her counsel asserted that "[t]his Court has an independent obligation to faithfully execute the Constitution and laws of the United States, and it must be guided by that obligation unless its hands are tied

---

[387]See McCullers, 451 B.R. at 502-03; Parks, 2011 WL 2493071, at *3-4; Parks BAP, 475 B.R. at 707.

by a superior court."[388]  The Court agrees.

Ms. Aquino's filings also indicate concern that this Court would simply view <u>Parks BAP</u> as binding as opposed to persuasive authority, and would therefore ignore the plethora of other decisions from courts around the country when deciding whether to confirm Plan #2. Resultantly, Ms. Aquino through her counsel stridently argued that the decisions of the Ninth Circuit BAP should not be construed as binding upon the bankruptcy courts within that circuit,[389] that "[Parks BAP] was wrongly decided and should not be followed by this Court[,]"[390] and that the Court should adopt and apply the holding from the Sixth Circuit's Bankruptcy Appellate Panel in [<u>Seafort BAP</u>]."[391]

This Court is aware that the Ninth Circuit Court of Appeals has "never held that all bankruptcy courts in the circuit are bound by the BAP." <u>State Comp. Ins. Fund v. Zamora</u> (<i>In re</i> Silverman), 616 F.3d 1001, 1005 (9th Cir. 2010), <u>cert. denied</u>, 562 U.S. 1287 (2011), <u>citing</u> <u>Bank of Maui v. Estate Analysis, Inc.</u>, 904 F.2d 470, 472 (9th Cir. 1990).  The Ninth Circuit does, however, "treat the BAP's decisions as persuasive authority given its special expertise in bankruptcy issues and to promote uniformity of bankruptcy law throughout the Ninth Circuit." <u>Silverman</u>, 616 F.3d at 1005 n.1.[392]

---

[388]ECF No. 66, p. 2 of 7, para. 8, citing <u>Nat'l Sign & Signal v. Livingston</u> (<i>In re</i> Livingston), 379 B.R. 711 (Bankr. W.D. Mich. 2007).  In citing <u>Livingston</u>, Ms. Aquino's counsel failed to note that the bankruptcy court's decision in that case was subsequently reversed on other grounds by the United States District Court for the Western District of Michigan.  The complete citation to <u>Livingston</u> is <u>Nat'l Sign & Signal v. Livingston</u> (<i>In re</i> Livingston), 379 B.R. 711 (Bankr. W.D. Mich. 2007), <u>rev'd on other grounds</u>, 422 B.R. 645 (W.D. Mich. 2009).

[389]ECF No. 66, pp. 2-3 of 7, para. 9; omitted citation to FED. R. BANKR. P. 8005 (providing that appeals from the bankruptcy court shall be heard by the District Court if any party makes an election).  Implicit in Ms. Aquino's argument is that this Court <i>is</i> bound by the decisions of the Ninth Circuit Court of Appeals, such as <u>Egebjerg v. Anderson</u> (<i>In re</i> Egebjerg), 574 F.3d 1045 (9th Cir. 2009).

[390]ECF No. 66, p. 3 of 7, para. 10; citing <u>In re Bruce</u>, 484 B.R. 387 (Bankr. W.D. Wa. 2012) and <u>In re Anh-Thu Thi Vu</u>, 2015 Bankr. LEXIS 1967 (Bankr. W.D. Wa. Case No. 15-41405-BDL, June 16, 2015).

[391]ECF No. 66, p. 4 of 7, para. 13.

[392]Even if the decisions of the Ninth Circuit BAP are not binding on this Court as suggested by counsel for Ms. Aquino, on appellate review the BAP certainly has the ability to treat its own decisions as controlling and the power to reverse a contrary legal decision of this

1    The Court has carefully examined the various lines of cases bearing on whether Plan #2

2    should be confirmed.  It did so in keeping with its "independent obligation to faithfully execute

3    the Constitution and laws of the United States."  The Court concludes that it is bound by the

4    Ninth Circuit Court of Appeals' decision in Egebjerg v. Anderson (In re Egebjerg), 574 F.3d

5    1045 (9th Cir. 2009).  The Court also concludes that with the exception of decisions authored by

6    the United States Supreme Court and the Ninth Circuit Court of Appeals, all of the cases

7    canvassed above, including without limitation Parks BAP, are persuasive, non-binding

8    authorities relevant to the issue of whether Plan #2 should be confirmed.  Aware of the

9    procedural and substantive history and facts of Ms. Aquino's case, and having carefully

10   considered the many different viewpoints offered in the case law discussed above, the Court

11   must now decide whether confirmation of Plan #2 is appropriate when the controlling provisions

12   of the Code are properly applied to the facts of this case.

### 5.    Trustee's Objection to Confirmation of Plan #2 Under Section 1325(b)(1)(B) Is Sustained

15       The Court concludes that the preponderance of the evidence demonstrates that Plan #2

16   does not apply all of Ms. Aquino's projected disposable income to be received during the

17   applicable commitment period to make payments to unsecured creditors.  As a result, the Court

18   concludes that it "may not approve" Plan #2 by operation of Section 1325(b)(1)(B).

19       For clarity and avoidance of any doubt, the Court does not reach the foregoing

20   conclusions based simply upon a belief that Parks BAP is binding authority.  The Court's

21   conclusion is based upon its comprehensive review of the facts present in Ms. Aquino's case,

22   and a considered application of the statutory and case law governing chapter 13 plan

23   confirmation to those specific facts.  The Court will address the proper scope of Ms. Aquino's

24   bankruptcy estate first.  It will then resolve the only remaining substantive issue actually joined

25   by the parties in their papers:  Whether Plan #2 should be confirmed under Section 1325.

26

27

28   Court on that basis - - even where an acknowledged split of authority exists on the relevant legal
     issue.  See Black v. Leavitt (In re Black), 609 B.R. 518, 526-28) (9th Cir. BAP 2019).

a.     **The Court Concludes That Ms. Aquino Made $612.90**
**Voluntary Monthly Contributions to Her 401(k) Retirement**
**Plan Prior to Bankruptcy**

The preponderance of the evidence establishes that long prior to the filing of her bankruptcy case, Ms. Aquino had elected to participate in a 401(k) retirement plan offered by her employer, Fresenius Medical Care.[393]  It is undisputed that Ms. Aquino makes monthly contributions to that 401(k) retirement plan, and was doing so well before her bankruptcy petition was filed.  Ms. Aquino's statements as to whether her 401(k) contributions are mandatory or voluntary, however, changed after conversion of her case to chapter 13.

In the Chapter 7 Schedules, Ms. Aquino originally claimed that she made ***mandatory*** monthly contributions of $612.90 to her 401(k) retirement plan.[394]  The exact same information regarding the amount and mandatory nature of her claimed 401(k) retirement plan contributions is reflected in Amended Chapter 7 Schedule I.[395]  As detailed in the UST Declaration, the United States Trustee's review of the Chapter 7 Schedules and Amended Chapter 7 Schedule I revealed that Ms. Aquino had "improperly listed her voluntary retirement contributions as mandatory contributions."[396]

It was not until after Ms. Aquino opted to convert her case to chapter 13 on the eve of the hearing on the UST Dismissal Motion that she disclosed ***for the first time*** in the Chapter 13 Schedules that (a) her monthly 401(k) contributions were actually ***voluntary, not mandatory***, and (b) those ***voluntary*** monthly 401(k) contributions were in the amount of $1,509.50 instead of the $612.90 figure reported at the commencement of her case.[397]  The $1,509.50 amount reflected in

---

[393]ECF No. 1, pp. 16 and 36 of 55.

[394]ECF No. 1, p. 37 of 55, Part 2, para. 5, line 5b.

[395]ECF No. 20, p. 2 of 4, Part 2, para. 5, line 5b.

[396]ECF No. 26, p. 3 of 32, para. 8, note 1.

[397]Compare ECF No. 1, p. 37 of 55, Part 2, para. 5, lines 5b and 5c, and ECF 20, p. 2 of 4, Part 2, para. 5, lines 5b and 5c, with ECF No. 36, p. 23 of 33, Part 2, para. 5, lines 5b and 5c and ECF No. 46, p. 23 of 25, para. 5, lines 5b and 5c.  This is not an inconsequential error or misstatement.  Claiming that retirement plan contributions are mandatory when they are in fact voluntary has a substantial and direct impact on the disposable income calculus.  Mandatory contributions required by an employer can be deducted in determining disposable income under the IRS guidelines incorporated into section 707(b), while voluntary contributions cannot.  See

the Chapter 13 Schedules and Amended Chapter 13 Schedules[398] is consistent with the $1,509.50 amount reported on line 41 of both the Chapter 13 Disposable Income Form and the Amended Chapter 13 Disposable Income Form.[399]

On the record before it, the Court finds that the preponderance of the evidence establishes that Ms. Aquino's monthly contributions to her 401(k) plan are voluntary; that as of the filing date, those voluntary monthly contributions were in the amount of $612.90; and that upon conversion of her presumptively abusive chapter 7 case to chapter 13 she increased her voluntary monthly 401(k) retirement plan contributions by $896.60 to $1,509.50.[400]

> **b.    The Court Concludes That All Money on Deposit in Ms. Aquino's 401(k) Plan on the Filing Date of Her Bankruptcy Petition is Exempt From Her Bankruptcy Estate As a Matter of Law**

The Chapter 7 Schedules filed with the Court under oath list the value of Ms. Aquino's 401(k) plan at $84,000.00.[401]  Although she  purports to make $1,509.50[402] voluntary monthly contributions to her qualified 401(k) retirement plan, both the Chapter 13 Schedules and Amended Chapter 13 Schedules filed about six months post-petition still listed the value of her 401(k) plan at $84,000.00.[403]

In the Chapter 7 Schedules, Ms. Aquino claimed the $84,000.00 already on deposit in her 401(k) retirement plan on the filing date as an exempt asset under Nevada law in Schedule C: The Property You Claim as Exempt.[404]  She also consistently claimed that exact same exemption in all subsequently filed amendments to Schedule C.[405]  No timely objection to that claimed

_____

Egebjerg, 574 F. 3d at 1051-52; see also McCullers, 451 B.R. at 505 n. 8.

[398] ECF No. 36, p. 23 of 33, Part 2, para. 5, lines 5b and 5c and ECF No. 46, p. 23 of 25, para. 5, lines 5b and 5c.

[399] ECF 39, p. 7 of 8 and ECF No. 44, p. 7 of 8; see note 38, supra.

[400] See note 38, supra.

[401] ECF No. 1, pp. 16 and 36-37 of 55.

[402] See note 38, supra.

[403] ECF No. 36, p. 3 of 33; ECF No. 46, p. 3 of 25.

[404] ECF No. 1, p. 20 of 55, Part 1, Item 2.

[405] ECF No. 14, p. 7 of 7, Part 1, Item 2;  ECF No. 36, p. 7 of 33, Part 1, Item 2; ECF No. 46, p. 7 of 25, Part 1, Item 2.

exemption was ever filed by Trustee or any other party in interest.  Trustee has not challenged that claimed exemption in her papers opposing confirmation, either.

So, to the extent that the $84,000.00 on deposit in Ms. Aquino's 401(k) plan constituted estate property on the filing date of her bankruptcy petition, it is now exempt from her bankruptcy estate as a matter of law.  Taylor v. Freeland & Kronz, 503 U.S. 638, 643-44 (1992).  Resultantly, the contested confirmation dispute presently before the Court regarding Plan #2 presents no direct risk to the $84,000.00 in retirement savings that was already in Ms. Aquino's 401(k) retirement plan on the petition date.

> **c.**     **The Court Concludes That Under Section 541(b)(7), All Amounts Withheld From Ms. Aquino's Pre-Petition Wages As Retirement Plan Contributions Which Had Not Been Remitted to or Deposited In Her 401(k) Plan As of the Petition Date Are Excluded From Her Bankruptcy Estate Under Section 541(b)(7)**

For clarity and avoidance of doubt, ***as to the scope of Ms. Aquino's bankruptcy estate,*** this Court finds the interpretation of Section 541(b)(7) set forth in the Prigge/McCullers/Parks BAP line of cases to be more persuasive than the alternative interpretations offered by the other lines of authority discussed above.  See generally Prigge, Parks, McCullers, Green, and Parks BAP, supra.  The interpretation of Section 541(b)(7) established by the Prigge/McCullers/Parks BAP line of cases, all of which were decided by courts within the Ninth Circuit, affords an appropriate level of protection to Ms. Aquino's retirement savings efforts as of the date of the filing of her bankruptcy petition.  It likewise gives full meaning and effect to the statutory language of Section 541(b)(7).  Under the Prigge/McCullers/Parks BAP interpretation of Section 541(b)(7), any amounts withheld from Ms. Aquino's wages for the purpose of adding to her 401(k) plan account that had not yet been remitted to or deposited in her 401(k) plan on the filing date are shielded from creditor claims, ***because they are excluded from the scope of the***

144

***bankruptcy estate.***

There is substance to the interpretation of Section 541(b)(7) established by the Prigge/McCullers/Parks BAP line of cases, and that interpretation is expressly adopted by this Court.  That interpretation of Section 541(b)(7) ensures that hundreds, or even thousands of dollars[406] withheld prepetition from a debtor's paychecks for deposit into a qualified retirement plan aren't included in the bankruptcy estate and subjected to creditor claims simply because a bankruptcy petition is filed before the withheld earnings were actually deposited into the retirement plan as intended.

In this case, Trustee's confirmation objection papers make no claim, and Trustee presented no evidence to establish, that there was any money actually withheld from Ms. Aquino's paychecks as voluntary 401(k) retirement plan contributions that hadn't been deposited into her 401(k) plan on the petition date.  Nor do Trustee's confirmation objection papers suggest that any money withheld from Ms. Aquino's paychecks to fund her voluntary 401(k) retirement plan contributions, which hadn't been deposited into her 401(k) on the petition date, should be considered property of Ms. Aquino's bankruptcy estate.  Trustee's objection to confirmation of Plan #2 is instead that Ms. Aquino's contemplated $1,509.50[407] voluntary monthly contributions to her qualified 401(k) retirement plan over the duration of her chapter 13 case run afoul of Section 1325(b)(1).

> **d.    The Court Concludes That All Money Ms. Aquino Received For Services She Performed Post-Petition and Prior to Case Closure is Property of Her Chapter 13 Bankruptcy Estate Under Section 1306(a)**

The source of all of the voluntary $1,509.50[408] post-petition monthly contributions Ms. Aquino proposes to make to her 401(k) retirement plan to the exclusion of her creditors in this chapter 13 case is her post-petition wages.  All of her post-petition wages are property of her

---

[406]In this case, Ms. Aquino's claimed voluntary monthly 401(k) contributions are $1,509.50.  See note 38, supra.

[407]See note 38, supra.

[408]Id.

145

chapter 13 case under the plain language of a statutory provision found within the confines of chapter 13 of the Code that doesn't contain an ambiguous "hanging paragraph."

More particularly, Section 1306(a) of the Code states in part that "***in addition to the property specified in section 541*** of this title" property of a chapter 13 bankruptcy estate includes "all property of the kind specified [in Section 541] that the debtor acquires after the commencement of the case but before the case is closed" as well as "earnings from services performed by the debtor after the commencement of the case but before the case is closed."[409] The statutory text of Section 1306(a) makes it plain that the scope of Ms. Aquino's chapter 13 bankruptcy estate includes the property of the estate in existence on the filing date of her bankruptcy petition as defined by Section 541, and in addition, all of Ms. Aquino's post-petition earnings prior to the closure of her bankruptcy case.  This Court agrees with and adopts the straightforward statutory construction applied to Sections 541 and 1306 by the Sixth Circuit in its Seafort Circuit decision in setting the parameters of a chapter 13 bankruptcy estate:

> Section 1306(a) expressly incorporates § 541.  Read together, § 541 [inclusive of Section 541(b)(7) and the "hanging paragraph"] fixes property of the estate ***as of the date of filing***, while § 1306 adds to the "property of the estate" property interests which arise ***post-petition***.

Seafort Circuit, 669 F.3d at 667 (parenthetical and emphasis added); see also McCullers, 451 B.R. at 503 n. 7 ("In a chapter 13 case, postpetition personal service income becomes property of the estate under section 1306(a)(2), not under section 541."); Parks BAP, 475 B.R. at 707-08 (quoting Seafort Circuit, 669 F.3d at 667, and concluding that "[i]t is section 1306(a)(2) which operates to bring the debtor's earnings from postpetition services into his or her estate.").  The Court concludes that all of Ms. Aquino's postpetition earnings prior to the closure of her case constitute property of her chapter 13 bankruptcy estate as a matter of law under Section 1306(a)(2).

---

[409]Emphasis added.

e.    **Summary of the Court's Conclusions As to the Scope of Ms.**
**Aquino's Chapter 13 Bankruptcy Estate**

On the issue of the proper scope of Ms. Aquino's chapter 13 bankruptcy estate, the Court concludes:

•**As to the $84,000.00 on deposit in Ms. Aquino's 401(k) plan on the petition date:**  To the extent that such money constituted estate property under Section 541(a) on the filing date of her bankruptcy petition, it is now exempt from her chapter 13 bankruptcy estate as a matter of law.  Taylor v. Freeland & Kronz, 503 U.S. 638, 643-44 (1992).

•**As to any money that had been withheld from Ms. Aquino's pre-petition wages as retirement plan contributions, but had not been remitted to or deposited in her qualified 401(k) retirement plan as of the petition date:**  All such money is excluded from, and does not constitute property of, her chapter 13 bankruptcy estate under Section 541(b)(7) as a matter of law.

•**As to all money earned by Ms. Aquino from services she performed after the commencement of this case but prior to case closure:**  All such money is property of her chapter 13 bankruptcy estate under Section 1306(a) as a matter of law.

Having ascertained the proper scope of Ms. Aquino's chapter 13 bankruptcy estate, mindful that all $84,000.00 in her qualified 401(k) plan on the filing date of her petition is exempt from that estate as a matter of law, and cognizant that Trustee's objections to confirmation of Plan #2 do not suggest that the chapter 13 estate includes any prebankruptcy wages withheld by Ms. Aquino's employer that had not been deposited in her 401(k) retirement plan as intended on the petition date, the Court will now focus upon the heart of the dispute between the parties:  Whether Plan #2 can be confirmed when Section 1325 is properly applied to the facts of this case.

**f.    It Is Undisputed That Trustee Objected to Confirmation of Plan #2**

The bar to confirmation of a proposed plan under Section 1325(b)(1) requires the filing of an objection to the proposed plan by "the trustee or the holder of an allowed unsecured claim."[410] The record plainly reflects that Trustee filed papers objecting to confirmation of Plan #2 "pursuant to 11 U.S.C. § 1325(a)(3) and (b)" due to Ms. Aquino's contemplated $1,509.50 voluntary monthly 401(k) retirement plan contributions during the pendency of her chapter 13 case.[411]

**g.    Since Trustee Filed An Objection to Confirmation of Plan #2, Under Section 1325(b)(1)(B) the Court May Not Approve That Plan Unless It Provides That All of Ms. Aquino's Projected Disposable Income During the Applicable Commitment Period Will Be Applied to Make Payments to Unsecured Creditors.**

The phrase "projected disposable income" as used in Section 1325(b)(1)(B) is not defined in that section, or anywhere else in the Code.[412]  The United States Supreme Court has held that the term "projected disposable income" as used in Section 1325(b)(1)(B) is simply the debtor's disposable income as calculated under Section 1325(b)(2), adjusted for any "changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation."[413] In most cases, when a debtor does not expect any changes in financial circumstances, the debtor's projected disposable income under Section 1325(b)(1) is simply his or her disposable income calculated under Section 1325(b)(2) multiplied by the applicable commitment period.[414]

Ultimately then, determining a debtor's "projected disposable income" under Section 1325(b)(1)(B) involves a four-step process.  The first step is to establish the debtor's "disposable

---

[410]Section 1325(b)(1).

[411]ECF No. 65, p. 2 of 3, lines 2-3; see note 38, supra.

[412] Davis, 960 F.3d at 350.

[413]Id., quoting Lanning, 560 U.S. at 524 (2010).

[414]Davis, 960 F.3d at 350, citing Lanning, 560 U.S. at 519.

148

income" under the formula found in Section 1325(b)(2).[415]  The second step is to adjust that amount for any changes "known or virtually certain" to occur during the applicable commitment period.[416]  The third step is to multiply the resultant "disposable income" figure by the applicable commitment period to establish "projected disposable income" under Section 1325(b)(1)(B).  The fourth and final step is to compare the "projected disposable income" figure to the amount unsecured creditors will receive under the proposed plan.  If the plan proposes to pay the entire "projected disposable income" amount to unsecured creditors, it will survive the bar to confirmation imposed by Section 1325(b)(1)(B) and may be confirmable if it meets all other confirmation requirements imposed under Section 1325(a).  If the plan proposes to pay less than the entire "projected disposable income" amount to unsecured creditors, though, the bar to confirmation imposed by Section 1325(b)(1)(B) is triggered and the court "may not approve the plan."

I.    **Step #1 in the Projected Disposable Income Calculus**:
**Establishing Ms. Aquino's Disposable Income Under Section 1325(b)(2)**

The first step in establishing Ms. Aquino's disposable income under Section 1325(b)(2) is to ascertain the amount of her "current monthly income."  The Code contains a very specific definition of the phrase "current monthly income."  More particularly, Section 101(10A) of the Code, as it was in effect on the filing date of Ms. Aquino's bankruptcy petition,[417] defines the phrase "current monthly income" and spells out with specificity what is included in and excluded from it:

---

[415]Id.

[416]Id.

[417]Under the Coronavirus Aid, Relief, and Economic Security Act enacted on March 20, 2020, Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020) ("CARES Act"), Section 101(10A) of the Code was temporarily amended to include "[p]ayments made under federal law relating to the national emergency declared by the President under the National Emergencies Act (50 U.S.C. § 1601 et seq.) with respect to the coronavirus disease 2019 (COVID-19)."  The CARES Act became law well after Ms. Aquino's bankruptcy case was filed, and payments under the CARES Act are not at issue here.

§ 101. **Definitions**

. . . . .

(10A)  The term "current monthly income"--

    (A)    means the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6-month period ending on--

        (i)    the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or

        (ii)    the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii); and

    (B)    (i)    *includes* any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents (and in a joint case the debtor's spouse if not otherwise a dependent); and

        (ii)    *excludes*--

            (I)    benefits received under the Social Security Act (42 U.S.C. 301 et seq.);

            (II)    payments to victims of war crimes or crimes against humanity on account of their status as victims of such crimes;

150

<blockquote>

(III)    payments to victims of international terrorism or domestic terrorism, as those terms are defined in section 2331 of title 18, on account of their status as victims of such terrorism; and

(IV)    any monthly compensation, pension, pay, annuity, or allowance paid under title 10, 37, or 38 in connection with a disability, combat-related injury or disability, or death of a member of the uniformed services, except that any retired pay excluded under this subclause shall include retired pay paid under chapter 61 of title 10 only to the extent that such retired pay exceeds the amount of retired pay to which the debtor would otherwise be entitled if retired under any provision of title 10 other than chapter 61 of that title.

</blockquote>

11 U.S.C. § 101(10A) (emphasis added).

The Court finds it noteworthy that Congress expressly and specifically excluded Social Security benefits, payments to victims of war crimes or crimes against humanity, payments to victims of international or domestic terrorism, and compensation related to the disability, combat-related injury or disability, or death of members of the uniformed services from the Code's definition of "current monthly income." There is no similar exclusion to the definition of "current monthly income" for a debtor's post-petition voluntary contributions to a qualified retirement plan like Ms. Aquino's 401(k) plan.[418]

---

[418]In this Court's view, the logic of the <u>Vu</u> decision is significantly compromised by the absence of an express statutory exception for voluntary contributions to qualified retirement plans from the Code's specific definition of "current monthly income." See <u>Vu</u>, 2015 WL

Ms. Aquino's Amended Chapter 13 CMI Form, the most recent such form filed with the Court under oath, reveals that the average monthly income she and her non-filing spouse received from all sources during the 6 full months prepetition was $12,990.00.[419]  Because she was living separately from her non-filing spouse, Ms. Aquino took advantage of the marital deduction which reduced the combined monthly income figure by $4,150.00 (an amount equal to all monthly income earned by her non-filing spouse), and reported her current monthly income over the six months prior to the filing of her bankruptcy petition as $8,840.00.[420]  **As the Amended Chapter 13 CMI Form was signed by Ms. Aquino under penalty of perjury prior to filing with the Court, and is not challenged by Trustee, the Court concludes that the preponderance of the evidence establishes that Ms. Aquino's current monthly income as defined at Section 101(10A) and calculated under Section 1325(b)(2) is $8,840.00.**

The next analytical step under Section 1325(b)(2) requires the Court to determine what amounts are "reasonably necessary to be expended for the maintenance or support of" Ms. Aquino and her dependents.  To make that determination, it is first necessary to annualize Ms. Aquino's current monthly income, and then compare it to the median annual family income for a household of Ms. Aquino's size in Nevada, the state where she lived on the petition date.  That calculation is required because if Ms. Aquino's annualized current monthly income exceeds the applicable Nevada state median income level for a household of Ms. Aquino's size on the petition date, then the deductions from her current monthly income for "amounts reasonably necessary to be expended" for the maintenance and support of Ms. Aquino and her dependents are subject to the provisions of Section 1325(b)(3), which in turn incorporates the means testing provisions of Section 707(b)(2)(A) and (B).[421]  However, if Ms. Aquino's annualized current monthly income falls below the applicable Nevada state median income level for a household of

---

6684227, at *3 (relying upon the general provisions of Section 541(b)(7), without analysis of the specific definitional text of Section 101(10A), to conclude that "the monthly average of the contributions [to a qualified retirement plan] during the six month period pre-petition ***should not be included in the calculation of CMI*** for purposes of calculating disposable income.") (emphasis added).

[419]ECF No. 45, p. 2 of 3, Line 11.
[420]ECF No. 45, p. 2 of 3, Lines 12-14.
[421]Section 1325(b)(3).

Ms. Aquino's size on the petition date, then the "amounts reasonably necessary to be expended" for the maintenance and support of Ms. Aquino and her dependents "are not governed by Section 707(b) and the IRS guidelines, and are instead governed by the more general principles of necessity and reasonableness."[422]

Ms. Aquino's Amended Chapter 13 CMI Form, the most recent such form filed with the Court under oath, reflects that her annualized current monthly income is $106,080.00.[423]  On her Amended Chapter 13 CMI Form, Ms. Aquino reported that she lived in Nevada in a three person household.[424]  She also reported that the median annual family income for a three person household in Nevada on the filing date of her bankruptcy petition was $69,239.00.[425]  The Nevada median income figure of $69,239.00 reported by Ms. Aquino is consistent with the Census Bureau's Median Family Income by Family Size for the State of Nevada for the period from April 1, 2019 through April 30, 2019, as reflected on the website maintained by the United States Trustee.[426]

On her Amended Chapter 13 CMI Form, Ms. Aquino properly acknowledged that her annualized current monthly income exceeded the applicable median income level for a three person Nevada household when her bankruptcy petition was filed on April 30, 2019.[427]  **The Court therefore concludes that the preponderance of the evidence establishes that Ms. Aquino is an above-median income Nevada chapter 13 debtor.**

The significance of Ms. Aquino's status as an above-median income Nevada chapter 13 debtor is two-fold.  First, determination of the "amounts reasonably necessary to be expended" for the maintenance and support of Ms. Aquino and her dependents is governed by Section

---

[422] McCullers, 451 B.R. at 501 n.6.

[423] ECF No. 45, p. 3 of 3, lines 20a and 20b.  The Court takes judicial notice under FED. R. EVID. 201(b) and (c) that $8,840.00 x 12 = $106,080.

[424] ECF No. 45, p. 3 of 3, lines 16a and 16b.

[425] ECF No. 45, p. 3 of 3, line 16c.

[426] https://www.justice.gov/ust/eo/bapcpa/20190401/bci_data/median_income_table.htm

[427] ECF No. 45, p. 3 of 3, lines 20b, 20c, and 21

153

1325(b)(3).  Second, the "applicable commitment period" in her chapter 13 case is five years.[428]

Because determination of the "amounts reasonably necessary to be expended" for the maintenance and support of Ms. Aquino and her dependents is governed by Section 1325(b)(3), those amounts "shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2)" of the Code.  Section 707(b)(2)(A)(ii)(I) reads in part, as relevant to the Court's analysis of Ms. Aquino's case:

> **§ 707.  Dismissal of a [Chapter 7] case or conversion to a case under Chapter 11 or 13**
>
> . . . . .
>
> (b)
>
> > . . . . .
>
> > (2)(A)(ii)(I)  The debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards, and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides, as in effect on the date of the order for relief, for the debtor, the dependents of the debtor, and the spouse of the debtor in a joint case, if the spouse is not otherwise a dependent. Such expenses shall include reasonably necessary health insurance, disability insurance, and health savings account expenses for the debtor, the spouse of the debtor, or the dependents of the debtor. Notwithstanding any other provision of this clause,

---

[428]See Sections 1325(b)(4)(A)(ii) and (b)(4)(B); ECF No. 45, p. 1 of 3, and p. 3 of 3, line 21.

the monthly expenses of the debtor shall not include
any payments for debts.  [. . . . .]

11 U.S.C. § 707(b)(2)(A)(ii)(I).

Ms. Aquino has not challenged her status as an above-median income Nevada chapter 13 debtor.  She has not disputed that determination of the "amounts reasonably necessary to be expended" for the maintenance and support of Ms. Aquino and her dependents is governed by Section 1325(b)(3).  She has not argued that those amounts ought not "be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2)" of the Code.  To the contrary, she signed and filed the Amended Chapter 13 Disposable Income Form with the Court.  Her Amended Chapter 13 Disposable Income Form, the most recent such form filed with the Court under oath, specifically provides the detailed information needed to make the "amounts reasonably necessary to be expended" calculation under Sections 1325(b)(3) and 707(b)(2).[429]

Lines 38 and 42 of Ms. Aquino's Amended Chapter 13 Disposable Income Form, which she signed and filed with the Court under oath, disclose the following information:

•All of [her] expenses allowed under IRS expense allowances:   $6,165.00[430]

•All of [her] additional expense deductions:   $   426.00[431]

•All of [her] deductions for debt payment:   $   487.00[432]

•Total of all deductions allowed under Section 707(b)(2)(A):   $7,078.00[433]

Trustee did not object to the bulk of Ms. Aquino's claimed expense deductions under Sections 1325(b)(3) and 707(b)(2)(A) as detailed in the Amended Chapter 13 Disposable Income Form.[434]  Trustee did, however, object to Ms. Aquino's claimed $200.00 continuing charitable

---

[429]ECF No. 44.

[430]ECF No. 44, p. 6 of 8, line 38.

[431]Id.

[432]Id.

[433]ECF No. 44, p. 6 of 8, line 38; p. 7 of 8, line 42.

[434]Trustee did object to the fact that Ms. Aquino was paying her daughter's car insurance in an unstated amount, and that she had not verified childcare and education costs of $500.00.  ECF No. 65, pp. 1-2 of 3.  But as counsel for Ms. Aquino accurately observed, none of those expenses are reflected in Ms. Aquino's Amended Chapter 13 Disposable Income Form.  See ECF 66, p. 5 of 7, para. 14(b)(i) and ECF No. 44, pp. 1-6 of 8.

contribution expense deduction.[435]  Ms. Aquino did not offer Trustee or the Court any substantiating evidence for her claimed $200.00 continuing charitable contribution deduction, and argues only that Ms. Aquino's "projected disposable income is more than $1,000/month less than her proposed plan payment, so even if the Court were to disallow this expense as a deduction from her disposable income, her plan should still be confirmed."[436]

The Court concludes that Trustee's objection to Ms. Aquino's $200.00 continuing charitable contribution deduction should be sustained due to the absence of any supporting evidence, and therefore disallows that deduction.  **The Court further concludes that the preponderance of the evidence establishes that the total amount of Ms. Aquino's allowable expense deductions under Sections 1325(b)(3) and 707(b)(2)(A) is $6,878.00,** calculated as follows:

•All of [her] expenses allowed under IRS expense allowances:    $6,165.00

•All of [her] additional expense deductions:    $  226.00

•All of [her] deductions for debt payment:    $  487.00

•Total of all deductions allowed under Section 707(b)(2)(A):    **$6,878.00**[437]

The reason for the dispute between Ms. Aquino and Trustee regarding confirmation of Plan #2 becomes patently obvious when the voluntary $1,509.50[438] monthly 401(k) retirement plan contributions Ms. Aquino proposes to fund with her post-petition wages are excluded from the disposable income calculus under Section 1325(b)(2):

•Ms. Aquino's Current Monthly Income:    $8,840.00[439]

Less:

•"Amounts reasonably necessary to be expended"

for the maintenance and support of Ms. Aquino

---

[435]See ECF 65 p. 2 of 3, and ECF No. 44, p. 5 of 8, line 31.
[436]See ECF 66, p. 5 of 7, para. 14(b)(ii).
[437]The sum of $6,878.00 is simply the $7,078.00 total of all deductions listed on the Amended Chapter 13 Disposable Income Form reduced by the $200.00 continuing charitable contribution deduction disallowed by the Court.  See ECF 44, p. 6 of 8, line 38.
[438]See note 38, supra.
[439]ECF No. 45, p. 2 of 3, line 14; ECF No. 44, p. 7 of 8, line 39.

156

and her dependents as "determined in accordance

with subparagraphs (A) and (B) of section

707(b)(2)" under Section 1325(b)(3):          $6,878.00

•**Ms. Aquino's Disposable Income Under**

**Section 1325(b)(2):**          **$1,962.00**

Plan #2 proposes to pay unsecured creditors just $9,878.67.[440]  That amount would be generated by just over five months of Ms. Aquino's disposable income as calculated under Section 1325(b)(2).  The applicable commitment period in this case is sixty months.

In an effort to reduce her disposable income under the Section 1325(b)(2) formula, Ms. Aquino asserts that the contemplated $1,509.50 voluntary monthly contributions to her 401(k) plan funded by her postpetition wages are either (a) an additional "amount reasonably necessary to be expended" for the maintenance and support of Ms. Aquino and her dependents as "determined in accordance with subparagraphs (A) and (B) of section 707(b)(2)" under Section 1325(b)(3), or  (b) excluded from the disposable income calculation by operation of Section 541(b)(7).

The contention that Ms. Aquino's contemplated $1,509.50 voluntary monthly contributions to her 401(k) plan funded by her postpetition wages is an additional "amount reasonably necessary to be expended" for the maintenance and support of Ms. Aquino and her dependents" in the context of Sections 1325(b)(3) and 707(b)(2) is a non-starter.  As the Vu court aptly noted:

> For purposes of complying with § 1325(b)(1)(B)'s "projected disposable income" requirement, the Code defines "disposable income" as "current monthly income [. . . . .] less amounts reasonably necessary" for the maintenance or support of the debtor or the debtor's dependent.  11 U.S.C. § 1325(b)(2).  Above-median income debtors who pursue the "amounts reasonably necessary" path quickly meet a dead end:  Section 1325(b)(3) provides that, for above-median-income debtors, "amounts reasonably necessary" are determined by sections 707(b)(2)(A) and (B),

---

[440]ECF No. 50, p. 4 of 6, section 5.4.

neither of which provide for voluntary retirement contributions as an allowable, necessary expense.  As discussed *infra*, some courts hold that for the purposes of calculating "disposable income" under § 1325(b)(2), voluntary retirement contributions cannot be deducted from current monthly income ("CMI") as "amounts reasonably necessary."

Vu, 2015 WL 6684227, at *2.

The Ninth Circuit Court of Appeals appears to be aligned with the "some courts" referenced in Vu as having concluded that voluntary retirement plan contributions cannot be deducted from current monthly income as "amounts reasonably necessary" under the tandem of Sections 1325(b)(3) and 707(b)(2)(A).  In conducting the means test analysis in a chapter 7 context where the debtor argued that a 401(k) loan repayment was an "other necessary expense" under § 707(b)(2)(A)(ii), the Ninth Circuit has stated:

> Under the statutory provisions governing the means test, debtors may deduct, in addition to payments on secured debt, their "actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service."  11 U.S.C. § 707(b)(2)(A)(ii).  In turn, the Internal Revenue Manual ("IRM") lists fifteen categories of expenses which may be considered necessary under certain circumstances, such as child care, education and court-ordered payments such as alimony and child support.  IRM § 5.15.1.10.
>
> [. . . . .]
>
> Egebjerg's repayment of his 401(k) loan does not qualify as an "Other Necessary Expense."  Such payments do not fit within any of the IRM's listed categories.  *In re Barraza*, 346 B.R. 724, 730 (Bankr. N.D. Tex. 2006) (rejecting argument that repayment could be considered an "involuntary deduction" because it is not a condition of the debtor's employment); *see also In re Lenton*, 358 B.R. at 657-58 (same).  As discussed above, the 401(k) loan repayments themselves are voluntary in the sense that Egebjerg can simply ask the loan administrator to treat his outstanding loan balance as an early withdrawal from his 401(k) and thereby

158

1    relieve himself of a future repayment obligation.  Doing so would have tax

2    consequences, but Egebjerg would retain the use of most of the money loaned.

3

4    According to Egebjerg, the replenishment of his 401(k) plan is necessary to his

5    long-term "health and welfare," because he is approaching retirement and his

6    401(k) plan is his only significant asset.  But even if we were to look beyond the

7    specified categories to consider the more general "necessary expense test" in the

8    IRM, 401(k) repayments are simply not of the same kind and character of those

9    expenses allowed elsewhere under § 5.15.1.10.  For example, dependent care

10    expenses (for care of the elderly or handicapped) are permitted only if there is no

11    alternative to paying the expense, and "[e]ducation" costs are necessary expenses

12    only if they are "required for a physically or mentally challenged child and no

13    public education providing similar services is available" or if they are "required as

14    a condition of [the debtor's] employment.  *Id*.  **We also note that the IRS**

15    **guidelines themselves provide that "[c]ontributions to voluntary retirement**

16    **plans are not a necessary expense."  IRM § 5.15.1.23;** *see also In re Lenton***,**

17    **358 B.R. at 658 ("[i]f future voluntary contributions to the 401(k) plan are**

18    **not necessary expenses, it is hard to argue that the replenishment of past**

19    **voluntary contributions to the 401(k) account by repaying loans is a**

20    **necessary expense.").**

21    Egebjerg v. Anderson (*In re* Egebjerg), 574 F.3d 1045, 1051-52 (9th Cir. 2009) (emphasis

22    added).  Well-reasoned decisions from other courts within the Ninth Circuit have reached the

23    same conclusion.  See Prigge, 441 B.R. at 676-77 (citing Egebjerg in holding that contributions

24    to voluntary retirement plans "are not a necessary expense, in any amount."); McCullers, 451

25    B.R. at 501 (citing Egebjerg and Prigge, and holding that in the disposable income calculus

26    under Sections 1325(b)(3) and 707(b)(2) "[u]nder the IRS guidelines, mandatory retirement

27    contributions are deductible, but voluntary contributions are not."); Green, 2012 WL 8255556, at

28    *2 (citing Prigge and McCullers in holding that the "Debtor may not take a deduction, in her

disposable [income] calculation, for contributions she wishes to make voluntarily to a 403(b) retirement plan."); Parks BAP, 475 B.R. at 709 (citing Egebjerg and Prigge in concluding that "[a]lthough the IRS guidelines do not prevail over a plain reading of § 541(b)(7)(A), they do provide 'specific guidance that [401(k) contributions] are not a necessary expense, in any amount.").

The Court finds compelling both the Ninth Circuit Court of Appeals' statements in Egebjerg, and the logic of the Prigge, McCullers, Green, and Parks BAP cases. The Court also agrees with the Vu court's observation that above-median income debtors like Ms. Aquino who pursue the "amounts reasonably necessary" argument in responding to a confirmation objection lodged under Section 1325(b)(1)(B) quickly meet a logical dead. To the extent that Ms. Aquino argues that the contemplated $1,509.50 voluntary monthly contributions to her 401(k) plan funded by her postpetition wages are an additional "amount reasonably necessary to be expended" for her maintenance and support and that of her dependents as "determined in accordance with subparagraphs (A) and (B) of section 707(b)(2)" under Section 1325(b)(3), the Court rejects that argument, and expressly holds to the contrary.

Ms. Aquino's remaining argument is that the contemplated $1,509.50 voluntary monthly postpetition contributions to her 401(k) retirement plan, funded by her postpetition wages at the expense of her creditors, are excluded from the disposable income calculation under Section 1325(b)(2) by operation of Section 541(b)(7) and its ambiguous "hanging paragraph." That argument fares no better.

This Court has carefully reviewed the various and divergent lines of authority having considered this issue. Like the Sixth Circuit in Seafort Circuit and Davis, this Court concludes "that the *Johnson* line of cases are not persuasive because they do not read § 541(b)(7) within the larger context of § 541 as a whole." Seafort Circuit, 669 F.3d at 672-73; see also Davis, 960 F.3d at 353 (noting that Seafort Circuit rejected the Johnson interpretation of Section 541(b)(7)).

The Court also finds the reasoning of the Vu line of cases unpersuasive. Those cases suggest that postpetition voluntary contributions to qualified retirement plans are properly excluded from current monthly income, despite the fact that no such exclusion exists in the

Code's specific definition of current monthly income at Section 101(10A).[441]

The remaining lines of authority can be traced back to <u>Seafort BAP</u> and <u>Prigge</u>.  In her papers, Ms. Aquino "suggests the proper test for this Court to adopt here is that proposed by the Sixth Circuit's Bankruptcy Appellate Panel in [<u>Seafort BAP</u>]."[442]  After careful deliberation, the Court disagrees with Ms. Aquino's suggestion and rejects it.

Like Judge Carlson in <u>McCullers</u>, this Court concludes that there is some equitable appeal to the result reached in cases like <u>Seafort BAP</u> and <u>Davis</u>, to the effect that the "hanging paragraph" of Section 541(b)(7) "is best read to exclude from disposable income a debtor's post-petition monthly 401(k) contributions so long as those contributions were regularly withheld from the debtor's wages prior to bankruptcy."[443] But the equitable appeal of that result doesn't withstand close scrutiny under the controlling statutory framework:

> At first glance, [<u>Seafort BAP</u>] is more persuasive, because it adopts an attractive and plausible policy:  That Congress intended to encourage chapter 13 debtors to continue making retirement contributions, but did not intend to permit debtor s to increase their rate of contribution to the detriment of their creditors.  [<u>Seafort BAP</u>], 437 B.R. at 210.
>
> However appealing the result achieved in [<u>Seafort BAP</u>], close analysis of the language of the statute suggests that Congress actually intended the much more limited effect recognized in *Prigge*.  First, neither the statute itself nor the [<u>Seafort BAP</u>] decision offers any mechanism by which the *fixed amount* withheld as of the petition date is converted into a *monthly rate* of contribution that the debtor may continue postpetition.  Second, and more important, [<u>Seafort BAP</u>] does not take into account the use of the words "except that" at the beginning of the statutory language excluding retirement contributions from disposable income.  Section 541(b)(7) provides that certain contributions to qualified plans are

---

[441] <u>See</u> note 418, <u>supra</u>.
[442] ECF No. 66, p. 4 of 7, para. 13.
[443] <u>Davis</u>, 960 F.3d at 357.

excluded from property of the estate, and concludes with the language at issue here:  "*except that* such amount under this paragraph shall not constitute disposable income . . ." (emphasis added).  Use of the term "except that" suggests that the purpose of the language is merely to counteract any suggestion that the exclusion of such contributions from the property of the estate constitutes postpetition income to the debtor.  If Congress had intended to exclude prepetition contributions from the calculation of disposable income more generally, it would have been much more natural for Congress to provide that such contributions are excluded from property of the estate "and" in the calculation of disposable income.  *Prigge's* more limited interpretation is reinforced by the fact that Congress used much more direct language in excluding retirement loan repayments from disposable income.  Section 1322(f) was placed within the confines of chapter 13 itself, and states explicitly "any amounts required to repay such loan shall not constitute 'disposable income' under section 1325."  Congress' use of the words "except that" is entirely consistent with the *Prigge* decision, which held that the purpose of the statute was merely to clarify that the exclusion of certain prepetition contributions from property of the estate did not give rise to disposable income to the debtor.  *Prigge*, 441 B.R. at 677 n. 5.  This court is mindful of its obligation to adopt an interpretation that accords some effect to the statutory language in question, and that *Prigge* gives that language a very limited effect, because it is unlikely even without the language in question that excluding sums earned by the debtor prepetition from property of the estate would ever be construed as creating postpetition disposable income to debtor.  *Prigge's* limited reading is entirely appropriate, however, because the statutory language itself discloses very modest aims.  In using the words "except that," Congress suggests that its only purpose was to negate any inference that the exclusion of such contributions from property of the estate gives rise to income to the debtor.

McCullers, 451 B.R. at 504-05; see also Prigge, 441 B.R. at 677 ("If Congress had intended to exclude voluntary 401(k) contributions from disposable income it could have drafted § 1322(f) to provide for such an exclusion, or provided one elsewhere."); Green, 2012 WL 8255556, at * 2 (citing Prigge and McCullers in holding that a debtor "may not take a deduction, in her disposable [income] calculation, for contributions she wishes to make voluntarily to a 403(b) retirement plan."); Parks BAP, 475 B.R. at 709 (citing Seafort Circuit for the proposition that "to give meaning to the words 'under this paragraph' found in the hanging paragraph, it is reasonable to conclude that 'Congress intentionally limited the type of contributions to qualified retirement plans that would be excluded from disposable income, namely those 'under this subparagraph', § 541(b)(7)(A), which in turn governs only those contributions in effect as of the commencement of a debtor's bankruptcy case, per § 541(a)(1).'").

Additionally, this Court finds the following proposition set forth in Parks BAP to be compelling, and adopts it in rejecting Ms. Aquino's final argument:

> We also attach significance to the fact that § 1306(a)(2) makes postpetition earnings of a debtor part of his or her estate but nowhere in chapter 13 are voluntary retirement contributions excluded from disposable income. To the contrary, when Congress amended [sic] BAPCPA, it chose to exclude the repayment of 401(k) loans from disposable income in § 1322(f). "Where Congress includes particular language in one section of a statute but omits it in another, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Keene Corp. v. United States*, 508 U.S. 200, 208, 113 S. Ct. 2035, 124 L. Ed. 2d 118 (1993). Accordingly, it is likely "that Congress did not intend to treat voluntary 401(k) contributions like 401(k) loan repayments, because it did not similarly exclude them from 'disposable income' within Chapter 13 itself." [Seafort Circuit], 669 F.3d at 672. ***Simply put, without a clearer direction comparable to the carve out from disposable income for the repayment of retirement loans in § 1322(f), it seems unlikely that Congress intended § 541(b)(7)(A) to bestow a benefit on above-median chapter***

*13 debtors while their creditors absorbed an even greater loss.*

Parks BAP, 475 B.R. at 708-09 (emphasis added).

In summary, this Court finds the Prigge line of cases regarding the proper interpretation of Section 541(b)(7) to be the most persuasive and compelling. The Court therefore concludes that Section 541(b)(7) does not authorize above-median income chapter 13 debtors like Ms. Aquino to exclude voluntary postpetition contributions to their qualified retirement plans, funded by their postpetition earnings at the expense of their creditors, from the disposable income calculation under Section 1325(b)(2) *in any amount*. See Parks BAP, 475 B.R. at 709.

The Court is keenly aware that, in cases filed by above-median income chapter 13 debtors who were making regular voluntary contributions to a qualified retirement plan on the petition date, various courts - - and even different decisions within the same circuit - - have reached different conclusions as to the proper interpretation of Section 541(b)(7) and the calculation of disposable income under Section 1325(b). Compare Seafort Circuit and Prigge with Seafort BAP and Davis, supra. It is therefore prudent for this Court to consider the disposable income calculus under the holding in Prigge (no deduction from disposable income under Section 1325(b)(2) for voluntary postpetition retirement plan contributions in any amount) and the holding in Davis (excluding from disposable income under Section 1325(b)(2) a debtor's post-petition monthly 401(k) contributions so long as those contributions were "regularly withheld" from the debtor's wages prior to her bankruptcy.)[444]

This Court has previously concluded that the preponderance of the evidence establishes that Ms. Aquino's monthly contributions to her 401(k) plan are voluntary, that as of the filing date, those voluntary monthly contributions were $612.90, and that she had amassed $84,000.00 in her 401(k) plan prepetition.[445] Given the $84,000.00 balance in her 401(k) account on the petition date, the Court concludes that the preponderance of the evidence establishes that Ms. Aquino's $612.90 voluntary monthly 401(k) contributions had been "regularly withheld" from

---

[444] Davis, 960 F.3d at 357.
[445] See notes 393-400 and accompanying text, supra.

her prepetition wages.[446]

But Ms. Aquino did not claim to make voluntary contributions to her qualified 401(k) retirement plan in an amount exceeding $612.90 per month until **after** the UST Dismissal Motion had been filed identifying her case as ripe for dismissal as a presumptive abuse of chapter 7 of the Code, and **after** she had opted to convert her case to chapter 13.[447]  For clarity and avoidance of any doubt, the Court concludes that the preponderance of the evidence **does not establish** that Ms. Aquino's employer had "regularly withheld" $1,509.50 from Ms. Aquino's wages for the purpose of funding voluntary 401(k) plan contributions prior to the filing date.

If Ms. Aquino's $612.90 monthly voluntary contributions to her 401(k) plan that had been "regularly withheld" from her prepetition wages were found to be excluded from the disposable income calculus under Section 1325(b)(2) - - and for sake of clarity, this Court specifically holds to the contrary under the <u>Prigge</u> line of cases - - her disposable income would be calculated as follows:

| | |
|---|---|
| •Ms. Aquino's Current Monthly Income: | $8,840.00[448] |
| <u>Less</u>: | |
| •"Amounts reasonably necessary to be expended" for the maintenance and support of Ms. Aquino and her dependents as "determined in accordance with subparagraphs (A) and (B) of section 707(b)(2)" under Section 1325(b)(3): | $6,878.00[449] |
| •Amounts "regularly withheld" from Ms. Aquino's wages as voluntary contributions to her qualified 401(k) retirement plan prior to her bankruptcy: | <u>$   612.90</u> |
| Subtotal: | <u>$7,490.90</u> |

---

[446]Leaving aside investment returns, it would take roughly 137 months to amass $84,000.00 through monthly contributions of $612.90.

[447]<u>See</u> note 397 and accompanying text, <u>supra</u>.

[448]ECF No. 45, p. 2 of 3, line 14; ECF No. 44, p. 7 of 8, line 39.

[449]<u>See</u> note 437 and accompanying text, <u>supra</u>.

•**Ms. Aquino's Disposable Income Under**

**Section 1325(b)(2):**                                   **$1,349.10**

Plan #2 proposes to pay unsecured creditors $9,878.67.[450]  Even if Ms. Aquino was allowed a $612.90 deduction, representing the amount "regularly withheld" from her prepetition wages to fund voluntary monthly contributions to her 401(k) cases under the logic of decisions like Davis, the proposed dividend of $9,878.67 under Plan #2 would be generated by just over seven months of Ms. Aquino's disposable income.  The applicable commitment period in her case is sixty months.

To summarize, Ms. Aquino's disposable income under Section 1325(b)(2) as calculated under the Prigge line of authorities is **$1,962.00**.  Her disposable income under Section 1325(b)(2) as calculated under decisions such as Davis is **$1,349.10**.

II.       **Step #2 in the Projected Disposable Income Calculus:**

**Adjustments to Ms. Aquino's Disposable Income Under**

**Section 1325(b)(2) For Any Changes "Known or**

**Virtually Certain to Occur" During the Applicable**

**Commitment Period**

As determined previously, because Ms. Aquino is an above-median income Nevada chapter 13 debtor, and Plan #2 does not provide for payment in full of all allowed unsecured claims, the applicable commitment period in her case is sixty months.[451] There is little record evidence establishing any changes to Ms. Aquino's disposable income level under Section 1325(b)(2) that are "known or virtually certain to occur" during the applicable sixty month commitment period.

Ms. Aquino's Chapter 7 schedules indicated that she did not expect her income to increase or decrease during within the year after her bankruptcy petition was filed.[452]  The same is true with respect to Amended Chapter 7 Schedule I filed less than three months later.[453]  The

---

[450]ECF No. 50, p. 4 of 6, section 5.4.
[451]Sections 1325(b)(4)(A)(ii) and (b)(4)(B).
[452]ECF No. 1, p. 37 of 55.
[453]ECF No. 20, p. 2 of 4.

166

Chapter 13 Schedules and Amended Chapter 13 Schedules filed after conversion of her case to chapter 13 indicate that Ms. Aquino did expect a decrease in income in the year after those documents were filed as a result of a decision she had voluntarily made.[454]  The Chapter 13 Schedules and Amended Chapter 13 Schedules revealed that "Debtor will no longer accept overtime assignments as readily as she has in the past."[455]  Beyond those references, the record is bereft of any evidence that there were any anticipated changes in Ms. Aquino's disposable income level under Section 1325(b)(2) that were "known or virtually certain to occur" during the applicable sixty month commitment period.

To give credence to Ms. Aquino's statement that she would intentionally decrease her disposable income by reducing her overtime hours (but not her regular salaried hours), the Court will reduce Ms. Aquino's disposable income by a factor of five percent (5%).  Resultantly, Ms. Aquino's disposable income under Section 1325(b)(2), adjusted for changes "known or virtually certain to occur" during the applicable sixty-month commitment period, is as follows:

•Under the <u>Prigge</u> line of cases:   $1,962.00 x .95 = **$1,863.90**

•Under decisions such as <u>Davis</u>:  $1,349.10 x .95 = **$1,281.65**

### III.    Step #3 in the Projected Disposable Income Calculus: Multiplying Ms. Aquino's "Disposable Income" Figure By the Applicable Commitment Period to Establish "Projected Disposable Income" Under Section 1325(b)(1)(B)

This is a fairly straightforward mathematical calculation.  Ms. Aquino's "projected disposable income" under Section 1325(b)(1)(B) during the applicable sixty month commitment period for Plan #2 is as follows:

•Under the <u>Prigge</u> line of cases:   $1,863.90 x 60 months = **$111,834.00**

•Under decisions such as <u>Davis</u>:  $1,281.65 x 60 months = **$ 76,899.00**

To lend some additional perspective to the analysis here, under the <u>Prigge</u> line of cases, over the

---

[454]ECF No. 36, p. 23 of 33, Part 2, line 13; ECF No. 46, p. 23 of 25, Part 2, line 13.
[455]<u>Id.</u>

span of the applicable sixty month commitment period for Plan #2, Ms. Aquino's $111,834.00 in "projected disposable income" under Section 1325(b)(1)(B) would pay 100% of the $90,105.55 total of timely filed unsecured claims in her case, and would yield an excess of $21,728.45. Alternatively, under decisions such as Davis, Ms. Aquino's $76,899.00 in "projected disposable income" under Section 1325(b)(1)(B) during the applicable sixty month commitment period for Plan #2 would pay 85.34% of the $90,105.55 total of timely filed unsecured claims in her case.

## IV.   Step #4 in the Projected Disposable Income Calculus: Comparison of Ms. Aquino's "Projected Disposable Income" Under Section 1325(b)(1)(B) With the Amount Unsecured Creditors Will Receive Under Plan #2

This final step is also a straightforward mathematical comparison.  Ms. Aquino's "projected disposable income" under Section 1325(b)(1)(B) is $111,834.00 (under the Prigge line of cases adopted by this Court), or $76,899.00 (calculated under decisions such as Davis). Plan #2 provides for payments to unsecured creditors of just $9,878.67.  To lend additional context:

- Under the Prigge line of cases:

| | |
|---|---|
| Ms. Aquino's Projected Disposable Income: | $111,834.00 |
| Proposed Payments Under Plan #2: | $   9,878.67 |
| **Shortfall:** | **$101,955.33** |

- Under decisions such as Davis:

| | |
|---|---|
| Ms. Aquino's Projected Disposable Income: | $ 76,899.00 |
| Proposed Payments Under Plan #2: | $   9,878.67 |
| **Shortfall:** | **$ 67,020.33** |

The Court concludes that the preponderance of the evidence establishes that Plan #2 simply does not "provide that all of [Ms. Aquino's] projected disposable income to be received in the applicable [60 month] commitment period [. . . . .] will be applied to make payments to unsecured creditors under the plan" as required by Section 1325(b)(1)(B).  It isn't even close.

h.    **Since Trustee Filed An Objection to Confirmation of Plan #2, And Plan #2 Does Not Provide That All of Ms. Aquino's Projected Disposable Income During the Applicable Sixty Month Commitment Period Will Be Applied to Make Payments to Unsecured Creditors, the Court May Not Approve Plan #2 and Confirmation Must Be Denied Under Section 1325(b)(1)(B)**

Trustee, as the objector to confirmation of Plan #2, bore the initial burden of proof. Trustee was required to show by a preponderance of the evidence that because Plan #2 failed to provide that all of Ms. Aquino's projected disposable income would be applied to make plan payments to unsecured creditors, confirmation was prohibited under Section 1325(b)(1)(B).  In re Lopez, 574 B.R. 159, 171 (Bankr. E.D. Cal. 2017) (citing Itule v. Heath (*In re* Heath), 182 B.R. 557, 560-61 (9th Cir. BAP 1995)).  Based upon all of the facts detailed in this Memorandum and Order, the Court concludes that Trustee met the evidentiary burden attendant to her objection to confirmation of Plan #2 under Section 1325(b)(1).  Trustee did so by much more than a mere preponderance of the evidence.

As a result, the burden of proof shifted to Ms. Aquino "as the party with most access to proof on the point, to show ... that the objection lacks merit."  Lopez, 574 B.R. at 171 (citing In re Crompton, 73 B.R. 800, 809 (Bankr. E.D. Pa. 1987)).  The Court concludes that Ms. Aquino failed to meet her burden of showing by a preponderance of the evidence that Trustee's objection to confirmation of Plan #2 under Section 1325(b)(1) lacked merit.  In fact, Ms. Aquino's own filings made with this Court under oath and the preponderance of the evidence established quite the opposite.

In summary, because Plan #2 plainly does not "provide that all of [Ms. Aquino's] projected disposable income to be received in the [60 month] applicable commitment period [. . . . .] will be applied to make payments to unsecured creditors under the plan" as required by Section 1325(b)(1)(B), the Court "may not approve the plan."[456]  That is plainly true whether

---

[456]Section 1325(b)(1)(B).

"projected disposable income" is calculated under the Prigge line of cases adopted by this Court, or under decisions like Davis.  The Court therefore concludes that Trustee's objection to confirmation of Plan #2 under Section 1325(b)(1)(B) must be sustained, and that confirmation of Plan #2 must be denied.

### 6.    Trustee's Objection to Confirmation of Plan #2 Under Section 1325(a)(3) Is Also Sustained

Trustee also objected to confirmation on the basis that Ms. Aquino did not file Plan #2 in good faith as required by Section 1325(a)(3).  Ms. Aquino argued to the contrary.  After a considered review of the totality of the circumstances present in Ms. Aquino's case, the Court agrees with Trustee.

### a.    Legal Standards Governing the Good Faith Confirmation Requirement Under Section 1325(a)(3)

"Good faith" under Section 1325(a)(3) is neither defined by statute, nor explained in legislative history. Fid. & Cas. Co. of N.Y. v. Warren (In re Warren), 89 B.R. 87, 90 (9th Cir. BAP 1988), citing Goeb v. Heid (In re Goeb), 675 F.2d 1386, 1389–90 (9th Cir. 1982). Bankruptcy courts have an independent duty to make a considered assessment of the debtor's good faith in determining whether Section 1325(a)(3) has been satisfied in the plan confirmation calculus.  Warren, 89 B.R. at 90, citing In re Hale, 65 B.R. 893, 897 (Bankr. S.D. Ga. 1986) and In re Meltzer, 11 B.R. 624, 626 (Bankr. E.D.N.Y. 1981); see also In re Sisk, 962 F.3d 1133, 1151 (9th Cir. 2020) ("Moreover, even when no party objects, courts have an independent duty to determine whether a debtor's plan complies with the Code. United Student Aid Funds, Inc. v. Espinosa, 559 U.S. 260, 277, 130 S. Ct. 1367, 176 L. Ed. 2d 158 (2010). The Code 'makes plain that bankruptcy courts have the authority—indeed, the obligation—to direct a debtor to conform his plan to the requirements [of Chapter 13].' Id.").

The Warren court further observed:

> The determination with which the bankruptcy court is entrusted under
> § 1325(a)(3) is not a ministerial one. Like any judicial determination which a
> bankruptcy court is called on to make during the course of a proceeding, it calls

for the exercise of the Court's informed and independent judgment.

Warren, 89 B.R. at 90, quoting Meltzer, 11 B.R. at 626.

The Warren court emphasized the case-specific nature of a bankruptcy court's consideration of the good faith plan confirmation standard under Section 1325(a)(3):

> It should be noted here that Chapter 13 provides that the bankruptcy judge shall preside over confirmation proceedings. If confirmation depended entirely upon arithmetical computations or the absence of illegal activity in the case, there would be no need for a judge. Confirmation of a Chapter 13 plan requires the exercise of judicial discretion and assessment of evidence by a bankruptcy judge. The good faith requirement is one of the central, perhaps the most important confirmation finding to be made by the court in any Chapter 13 case. Each case must be judged on its own facts.

Warren, 89 B.R. at 90, citing Georgia R.R. Bank & Trust Co. v. Kull (In re Kull), 12 B.R. 654, 658 (S.D. Ga. 1981), aff'd sub nom. Kitchens v. Georgia R.R. Bank & Trust Co. (In re Kitchens), 702 F.2d 885 (11th Cir. 1983) and In re Chaffin, 836 F.2d 215, 216 (5th Cir. 1988) ("[t]he court has the authority and duty to examine a plan even when no creditor has objected...."); see also Sisk, 962 F.3d at 1150 (the Ninth Circuit Court of Appeals noting that "[T]he good faith analysis should be a fact-intensive examination of the 'totality of the circumstances.' [ . . . .] Where courts fail to factually support their good faith determinations, this Court has remanded for further findings.") (internal citation omitted), citing Drummond v. Welsh (In re Welsh), 711 F.3d 1120, 1131 (9th Cir. 2013) and 550 West Ina Road Trust v. Tucker (In re Tucker), 989 F.2d 328, 330 (9th Cir. 1993).

In Meyer v. Lepe (In re Lepe), 470 B.R. 851, 856 (9th Cir. BAP 2012), the Ninth Circuit Bankruptcy Appellate Panel summarized the need for a totality of the circumstances inquiry when a bankruptcy court is tasked with resolving a plan confirmation objection based upon a lack of good faith under Section 1325(a)(3):

> In short, Goeb established that, in this circuit, a good faith determination in connection with chapter 13 plan confirmation cannot be based on any single

factor or feature of a proposed plan, to the exclusion of review of all other
relevant information. Importantly, it is of no moment that a single factor may be
indicative of bad faith, or that a specific plan feature is not consistent with the
"spirit of chapter 13" or may indicate manipulation of the Bankruptcy Code.
Factors indicating good and bad faith may not be considered in isolation, but must
always be weighed against the totality of the circumstances in each case.

Lepe, 470 B.R. at 856-57.

The Warren court noted that after the Ninth Circuit issued its decision in Goeb, general
guidelines began to develop for bankruptcy courts to follow in conducting the totality of the
circumstances inquiry required when a debtor's good faith in filing a plan is challenged under
Section 1325(a)(3):

Given the nature of bankruptcy courts and the absence of congressional intent to
specially define "good faith," we believe that the proper inquiry is whether the
Goebs acted equitably in proposing their Chapter 13 plan. A *bankruptcy court
must inquire* whether the debtor has misrepresented facts in his plan, unfairly
manipulated the Bankruptcy Code, or otherwise proposed his Chapter 13 plan in
an inequitable manner. Though it may consider the substantiality of the proposed
repayment, the court must make its good-faith determination in the light of all
militating factors.

Warren, 89 B.R. at 90-91, quoting Goeb, 675 F.2d at 1390 (emphasis in original); see Sisk, 962
F.3d at 1150 (citing Goeb for the principle that "[f]undamentally, the good faith inquiry assesses
'whether the debtor has misrepresented facts in his plan, unfairly manipulated the Bankruptcy
Code, or otherwise proposed his Chapter 13 plan in an inequitable manner.'"); see also Lepe, 470
B.R. 851, 856 (9th Cir. BAP 2012) (citing Goeb and observing that a bankruptcy court's good
faith inquiry should be "directed to whether or not there has been an abuse of the provisions,
purpose, or spirit of Chapter XIII in the proposal or plan."); Chinichian v. Campolongo (In re
Chinichian), 784 F.2d 1440, 1444 (9th Cir. 1986) (holding that the good faith inquiry "should
examine the intentions of the debtor and the legal effect of the confirmation of a Chapter 13 plan

in light of the spirit and purposes of Chapter 13.").

Over time, courts within the Ninth Circuit have developed a non-talismanic list of factors for bankruptcy courts to consider when making good faith determinations under Section 1325(a)(3) using the totality of the circumstances approach:

1.  The amount of the proposed payments and the amount of any surplus of debtor's income after paying expenses;

2.  The debtor's employment history, ability to earn, and likelihood of future increases in income;

3.  The probable or expected duration of the plan;

4.  The accuracy of the plan's statements of the debts, expenses and percentage of repayment of unsecured debt, and whether any inaccuracies are an attempt to mislead the court;

5.  The extent of any preferential treatment between classes of creditors;

6.  The extent to which secured claims are modified;

7.   The type of debt sought to be discharged, and whether any such debt is nondischargeable in chapter 7;

8.  The existence of special circumstances such as inordinate medical expenses;

9.  The frequency with which the debtor has sought bankruptcy relief;

10.  The motivation and sincerity of the debtor in seeking Chapter 13 relief;

11.  The burden which the plan's administration would place upon the trustee.

12.  Whether the debtor misrepresented facts in his [petition or] plan, unfairly manipulated the Bankruptcy Code, or otherwise [filed] his Chapter 13 [petition or] plan in an inequitable manner;

13.  The debtor's history of filings and dismissals;

14.  Whether the debtor only intended to defeat state court litigation; and

15.  Whether egregious behavior is present.

Lepe, 470 B.R. at 857-58, citing Warren, 89 B.R. at 93, United States v. Estus (*In re* Estus), 695 F.2d 311, 317 (8th Cir. 1982), and Leavitt v. Soto (*In re* Leavitt), 171 F.3d 1219, 1224 (9th Cir.

1999) (other internal citations omitted).

Emphasizing that the foregoing factors are guidelines to be understood as the beginning and not the end of the good faith analysis, the Lepe court summarized the good faith decisional standard under Section 1325(a) as follows:

> In summary, then, in the Ninth Circuit, in determining whether a debtor has proposed a plan in good faith under § 1325(a)(3), a bankruptcy court must examine the totality of the circumstances. Stated another way, in evaluating good faith, a bankruptcy court must never view one factor in isolation, even if that one factor is indicative of bad faith.

Lepe, 470 B.R. at 858, citing Goeb, 675 F.2d at 1391.

**b.    The Totality of the Circumstances In Ms. Aquino's Bankruptcy Case Demonstrate That She Did Not Propose Plan #2 In Good Faith As Required Under Section 1325(a)(3)**

The Court has conducted a careful review of all of the circumstances present in Ms. Aquino's bankruptcy case.  Her case was originally filed under chapter 7 of the Code.  Soon thereafter the UST filed the UST Dismissal Motion,[457] supported by the UST Declaration detailing a shedload of misstatements and inaccuracies in the papers Ms. Aquino had signed and filed with this Court under oath.[458]   Ms. Aquino voluntarily converted this case from chapter 7 to chapter 13 on the literal eve of the hearing on the UST Dismissal Motion.[459]  The magnitude of the differences in the financial information listed in the various iterations of her bankruptcy schedules generally, and as to the voluntary nature and amount of her 401(k) retirement plan contributions pre- and post-conversion in particular, is revealing as to her state of mind in the prosecution  of this case.[460]  Reviewing the totality of the circumstances present in Ms. Aquino's case  through the lens of the non-talismanic list of factors identified in Lepe is both necessary and enlightening.

---

[457]ECF No. 25.
[458]ECF No. 26.
[459]See notes 147-151 and accompanying text, supra.
[460]See generally Findings of Fact, Section B, supra.

174

I.     **The Amount of Proposed Payments And the Amount of Any Surplus of Ms. Aquino's Income After Paying Expenses**

In analyzing this factor, the Court is mindful of the Ninth Circuit's admonition that consideration of Ms. Aquino's disposable income under Section 1325(b), discussed in detail above, "has no role in the good faith analysis" under Section 1325(a)(3). Welsh, 711 F.3d at 1132-33. The proper focus is instead on Ms. Aquino's "motivation and forthrightness with the court in seeking relief" through confirmation of Plan #2. Id.

The totality of the circumstances here shows that after Ms. Aquino filed a bankruptcy petition that she herself acknowledged to be a presumptive abuse of chapter 7 of the Code under section 707(b)(2),[461] she converted her case to chapter 13 on the eve of the hearing on the resultant UST Dismissal Motion.[462] She then filed Plan #1, which proposed to pay general unsecured creditors nothing at all.[463] When Plan #1 met with resistance from Trustee, Ms. Aquino filed Plan #2, which increased the proposed five-year payout to unsecured creditors to $9,878.67 ($1,957.73 per year, or $164.65 per month).[464]

While proposing to pay her creditors $164.65 per month for 60 months under Plan #2, Ms. Aquino had increased her voluntary 401(k) retirement plan contributions from their prebankruptcy level of $612.90 per month[465] to a postconversion level of $1,509.50 per month - - an increase of $896.60 per month.[466] Over the 60 month term of Plan #2 then, Ms. Aquino proposed to contribute $90,570.00 to her own retirement plan - - an amount sufficient to fully pay all $90,105.55 in total timely filed general unsecured claims - - while paying the creditors

---

[461]ECF No. 21, p. 10 of 12, Part 3, line 40; ECF No. 21, p. 3 of 12 (box checked confirming that "There is a presumption of abuse.").

[462]See notes 147-151 and accompanying text, supra.

[463]ECF No. 37, p. 4 of 6.

[464]ECF No. 50, p. 4 of 6. The sum of $9,878.67 represents a 10.96% dividend to the holders of the $90,105.55 in total timely filed unsecured claims in Ms. Aquino's case.

[465]ECF No. 1, p. 37 of 55, Schedule J – Your Expenses, lines 5b and 5c; ECF No. 20, p. 2 of 4, lines 5b and 5c.

[466]ECF No. 36, p. 23 of 33, Schedule J – Your Expenses, lines 5b and 5c; ECF No. 46, p. 23 of 25, Schedule J – Your Expenses, Lines 5b and 5c.

holding those general unsecured claims just $9,878.67.[467]

The actual income and expense schedules included in Ms. Aquino's Amended Chapter 13 Schedules (as distinguished from her means test forms) show actual monthly net income of $144.68.[468]  Had she not increased her voluntary 401(k) retirement plan contributions from their prebankruptcy level of $612.90 per month to their postbankruptcy level of $1,509.50 per month, her actual monthly net income would have increased by $896.60 to $1,041.28 per month.  At an actual monthly net income level of $1,041.28, Ms. Aquino would have been able to pay the full $9,878.67 she proposed to pay to general unsecured creditors under Plan #2 in just over nine months of the sixty month plan term.

The Court concludes that when Ms. Aquino's proposed payments under Plan #2 are considered in light of the procedural history of this case, and the available surplus of her actual income after paying her expenses (as distinguished from her means test filings), it is apparent that her motivation was a straightforward one:  to utilize the bankruptcy process to more than double her own retirement savings[469] while avoiding repayment of approximately 90% of the $90,105.55 in total claims timely filed by her general unsecured creditors.[470]  This factor **weighs heavily against** a finding that Plan #2 was proposed in good faith as required under Section 1325(a)(3).  But it is just one factor, it is not outcome determinative, and it does not eliminate the need to work through the entire good faith under the totality of the circumstances calculus.

## II.    Ms. Aquino's Employment History, Ability to Earn, And Likelihood of Future Increases In Income

The Chapter 7 Schedules, filed with the Court under oath, show Ms. Aquino had worked for her current employer for approximately 15 months when her bankruptcy petition was filed.[471] The statement of financial affairs encompassed within her Chapter 7 Schedules shows that in

---

[467]ECF No. 50, p. 4 of 6, Section 5.4.

[468]ECF No. 46, p. 25 of 25, line 23(c).

[469]The scheduled value of Ms. Aquino's 401(k) plan is $84,000.00.  Monthly contributions of $1,509.50 over 60 months total $90,570.00.

[470]See note 243 and accompanying text, supra.

[471]ECF No. 1, p. 36 of 55, Part 1, line 1; see also ECF No. 20, p. 1 of 4, Part 1, line 1; ECF No. 36, p. 22 of 33, Part 1, line 1; ECF No. 46, p. 22 of 25, Part 1, line 1.

each of calendar years 2017 and 2018, she had earned wage income totaling $65,000.00, and had earned wage income totaling $12,000.00 in 2019 prior to the April 30, 2019 petition date.[472]  The statement of financial affairs she filed after opting to convert to chapter 13 shows that she had actually earned $91,512.00 in wages during calendar year 2017; $81,025.00 in wages during calendar year 2018; and had earned wages of $25,127.42 in calendar year 2019 as of the April 30, 2019 petition date.[473]  The understatement of income evident from a comparison of those filings totals $55,664.42.  Still, that wage earning history, combined with the fact that her 401(k) held $84,000.00 when her bankruptcy petition was filed,[474] suggests long term income stability, and sufficient income to generate savings from that income.

While the record shows Ms. Aquino has a demonstrated capacity to earn money above her base wage by accepting overtime assignments, the Chapter 13 Schedules and Chapter 13 Amended Schedules reveal that she does not intend to take advantage of such opportunities during the pendency of her chapter 13 case.  More particularly, in Schedule I – Your Income included within the Chapter 13 Schedules and Chapter 13 Amended Schedules, Ms. Aquino stated quite plainly that she expected to reduce her income during the pendency of her chapter 13 case as she "will no longer accept overtime assignments as readily as she has in the past."[475]

To summarize, the Court has considered the record evidence regarding Ms. Aquino's employment history, ability to earn, and likelihood of future increases in income in light of all of the circumstances present in her case.  The preponderance of that evidence shows that she has the ability to steadily generate sufficient income to make significant payments to her general unsecured creditors, but little desire to make such payments through a sixty month chapter 13 plan.  This factor **weighs significantly against** a finding that Plan #2 was proposed in good faith as required under Section 1325(a)(3).  But it is just one factor, it is not outcome determinative, and it does not eliminate the need to work through the entire good faith under the totality of the

---

[472]ECF No. 1, pp. 41-42 of 55, Part 2, Question 4.

[473]ECF No. 36, pp. 26-27 of 33, Part 2, Question 4.

[474]ECF No. 1, p. 16 of 55, Part 4, Question 21; ECF No. 46, p. 3 of 25, Part 4, Question 21.

[475]ECF No. 36, p. 23 of 33, Part 2, Question 13; ECF 46, p. 23 of 25, Part 2, Question 13.

circumstances calculus.

### III.     The Probable Or Expected Duration of Plan #2

The probable or expected duration of Plan #2 is sixty months.[476]  As discussed above, over the 60 month term of Plan #2, Ms. Aquino proposes to voluntarily contribute $90,570.00 to her own retirement plan - - an amount sufficient to pay all $90,105.55 in total timely filed general unsecured claims - - while paying the creditors holding those general unsecured claims just $9,878.67.  This factor also **weighs significantly against** a finding that Plan #2 was proposed in good faith as required under Section 1325(a)(3).  But it is just one factor, it is not outcome determinative, and it does not eliminate the need to work through the entire good faith under the totality of the circumstances calculus.

### IV.     The Accuracy of the Statements of the Debts, Expenses And Percentage of Repayment of Unsecured Debt in Plan #2, and Whether Any Inaccuracies Are An Attempt to Mislead the Court

Plan #2 accurately addresses the debts, expenses, and the amount (not the percentage of repayment) of unsecured debt to be repaid through that plan.[477] This factor is either neutral in the calculus, or **weighs slightly in favor** of a finding that Plan #2 was proposed in good faith as required under Section 1325(a)(3).  But it is just one factor, it is not outcome determinative, and it does not eliminate the need to work through the entire good faith under the totality of the circumstances calculus.

### V.     The Extent of Any Preferential Treatment Between Classes of Creditors Under Plan #2

During the 60-month term of Plan #2, Ms. Aquino would make a total of $90,570.00 in voluntary contributions to her retirement plans.  Her administrative expenses and the debt secured by her 2019 Toyota CHR would be paid in full.  But her general unsecured creditors, holding $90,105.55 in timely filed claims, would receive their pro rata share of a total dividend

---

[476]ECF 50, p. 1 of 6, Sections 2.2 and 2.5.
[477]See generally ECF No. 50.

of $9,787.67 paid out over 5 years, a sum that pencils out to less than $2,000.00 per year.[478]

Stated another way, under Plan #2, the classes comprised of administrative expenses are paid in full; Ms. Aquino will retain her car because the class comprised of the related secured claim will be paid in full; Ms. Aquino's $90,570.00 in voluntary postpetition contributions to her 401(k) plan during the 60 month term of Plan #2 would more than double the $84,000.00 on deposit in that plan as of the filing date of her bankruptcy petition; but the class of general unsecured creditors, who hold $90,105.55 in total timely filed general unsecured claims, would be paid their pro rata share of just $9,787.67 over 5 years, sharing less than $2,000.00 per year among them.

This factor also **weighs significantly against** a finding that Plan #2 was proposed in good faith as required under Section 1325(a)(3). But it is just one factor, it is not outcome determinative, and it does not eliminate the need to work through the entire good faith under the totality of the circumstances calculus.

## VI.    The Extent to Which Secured Claims Are Modified Under Plan #2

The only class of secured debt provided for under Plan #2 is a $24,104.37 debt secured by her 2019 Toyota CHR.[479] To the extent that Plan #2 modifies that claim, no creditor or party in interest, including Trustee, has objected to the treatment of that claim under Plan #2. This factor is either neutral in the calculus, or **weighs slightly in favor** of a finding that Plan #2 was proposed in good faith as required under Section 1325(a)(3). But it is just one factor, it is not outcome determinative, and it does not eliminate the need to work through the entire good faith under the totality of the circumstances calculus.

## VII.    The Type of Debt Sought to Be Discharged Through Plan #2, And Whether Any Such Debt Is Nondischargeable in Chapter 7

As all administrative and secured claims are paid in full through Plan #2, the only debt

---

[478]ECF No. 50, p. 4 of 6, Section 5.4.
[479]ECF No. 50, p. 3 of 6, Section 4.4.

subject to discharge in Ms. Aquino's chapter 13 case is the $90,105.55 in total timely filed general unsecured claims. That debt is comprised primarily of consumer debt.[480] There is no evidence in the record, nor any pending adversary proceeding, that would suggest that any or all of Ms. Aquino's unsecured debt would be nondischargeable in a chapter 7 proceeding.

It is also true, however, that when Ms. Aquino attempted to obtain chapter 7 relief, the UST identified her case as an abuse of chapter 7 of the Code, filed the UST Dismissal Motion, and Ms. Aquino opted to convert the case to chapter 13.[481] Ultimately, the Court concludes that this factor is either neutral in the calculus, or **weighs slightly against** a finding that Plan #2 was proposed in good faith as required under Section 1325(a)(3). But it is just one factor, it is not outcome determinative, and it does not eliminate the need to work through the entire good faith under the totality of the circumstances calculus.

## VIII. The Existence of Special Circumstances, Such As Inordinate Medical Expenses, In Ms. Aquino's Bankruptcy Case

Neither Ms. Aquino, Trustee, nor any of Ms. Aquino's filings with the Court suggest that any such special circumstances exist in this case, and the Court is unaware of any. The Court concludes that this factor is either inapplicable to, or neutral in, the analytical calculus in deciding whether Plan #2 was proposed in good faith as required under Section 1325(a)(3). But it is just one factor, it is not outcome determinative, and it does not eliminate the need to work through the entire good faith under the totality of the circumstances calculus.

## IX. The Frequency With Which Ms. Aquino Has Sought Bankruptcy Relief

The record does not reflect any prior bankruptcy filings by Ms. Aquino. The record does reflect, though, that she originally sought bankruptcy relief under chapter 7 of the Bankruptcy Code, and when faced with an imminent hearing on the UST Dismissal Motion, converted the case to Chapter 13. This factor is either inapplicable to, or neutral in, the analytical calculus in

---

[480] See ECF No. 1, pp. 22-33 of 55; ECF No. 36, pp. 8-19 of 33; ECF No. 46, pp. 8-19 of 25.

[481] See ECF No. 25, 26, 30, and 31.

deciding whether Plan #2 was proposed in good faith as required under Section 1325(a)(3).  But it is just one factor, it is not outcome determinative, and it does not eliminate the need to work through the entire good faith under the totality of the circumstances calculus.

## X.    The Motivation And Sincerity of Ms. Aquino in Seeking Chapter 13 Relief

As noted previously, Ms. Aquino did not originally seek bankruptcy relief under chapter 13.  She is an above-median income earning debtor who initially sought bankruptcy relief under chapter 7 of the Code.  By electing to file a chapter 7 petition, Ms. Aquino was seeking to obtain a bankruptcy discharge without paying her unsecured creditors from her future earnings at all.  It was only after Ms. Aquino's case was caught in the filter of the chapter 7 means test, and her case was on the cusp of dismissal pursuant to the UST Dismissal Motion and UST Declaration that she converted her case to chapter 13.[482]

After conversion of her case to chapter 13, Ms. Aquino continued on her quest to avoid paying her unsecured creditors anything in her bankruptcy case.  Plan #1 proposed to pay unsecured creditors absolutely nothing,[483] while Ms. Aquino would make voluntary $1,509.50 monthly payments to her own 401(k) retirement plan.[484]  Over a 60 month plan term, the total amount of those voluntary $1,509.50 payments ($90,570.00) would exceed the total amount of all timely filed unsecured claims in her case ($90,105.55).  Prebankruptcy monthly contributions to Ms. Aquino's retirement plan were $612.90;[485] hence she had purportedly increased those voluntary monthly contributions by $896.60 after converting her case to Chapter 13.[486]

Having drawn an objection from Trustee regarding confirmation of Plan #1 because it did not contribute all of her disposable income to repayment of unsecured creditor claims, Ms.

---

[482]ECF No. 25, 26, 30, and 31.

[483]ECF No. 50, p. 4 of 6, Section 5.4.

[484]See ECF No. 36, p. 23 of 33, Part 2, line 5c; ECF No. 46, p. 23 of 25, Part 2, line 5c; see also note 38, supra.

[485]ECF No. 1, p. 37 of 55, Part 2, lines 5b and 5c; ECF No. 20, p. 2 of 4, Part 2, lines 5b and 5c.

[486]ECF No. 36, p. 23 of 33, Part 2, line 5c; ECF No. 46, p. 23 of 25, Part 2, line 5c.

Aquino filed Plan #2,[487] leaving the voluntary $1,509.50[488] monthly contributions to her own 401(k) retirement plan in place.[489]  During the 60-month term of Plan #2, all administrative expenses and the debt secured by Ms. Aquino's 2019 Toyota CHR would be paid in full, but unsecured creditors holding claims totaling $90,105.55 would be paid their pro rata share of just $9,787.67 over 5 years, sharing in less than $2,000.00 per year.[490]  Meanwhile, Ms. Aquino would "no longer accept overtime assignments as readily as she [had] in the past,"[491] and would make a total of $90,600.00 in voluntary contributions to her own 401(k) retirement plan.  When Trustee objected to confirmation of Plan #2 because, like Plan #1, it did not contribute all of Ms. Aquino's disposable income to repayment of unsecured creditor claims, Ms. Aquino for the first time suggested that Section 541(b)(7) and its "hanging paragraph" lent legitimacy to Plan #2 and her contemplated $1,509.50 voluntary monthly 401(k) plan contributions.[492]

        The Court concludes that the preponderance of the evidence is that Ms. Aquino, a debtor whose income is substantially above the applicable state median, was motivated to file a chapter 7 bankruptcy in an attempt to avoid paying her general unsecured creditors anything at all from her future earnings.  Her motivation to avoid paying her creditors in bankruptcy despite her ability to do just that was on full display after she converted her case to chapter 13 for all of the reasons discussed above.

        As to the question of Ms. Aquino's sincerity in seeking chapter 13 relief, the preponderance of the evidence shows that her case pends under chapter 13 only because she wanted to avoid dismissal of her case under Section 707(b) as a consequence of the UST Dismissal Motion.  What Ms. Aquino's filings with this Court throughout this case show is that during the 60 month term of her Chapter 13 plan, she sincerely wants to double the $84,000.00 on deposit in her 401(k) retirement savings on the date of filing and receive a bankruptcy

---

[487]ECF No. 50.
[488]See note 38, supra.
[489]ECF No. 36, p. 23 of 33, Part 2, line 5c; ECF No. 46, p. 23 of 25, Part 2, line 5c; see also ECF No. 39, p. 7 of 8, Part 2, line 41; ECF No. 44, p. 7 of 8, Part 2, line 41.
[490]See generally ECF No. 50.
[491]ECF No. 36, p. 23 of 33, Part 2, line 13; ECF No. 46, p. 23 of 25, Part 2, line 13.
[492]ECF No. 66.

discharge without paying her general unsecured creditors anything more than a token sum.

This factor **weighs significantly against** a finding that Plan #2 was proposed in good faith as required under Section 1325(a)(3).  But it is just one factor, it is not outcome determinative, and it does not eliminate the need to work through the entire good faith under the totality of the circumstances calculus.

## XI.    The Burden Which the Plan's Administration Would Place Upon the Trustee

If it were confirmed, the preponderance of the evidence does not indicate that administration of Plan #2 would place any sort of unusual burden on Trustee.  It is equally true, though, that Trustee has had to devote significant time to the analysis and opposition of both of Ms. Aquino's proposed plans in this case, largely because Ms. Aquino has steadfastly held to her desire to double the amount of her 401(k) retirement savings and receive a discharge in her bankruptcy case without paying her general unsecured creditors anything more than a token sum.

## XII.    Whether Ms. Aquino Misrepresented Facts in Plan #2, Unfairly Manipulated the Bankruptcy Code, Or Otherwise Filed Plan #2 In An Inequitable Manner

The preponderance of the evidence does not establish that Ms. Aquino misrepresented facts within the four corners of Plan #2.  It does, however, establish that in this case, Ms. Aquino has been engaged in an ongoing effort to unfairly manipulate the Code, and that she did propose Plan #2 in an inequitable manner.

Ms. Aquino's efforts to unfairly manipulate the Bankruptcy Code began immediately upon the filing of her Chapter 7 petition.  In her Chapter 7 Schedules, she claimed that she made $612.90 in monthly *mandatory* contributions to her 401(k) retirement  plan, and no *voluntary* contributions to her 401(k) retirement plan at all.[493]  She also reported monthly net income of $751.93.[494]  The Chapter 7 Schedules also reflected that she did not expect an increase or decrease in either her income or expenses in the following year.[495]

---

[493]ECF No. 1, p. 37 of 55, Part 2, lines 5(b) and (c).
[494]ECF No. 1, p. 39 of 55, Part 2, line 23c.
[495]ECF No. 1, p. 37 of 55, Part 2, line 13; ECF No. 1, p. 39 of 55, Part 2, line 24.

Ms. Aquino's efforts to unfairly manipulate the Bankruptcy Code continued with the Chapter 7 means testing process generally, and more specifically, with the filing of her Chapter 7 CMI Form.[496]  On the Chapter 7 CMI Form, she calculated her current monthly income to be $6,810.00, and multiplied that amount by 12 to reach an annual income figure of $81,270.00.[497] She claimed a household of 4 persons - - instead of the accurate 3 person household size - - in determining the applicable Nevada median family income for means testing purposes.[498]  Having overstated the size of her household at 4 persons instead of 3, Ms. Aquino reported that the Nevada median family income figure applicable in the means testing process was $84,997.00.[499] Since the Nevada median family income figure for a 4 person household exceeded Ms. Aquino's reported annual income figure of $81,270.00 by $3,727.00, she reported that the presumption of abuse did not arise in her case.[500]  Had Ms. Aquino correctly reported that she lived in a 3 person household, the correct Nevada median family income figure would have been $69,239.00,[501]  a figure $12,031.00 less than her $81,270.00 in reported annual income, and the presumption that her bankruptcy case was a presumed abuse of chapter 7 of the Code would have arisen.  Simply put, the inaccuracies in Ms. Aquino's Chapter 7 CMI Form, filed with the Court under oath, allowed her to avoid self-reporting that her bankruptcy case was an abuse of chapter 7 of the Code.

Subsequently, Ms. Aquino amended her bankruptcy schedules related to monthly income and expenses.[502]  In Amended Chapter 7 Schedule I, she continued to claim that her $612.90 monthly 401(k) retirement plan contributions were *mandatory*, not voluntary.[503]  While the original Chapter 7 Schedules indicated that Ms. Aquino did not expect any changes to her

---

[496]ECF No. 4.
[497]ECF No. 4, p. 2 of 3, Part 2 lines 12a and 12b.
[498]ECF No. 4, p. 2 of 3, Part 2, line 13.
[499]Id.  The applicable Census Bureau Median Family Income by Family Size chart can be viewed here:
https://www.justice.gov/ust/eo/bapcpa/20190401/bci_data/median_income_table.htm
[500]ECF No. 4, p. 2 of 3, Part 2, Line 14a.
[501]See note 499, supra.
[502]ECF No. 20.
[503]ECF No. 20, p. 2 of 4, Part 2, lines 5b and 5c.

income or expenses in the next year, the information in Amended Chapter 7 Schedule I and Amended Chapter 7 Schedule J, filed just 3 months later, reflected that Ms. Aquino had negative monthly net income of <-$341.07> instead of the positive $751.93 sum shown in the original Chapter 7 Schedules.[504]  Ultimately, Ms. Aquino filed an Amended Chapter 7 CMI Form,[505] together with a fully completed Chapter 7 Means Test,[506] the latter of which flatly stated that "*There is a presumption of abuse*" related to her chapter 7 bankruptcy filing.[507]

After the Amended Chapter 7 Means Test was filed showing that Ms. Aquino's bankruptcy filing was a presumed abuse of chapter 7 of the Code, the UST took swift action. The litany of inaccuracies in Ms. Aquino's sworn bankruptcy filings prior to conversion to Chapter 13 is well captured in the UST Dismissal Motion, and the UST Declaration sworn out by Paralegal Specialist Anabel Abad-Santos and filed as evidentiary support.[508]

Faced with the prospect of dismissal, Ms. Aquino opted to convert her case to chapter 13 the evening before the scheduled hearing on the UST Dismissal Motion.[509]  Ms. Aquino's attorney didn't attend the hearing on the UST Dismissal Motion, leaving it to the UST to advise the Court about the status of her case.

After conversion to chapter 13, and now faced with the prospect of having to pay money to her creditors over time from future earnings, Ms. Aquino filed the Chapter 13 Schedules and Amended Chapter 13 Schedules.[510]  In Schedules I and J encompassed within the Chapter 13 Schedules and Amended Chapter 13 Schedules, Ms. Aquino **disclosed for the first time in the six months that her case had been pending** that she was making *voluntary* - - not *mandatory* - - monthly contributions to her 401(k) retirement plan, and that the amount of those monthly contributions was $1,509.50 instead of the $612.90 she had reported in the chapter 7 phase of her

---

[504]Compare ECF No. 1, p. 39 of 55, Part 2, line 23c with ECF No. 20, p. 4 of 4, Part 2, line 23c.
[505]ECF No. 21, pp. 1-2 of 12.
[506]ECF No. 21, pp. 3-12 of 12.
[507]ECF No. 21, p. 10 of 12, Part 3, line 40; emphasis in original.
[508]ECF No. 25 and 26.
[509]ECF No. 25, 26, 30, and 21.
[510]ECF No. 36 and 46.

case.[511]  The $1,509.50 amount represents an $896.60 increase in Ms. Aquino's total scheduled

monthly retirement plan contributions, and purportedly left her with just $114.68 in reported

monthly net income.[512]  While she reported that she was salting away $1,509.50 in voluntary

retirement savings each month, Plan #1 proposed to pay her general unsecured creditors ***nothing***

***at all***.[513]  Ms. Aquino also made it very plain that during her chapter 13 case, she would "no

longer accept overtime assignments as readily as she has in the past." [514] Ms. Aquino's post-

conversion Amended Chapter 13 CMI Form made no attempt to hide the fact that her current

monthly income of $8,840.00 annualized to $106,080.00, a figure $36,841.00 in excess of the

applicable Nevada median income level for a three person household of $69,239.00.[515]

Faced with Trustee's opposition to confirmation of her Plan #1, Ms. Aquino filed Plan

#2.[516]  While Plan #2 proposes to pay unsecured creditors $9,878.67 over a sixty month

period,[517] it relies heavily on anticipated federal tax refunds to do so.[518]  Under Plan #1, those

same tax refunds were to be turned over to Trustee for payment to creditors,[519] but were

purportedly insufficient to generate ***any*** dividend to general unsecured creditors.[520]  Plan #2 also

requires unsecured creditors to accept pennies on the dollar while Ms. Aquino makes voluntary

401(k) retirement plan contributions in an amount that would pay all of those unsecured claims

in full.  Last, but not least, Ms. Aquino suggests that Section 541(b)(7) makes all of those things

acceptable in bankruptcy proceedings under chapter 13.

This Court disagrees.

This factor **weighs heavily against** a finding that Plan #2 was proposed in good faith as

---

[511]Compare ECF No. 1, p. 37 of 55, Part 2, lines 5b and 5c, and ECF No. 20, p. 2 of 4, Part 2, lines 5b and 5c, with ECF No. 36, p. 23 of 33, Part 2, lines 5b and 5c, and ECF No. 46, p. 23 of 25, Part 2, lines 5b and 5c.

[512]ECF No. 36, p. 25 of 33, Part 2, line 23c; ECF No. 46, p. 25 of 25, Part 2, line 23c.

[513]ECF No. 37, p. 4 of 6, Section 5.4.

[514]ECF No. 36, p. 23 of 33, Part 2, line 13; ECF No. 46, p. 23 of 25, Part 2, line 13.

[515]ECF No. 45, p. 3 of 3, line 20.

[516]ECF No. 50.

[517]ECF No. 50, p. 4 of 6, Section 5.4.

[518]ECF No. 50, pp. 1-2 of 6, Section 2.6.

[519]ECF No. 37, p. 2 of 6, Section 2.8.

[520]ECF No. 37, p. 4 of 6, Section 5.4

required under Section 1325(a)(3). But it is just one factor, it is not outcome determinative, and it does not eliminate the need to work through the entire good faith under the totality of the circumstances calculus.

## XIII.    Ms. Aquino's History of Filings And Dismissals

The record does not reflect any prior bankruptcy filings by Ms. Aquino. The record does reflect, though, that she originally sought bankruptcy relief under chapter 7 of the Code, and when faced with the UST Dismissal Motion, converted her case to Chapter 13 just hours before the related hearing.[521] This factor is either inapplicable to, or neutral in, the analytical calculus in deciding whether Plan #2 was proposed in good faith as required under Section 1325(a)(3). But it is just one factor, it is not outcome determinative, and it does not eliminate the need to work through the entire good faith under the totality of the circumstances calculus.

## XIV.    Whether Ms. Aquino Only Intended to Defeat State Court Litigation

The record does not reflect that Ms. Aquino was involved in any state court litigation when her bankruptcy petition was filed. This factor is either inapplicable to, or neutral in, the analytical calculus in deciding whether Plan #2 was proposed in good faith as required under Section 1325(a)(3). But it is just one factor, it is not outcome determinative, and it does not eliminate the need to work through the entire good faith under the totality of the circumstances calculus.

## XV.    Whether Egregious Behavior Is Present in Ms. Aquino's Case

The Court concludes that the preponderance of the evidence establishes that Ms. Aquino's course of conduct in prosecuting this case does constitute egregious behavior. She originally filed a chapter 7 case that was presumptively abusive. In her initial Chapter 7 CMI Form, she overstated her household size, which allowed her to initially evade the full means

---

[521]ECF No. 25, 26, 30, 31.

test.[522]  After later filing an Amended Chapter 7 CMI Form[523] and full Chapter 7 Means Test[524]

in which she self-reported that her bankruptcy filing was an abuse of chapter 7 of the Code,[525]

she converted her case to chapter 13 on the literal eve of the hearing on the UST's Dismissal

Motion.[526]  After conversion to chapter 13, she filed Chapter 13 Schedules and Amended

Chapter 13 Schedules recharacterizing her monthly retirement plan contributions from

mandatory to voluntary in nature.[527]  She also more than doubled the amount of her total monthly

retirement plan contributions after her case was converted to a chapter 13 proceeding where

payments to creditors over time would be necessary.[528]  After conversion, she made plain her

intention to limit her income during the pendency of her chapter 13 case, thus limiting the

amount of post-conversion income available for distribution to her general unsecured

creditors.[529]  Her first proposed chapter 13 plan (Plan #1) provided that general unsecured

creditors holding a total of $90,105.55 in timely filed claims would receive nothing.[530]  Faced

with Trustee's opposition to Plan #1,[531] she filed Plan #2.[532]  Under Plan #2, administrative

expenses and the debt secured by her 2019 Toyota CHR would be paid in full, but unsecured

creditors would only be paid their pro rata share of $9,787.67 over 5 years; sharing in less than

$2,000.00 per year.[533]  Meanwhile, during the 60-month term of Plan #2, Ms. Aquino would

---

[522]ECF No. 4, p. 2 of 3, Part 2, lines 12-14.

[523]ECF No. 21, pp. 1-2 of 12.

[524]ECF No. 21, pp. 3-12 of 12.

[525]ECF No. 21, p. 10 of 12, Part 3, Line 40; ECF No. 21, p. 3 of 12.

[526]ECF No. 25, 26, 30, 31.

[527] Compare ECF No. 1, p. 37 of 55, Part 2, lines 5b and 5c, and ECF No. 20, p. 2 of 4, Part 2, lines 5b and 5c, with ECF No. 36, p. 23 of 33, Part 2, lines 5b and 5c, and ECF No. 46, p. 23 of 25, Part 2, lines 5b and 5c.

[528]Id.  In the chapter 7 phase of her case, Ms. Aquino reported total monthly retirement plan contributions of $612.90.  Immediately after conversion to chapter 13, Ms. Aquino reported total monthly retirement plan contributions of $1,509.50.  That is a 146% increase in her scheduled total monthly retirement plan contributions.

[529]ECF No. 36, p. 23 of 33, Part 2, line 13; ECF No. 46, p. 23 of 25, Part 2, line 13.

[530]ECF No. 37, p. 4 of 6, Section 5.4.

[531]ECF No. 48.

[532]ECF No. 50.

[533]See generally ECF No. 50.

make a total of $90,600.00 in voluntary contributions to her 401(k) retirement plan.[534]  Those

voluntary retirement plan contributions alone would be enough to pay 100% of the $90,105.55 in

timely claims filed in her case, and would more than double the $84,000.00 balance held in her

401(k) plan on the petition date.

This factor also **weighs significantly against** a finding that Plan #2 was proposed in good

faith as required under Section 1325(a)(3).  But it is just one factor, and it is not outcome

determinative.

> **c.    Because the Totality of the Circumstances In Ms. Aquino's**
> **Bankruptcy Case Demonstrate That She Did Not Propose Plan**
> **#2 In Good Faith As Required Under Section 1325(a)(3),**
> **Confirmation of Plan #2 is Denied**

In TSOP #2, Trustee objected to confirmation of Plan #2 for failure to comply with the

good faith requirement of Section 1325(a)(3).[535]  Even if that were not the case, the Ninth Circuit

Court of Appeals has plainly stated that this court has an independent duty to determine whether

Plan # 2 complies with the Code, including without limitation the good faith requirement under

Section 1325(a) that is a predicate to plan confirmation. In re Sisk, 962 F.3d 1133, 1151 (9th Cir.

2020).

In discharging that duty, and in resolving Trustee's objection to confirmation of Plan #2

for lack of good faith under Section 1325(a), the Court has conducted the requisite case-specific,

fact-intensive examination of the 'totality of the circumstances' present in Ms. Aquino's case.

Sisk, 962 F.3d at 1150.  It has done so aided by the non-talismanic list of factors for

consideration developed by the courts to assist in the good faith determination, with no single

fact or factor controlling its calculus.  Meyer v. Lepe (In re Lepe), 470 B.R. 851, 856-57 (9th

Cir. BAP 2012).  The Court is likewise mindful that "[f]undamentally, the good faith inquiry

assesses 'whether the debtor has misrepresented facts in his plan, unfairly manipulated the

Bankruptcy Code, or otherwise proposed his Chapter 13 plan in an inequitable manner.'"  Sisk,

---

[534]ECF No. 36, p. 23 of 33, Part 2, line 5c; ECF No. 46, p.23 of 25, Part 2, line 5c.
[535]ECF No. 65, p. 2 of 3, lines 1-2.

962 F.3d at 1150.  The facts of Ms. Aquino's case satisfy that standard.

As noted previously, "[w]hen seeking confirmation of a plan, the debtor, as plan proponent, has the burden of proof on the issues of whether both the case and the plan were filed in good faith. § 1325(a)(3), (7)."  In re Ellsworth, 455 B.R. 904, 918 (9th Cir. BAP 2011). On the record before it in this case, the Court concludes that the preponderance of the evidence establishes that while Ms. Aquino did not misrepresent facts in Plan #2, she certainly did engage in a consistent pattern of conduct throughout the pendency of this case to unfairly manipulate the Code, and ultimately did propose Plan #2 in an inequitable manner.  Because Ms. Aquino failed to carry her burden of proving by a preponderance of the evidence that Plan #2 was filed in good faith, a prerequisite to confirmation under Section 1325(a)(3), Trustee's objection to confirmation of Plan #2 must be sustained, and confirmation of Plan #2 will be denied.

### ORDER

Based upon the record before the Court, the findings of fact detailed herein, the legal authorities cited above, and the conclusions of law set forth in this Memorandum and Order:

**IT IS ORDERED, ADJUDGED AND DECREED** that because Trustee failed to carry the burden of proving by a preponderance of the evidence that cause exists under Section 1307(c) to convert or dismiss Ms. Aquino's case, Trustee's Dismissal Motion [ECF No. 60] is **DENIED.**

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that Trustee did meet the burden of proving by a preponderance of the evidence that Plan #2 fails to "provide that all of [Ms. Aquino's] projected disposable income to be received in the [60 month] applicable commitment period [. . . . .] will be applied to make payments to unsecured creditors under the plan" as required by Section 1325(b)(1)(B).  As the party with most access to proof on the point, Ms. Aquino then failed to satisfy her burden of proving by a preponderance of the evidence that Trustee's opposition to confirmation under Section 1325(b)(1)(B) lacks merit.  Because Ms. Aquino failed to satisfy that burden, the Court "may not approve" Plan #2 by operation of Section 1325(b)(1)(B).  Trustee's objection to confirmation of Plan #2 under Section 1325(b)(1)(B) is therefore **SUSTAINED,** and confirmation of Plan #2 is **DENIED.**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that because Ms. Aquino failed to carry the burden of proving by a preponderance of the evidence that Plan #2 was filed in good faith, Trustee's objection to confirmation Plan #2 under Section 1325(a)(3) is **SUSTAINED,** and confirmation of Plan #2 is **DENIED.**

**IT IS SO ORDERED.**

Copies sent to all parties via CM/ECF Electronic Filing.

# # #